**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

STEPHANIE COX,

Plaintiff,

v.

VGW HOLDINGS PTY LIMITED, VGW HOLDINGS LIMITED, VGW MALTA LIMITED, VGW LUCKYLAND, INC., VGW GP LIMITED, VGW HOLDINGS, US, INC., and VGW US, INC.

Defendants.

Case No. 3:26-cv-00363

**SECOND AMENDED COMPLAINT**
**(CLASS ACTION)**

Plaintiff STEPHANIE COX, a Connecticut citizen and resident of New Haven County who resides at 182 Clifton Avenue, 1st Floor, New Haven Connecticut 06513, Connecticut, brings this action and sues Defendants VGW HOLDINGS PTY LTD and VGW HOLDINGS LIMITED, that have an address of L 11, Australia Place, 15-17 William Street Perth, Western Australia 6000 Australia, including their subsidiaries VGW MALTA LIMITED, with an address of 5-7 Matilda Court, Giuseppe Cali Street, Ta'Xbiex, XBX 1423 Malta, VGW LUCKYLAND INC., a Delaware Corporation with an address Care of Paracorp Incorporated, 2140 S. DuPont Hwy., Camden Delaware 19934, VGW GP LIMITED, that has an address of Trident Park, Notabile Gardens No6, Level 3 Central Business District, Mdina Road, Zone 2, BIRKIRKARA, Malta VGW HOLDINGS US INC. with an address Care of Paracorp Incorporated, 2140 S.

DuPont Hwy., Camden Delaware 19934, VGW US INC. with an address of Care of Paracorp Incorporated, 2140 S. DuPont Hwy., Camden Delaware 19934.

**PARTIES JURISDICTION AND VENUE**

1. This court has jurisdiction over the subject matter of this action because it is a court of general jurisdiction and the damages sought by Plaintiff and on behalf of a group of Connecticut citizens (hereafter referred to as the "Class") exceed the jurisdictional threshold for the Connecticut courts.

2. VGW HOLDINGS PTY LTD is the parent company of all VGW operations and was formerly known as VGW HOLDINGS LIMITED.

3. VGW HOLDINGS PTY LTD in conjunction with and through VGW HOLDINGS LIMITED, Australian companies – according to their audited financial statements filed with the Australian Securities & Investments Commission for many years – fully control and operate their subsidiary companies, VGW MALTA LIMITED, VGW GP LIMITED, VGW LUCKYLAND INC., VGW HOLDINGS US INC., and VGW US INC. VGW HOLDINGS PTY LTD and VGW HOLDINGS LIMITED still operate an internet website "vgwplay.com" that links to their subsidiary companies' internet casino gambling operations. VGW HOLDINGS PTY LTD and VGW HOLDINGS LIMITED along with their subsidiary companies, actively operate and market illegal internet gambling websites within the United States, the state of Connecticut and New Haven County, which websites and operations were and still are unpermitted and illegal under United States law and Connecticut law. 31 U.S.C. § 5361, *et seq.;* Conn. Gen. Stat. 53-278a, 53-278b; *See* Exhibit "A" (Cease and Desist Letter of February 29, 2024, from the Connecticut Department of Consumer Protection).

4. VGW MALTA LIMITED is a company formed in the Island of Malta. VGW MALTA LIMITED purposefully marketed to citizens of the state of Connecticut and purposefully conducted business throughout New Haven County and the state of Connecticut and has likewise committed numerous torts in the state of Connecticut by violating Connecticut law prohibiting unlicensed internet gambling.

5. VGW GP LIMITED is a company formed in the Island of Malta. VGW GP LIMITED purposefully marketed to citizens of the state of Connecticut and purposefully conducted business throughout New Haven County and the state of Connecticut and has likewise committed numerous torts in the state of Connecticut by violating Connecticut law prohibiting unlicensed internet gambling.

6. VGW LUCKYLAND INC. is a Delaware corporation. VGW LUCKYLAND INC. maintains an office in San Francisco California. VGW LUCKYLAND INC. purposefully marketed to citizens of the state of Connecticut and purposefully conducted business throughout New Haven County and the state of Connecticut and has likewise committed numerous torts in the state of Connecticut by violating Connecticut law prohibiting unlicensed internet gambling.

7. This court has personal jurisdiction over VGW HOLDINGS PTY LTD and VGW HOLDINGS LIMITED including their subsidiaries VGW MALTA LIMITED, VGW GP LIMITED, VGW LUCKYLAND INC., VGW HOLDINGS US INC., and VGW US INC. pursuant to Conn. Gen. Stat. § 52-59b because these defendants purposefully continually solicited and conducted business within the boundaries of the state of Connecticut, attempted to contract to supply goods and services into Connecticut, derived substantial revenue from such actions, and have tortiously injured Plaintiff and other Connecticut citizens by wrongly taking their money through illegal gambling operations that took place in Connecticut.

8. VGW HOLDINGS PTY LTD and VGW HOLDINGS LIMITED the parent companies of VGW MALTA LIMITED, VGW GP LIMITED, VGW LUCKYLAND INC., VGW HOLDINGS US INC., and VGW US INC., actively control and actively operate these subsidiaries and exercise sufficient control over the subsidiaries to render VGW MALTA LIMITED, VGW GP LIMITED, VGW LUCKYLAND INC., VGW HOLDINGS US INC., and VGW US INC. as agents or alter egos of VGW HOLDINGS LIMITED and/or VGW HOLDINGS PTY LTD. Hereafter, VGW HOLDINGS PTY LTD and VGW HOLDINGS LIMITED are referred to as "VGW HOLDINGS". VGW MALTA LIMITED is referred to as "VGW MALTA", VGW GP LIMITED is referred to as "VGW GP" and VGW LUCKYLAND INC., is referred to as "VGW LUCKYLAND". Throughout this Amended Complaint (hereafter referred to as "the Complaint") when Plaintiff refers to VGW HOLDINGS, VGW MALTA, VGW GP, VGW LUCKYLAND, VGW HOLDINGS US INC., and VGW US INC., collectively, Plaintiff refers to these combined Defendants acting in concert as "VGW".

9. Venue is proper in New Haven County pursuant to Conn. Gen. Stat. § 51-345 and Connecticut law because Plaintiff resides in New Haven County, substantial acts or omissions giving rise to the claims asserted herein occurred in New Haven County, and because VGW purposefully committed acts in New Haven County that caused injury to Plaintiff and form the basis for this lawsuit.

10. VGW purposefully and actively promotes and operates internet gambling websites that targeted Plaintiff and other citizens of the state of Connecticut and conducted business within the state of Connecticut and New Haven County.

11. Plaintiff is a natural person and citizen of the state of Connecticut who resides in New Haven County, Connecticut at all times material to this Complaint.

12. On or about July 15, 2024, Plaintiff registered and entered into the unlicensed and illegal casino websites operated by VGW MALTA, VGW GP, and VGW LUCKYLAND, which are owned and controlled by VGW HOLDINGS. During that period Plaintiff lost approximately $300, playing the casino games of chance that are promoted and operated by VGW on these internet websites (approximately $100 on the illegal gambling website known as “Chumba Casino”; approximately $100 on the illegal gambling website known as “Global Poker” and $100 on the illegal gambling website known as “LuckyLand Slots”).

13. Plaintiff is authorized to bring this action because Plaintiff was damaged by the illegal gambling operations conducted by VGW, and because Plaintiff has not agreed to any form of arbitration or alternative dispute resolution. On July 15, 2024, in accordance with the Terms of Service / Terms and Conditions contained in VGW’s websites, Plaintiff timely “opted out” of any obligations to participate in arbitration or alternate dispute resolution, and VGW’s additional terms including “choice of law” and “forum selection clause”.

14. VGW did not respond to Plaintiff’s emails “opting out” of arbitration, choice of law provision, forum selection clause and class waiver, A copy of Plaintiff’s notice is attached as Exhibit “B” and incorporated as part of this Complaint by reference.

15. Plaintiff is also authorized to bring this action on behalf of herself and other similarly situated Connecticut citizens who have gambled on VGW’s websites (“the Class”).

16. VGW purposely avails itself of Connecticut’s laws by intentionally conducting illegal gambling operations within the state of Connecticut.

17. VGW actively promotes and operates internet gambling websites that target Plaintiff and other citizens of the state of Connecticut and the actions of VGW constitute purposefully conducting business within the state of Connecticut and New Haven County.

## FURTHER ALLEGATIONS SUPPORTING PERSONAL JURISDICTION OVER VGW

**Jurisdiction of United States Courts**

18. Defendants VGW LUCKYLAND, VGW HOLDINGS US INC., and VGW US INC. are Delaware Corporations. Therefore, VGW LUCKYLAND, VGW HOLDINGS US INC., and VGW US INC are subject to the jurisdiction of the courts in the United States.

19. Further, VGW LUCKYLAND has office operations in California.

20. VGW MALTA maintains its United States headquarters as a post office box in Portsmouth, New Hampshire and records show that it maintains an office in Boulder, Colorado at 1881 9th Street, Suite 202.

21. VGW GP maintains its United States headquarters as post office box 8486. Portsmouth, New Hampshire 03801.

22. Records further show that VGW US INC appears to maintain an office or operations at 1881 9th Street, Suite 202, Boulder Colorado.

23. All VGW games are required to be played within the boundaries of the United States.

24. All United States players of VGW games are required to make transfers or payments from charges on credit cards, debit cards, digital wallets, and gift cards from within the United States.

25. Whenever a United States citizen attempts to collect winnings of money from playing VGW's gambling games, all VGW games mandate that prizes, or money paid to players must be paid to a bank, digital wallet, or gift card within the United States.

26. All VGW's websites seek to invoke the privileges afforded to United States' companies, such as attempts to invoke arbitration under the Federal Arbitration Act.

27. VGW also affirmatively seeks the protections of United States law by attempting to place in its Terms of Service / Terms and Conditions (hereafter "Terms of Service") class waivers, forum selection clauses and choice of law provisions that are purposely tailored to attempt to comply with United States law.

28. Specifically, for many years, VGW declared in its Terms of Service that it believes Delaware law should be the accepted law within the United States. VGW has since changed this choice of law clause to specify that the laws of Ontario, Canada should govern all disputes with VGW. VGW made this change in an attempt to avoid the laws of the United States after receiving a cease-and-desist letter from the state of Delaware which stated that VGW's operations were illegal gambling operations. *See,* Exhibit "C" (Cease and Desist Letter from Delaware Department of Safety and Homeland Security, Delaware Division of Gaming Enforcement for the State of Delaware).

29. By its own actions, VGW has stipulated to personal jurisdiction in several cases within the United States, including but not limited to the state courts of Massachusetts, Kentucky, and federal district courts in Alabama, Kentucky, and Tennessee.

30. VGW has affirmatively alleged in a variety of lawsuits that it is protected under the federal Class Action Fairness Act by stating, under oath, that thousands of United States citizens have played its website gambling games including, but not limited to, United States citizens in the states of Connecticut, Alabama, Florida, Kentucky, Georgia, Massachusetts, and Tennessee.

31. As of this date VGW has affirmatively claimed in its Terms of Service and posted on its websites that its companies are operating legally within all states of the United States, except for Connecticut, Delaware, Michigan, Montana, Nevada, and Washington. Further, VGW

acknowledges that it is not authorized to conduct part of its gambling operations in the additional states of Idaho, Louisiana, Connecticut, New Jersey, New York, Tennessee, and West Virginia.

32. VGW likewise operates several United States shell companies, including but not limited to VGW US INC and VGW HOLDINGS US INC.

33. VGW advertises its websites extensively in the United States through various forms of mass communication while spending millions of dollars on advertising with several United States sports and entertainment celebrities as its spokespersons, including Olympic champion swimmer, Michael Phelps, and "American Idol" and daily, national television talk show host, Ryan Seacrest. Most recently, VGW has even advertised VGW Malta's "Chumba Casino" on the nationally broadcasted television show, "Wheel of Fortune", through advertisements by Ryan Seacrest, the host of "Wheel of Fortune". Further, it has been discovered that VGW has gone so far as to advertise its illegal gambling operations on the radio in states such as Alabama and Georgia. And VGW repeatedly advertises its illegal gambling websites in internet postings by newspapers in the United States.

34. VGW has likewise advertised on the internet for the services of United States citizens to become employees of VGW's subsidiary companies.

35. VGW's websites are highly interactive in all ways. They are used simultaneously for commercial transactions – in the form of depositing funds, wagering/gambling, and redeeming funds – and also for exchanging information with VGW's host computers and servers in the form of playing casino games. VGW's websites are built entirely upon high levels of interactivity and are not passive in any way in terms of contact with the United States and its citizens.

36. The federal and state courts of the Unted States apply the same test for determining when nonresidents, like VGW HOLDINGS and VGW MALTA have established minimum contacts

with the United States and individual states, subjecting them to jurisdiction. *Adams v. Aircraft Spruce & Specialty Co.,* 284 A.3d 600 (Conn. 2022); *See, Hardy v. Scandinavian Airlines Sys.*, 117 F.4th 252, 265 n.31 (5th Cir. 2024), *cert. denied,* 145 S.Ct. 1308, 221 L.Ed.2d 396 (2025).

37. VGW is subject to the jurisdiction of the United States courts and the Connecticut courts because VGW has (1) purposely directed its activities toward the United States and other states, including Connecticut; and purposely availed itself of the privileges of conducting activities in the United States and the states including Connecticut; (2) the Plaintiff's cause of action arises out of or results from VGW's contacts with the United States and other states, including Connecticut; and (3) the exercise of personal jurisdiction over VGW is fair and reasonable. *Adams v. Aircraft Spruce & Specialty Co.,* 284 A.3d 600, 610 (Conn. 2022).

38. Therefore, it is clear that VGW and all of its companies listed as defendants in this Complaint are subject to the personal jurisdiction of the courts of the United States.

**Additional Facts Establishing Personal Jurisdiction and Venue – State of Connecticut**

39. Under Connecticut law and the requirements of due process, at all times material to this cause of action VGW has additional extensive contacts with the state of Connecticut for purposes of the constitutional exercise of personal jurisdiction over VGW by the Connecticut courts.

40. VGW purposefully and actively promotes and operates highly interactive illegal internet gambling websites that targeted Plaintiff and other Connecticut citizens and the actions of VGW constitute conducting business within the state of Connecticut and New Haven County.

41. Plaintiff and other Connecticut citizens were frequently intentionally targeted by advertisements for VGW's websites on platforms such as X/Twitter and Facebook.

42. In fact, at all times material to this cause of action, VGW targeted advertising to, and negotiated with individual Connecticut citizens. If Plaintiff or other Connecticut citizens enter

internet searches for the words, “Chumba” “Global Poker” or “LuckyLand” on internet search engines and social media websites, the algorithms utilized by VGW through internet platforms such as Google, Facebook, Instagram, X/Twitter, and others, identified the Connecticut citizens and then broadcasts targeted internet advertisements for VGW directly back to Plaintiff and other similar Connecticut citizens. This is a form of specific retargeted advertising employed by VGW to intentionally advertise to, entice, and negotiate with Plaintiff and other Connecticut citizens. The purpose of VGW’s retargeted advertising is to entice Plaintiff and other Connecticut citizens to gamble on VGW’s websites.

43. The retargeted advertising was specific to Plaintiff and other Connecticut citizens because VGW took significant effort to ensure that it was targeting its advertising to citizens who VGW believed are citizens located only in those states where VGW wrongly claims it is entitled to operate.

44. Once Plaintiff and other Connecticut citizens decided to access VGW’s websites, VGW ensured that Plaintiff and other Connecticut citizens who gambled on the websites were doing so only within those state jurisdictions where VGW claimed it was operating legally.

45. At all times material to this cause of action, VGW has made sure to target its activities to Connecticut by doing what is recognized as “geographic ring fencing” or “geofencing”. Geographic ring fencing or geofencing is described as the process of creating virtual boundaries to control data or services based on physical location, using GPS, Wi-Fi or IP addresses to make sure that internet activities are taking place within the physical area designated by boundaries created by the internet provider or website. For example, prior to October 2024 if a Connecticut citizen attempted to gamble on VGW’s website while outside the United States or in a state where VGW acknowledged it was prohibited from operating, the Connecticut citizen would be

denied access to the VGW website because that Connecticut citizen was located outside the geofenced boundary area.

46. The geographic ringfencing or geofencing utilized by VGW, based on internet protocol addresses clearly illustrates that VGW purposefully availed itself of the laws of Connecticut by intentionally operating in Connecticut in a specific manner. As an example, the depictions below show messages that are now sent to Plaintiff and other Connecticut citizens who attempt to access VGW from Connecticut or a state where VGW acknowledges it is prohibited to operate.






47. At all times material to this cause of action, before VGW ceased operations in Connecticut in October 2024, VGW would send the above messages, but VGW did not include Connecticut as a state where it prohibited gambling on VGW's websites.

48. Previously, and at all times material to this cause of action, VGW would make sure that Plaintiff and other Connecticut citizens were gambling on VGW's websites within the boundaries of the state of Connecticut, and at all times material to this cause of action, VGW verified that the Plaintiff and other Connecticut citizens registered with internet protocol addresses that were geographically assigned to Connecticut.

49. Further, according to the VGW Terms of Service, at all times material to this cause of action, Plaintiff and other Connecticut citizens were required to prove that they were citizens of Connecticut by producing their drivers' licenses and verifying their Connecticut addresses.

50. VGW verified that Plaintiff and other Connecticut citizens were registering and playing in the state of Connecticut in multiple ways. VGW confirmed the internet protocol addresses of Plaintiff and other Connecticut citizens to ensure that they were the players or wagerers located in Connecticut. VGW required proof of address and identity from Plaintiff and other Connecticut citizens when verifying Plaintiff's and other Connecticut citizens' accounts on the VGW websites. VGW verified Plaintiff's and the other Connecticut citizens' bank accounts to process redemptions. VGW confirmed that the addresses registered to the bank accounts match the Plaintiff and other Connecticut citizens' addresses provided to VGW. And the bank accounts, which for all practical purposes, were most likely located in Connecticut were the only bank accounts VGW would accept for processing of payments or redemptions to Plaintiff and the other Connecticut citizens.

51. After Plaintiff and other Connecticut citizens confirmed for VGW that they were going to play VGW's games within the state of Connecticut or only those areas where VGW claimed it could legally operate, VGW continually monitored the internet protocol addresses of Plaintiff and other Connecticut citizens as they were playing VGW's games. This was to ensure that Plaintiff and other Connecticut citizens were gambling within the boundaries of Connecticut or in locations where VGW claimed it has not been formally prohibited.

52. Through these steps VGW was operating in the same manner that any brick-and-mortar casino on the ground in Connecticut would operate – to make sure that Plaintiff and other Connecticut citizens were gambling within Connecticut or in accordance with what VGW falsely claimed was permitted by Connecticut. The only differences are that VGW did not have a building located on the ground in Connecticut where Plaintiff and other Connecticut citizens could sit down to gamble and that VGW was operating illegally within Connecticut.

53. VGW's Terms of Service now state, "3.2 Gold Coin purchases made from within the states of Washington, Michigan, Montana, Connecticut, Nevada and Delaware in the United States of America will be voided and refunded." However, at all times material to this cause of action, for all practical purposes transfers and payments were made to and from bank accounts within the state of Connecticut. Plaintiff and the Connecticut citizens playing VGW's games made payments to gamble just as if they are standing at a casino cage or casino table within the physical boundaries of Connecticut.

54. Prior to the filing of this lawsuit, in nearly all circumstances, whenever Plaintiff and other Connecticut citizens attempted to collect winnings of money from gambling on VGW's casino games, all VGW games mandated that prizes, or money paid to Plaintiff and other Connecticut citizens must be paid to a bank associated with Plaintiff and other Connecticut citizens' address and identifying information. For all practical purposes this meant the vast majority of VGW's financial transactions with Plaintiff and other Connecticut citizens occurred within the geographical boundaries of the state of Connecticut. This is identical to Plaintiff and other Connecticut citizens physically going to a casino cage to purchase chips, place bets, and collect gambling winnings. The only difference is that the transactions were being done electronically over the internet.

55. In the past, at all times material to this cause of action the interactivity between VGW's websites and Connecticut citizens expanded from digital communications to the physical world as well. As a part of VGW's thinly veiled attempt to classify its illegal gambling operations as "sweepstakes" VGW offered Plaintiff and other Connecticut citizens the opportunity to send handwritten letters to VGW through the United States mail to request "Sweeps Coins". Plaintiff and other Connecticut citizens could use the Sweeps Coins to gamble on VGW's websites and

redeem for dollars or money. However, VGW required that all such letters be sent from a physical location in Connecticut through a United States post office located in Connecticut. Furthermore, if Plaintiff and other Connecticut citizens, who registered an account with VGW, sent letters from outside of Connecticut, the letters would have been automatically rejected by VGW. This equated to VGW giving Plaintiff and other Connecticut citizens "comped" bets or free wagers, the same as may be done as if Plaintiff and the other Connecticut citizens were present at a brick-and-mortar casino in Connecticut, but only if the act of sending letters takes place in Connecticut. VGW offered this additional method of acquiring Sweeps Coins to misrepresent that VGW offered sweepstakes (instead of gambling) and simultaneously to induce Plaintiff and other Connecticut citizens to also spend money to make wagers or bets. However, at all times material to this cause of action if someone from the blocked areas such as Washington, Idaho, Montana, or Michigan were to have sent these physical handwritten letters to VGW the letters would not be processed, and no Sweeps Coins would be issued. This is another example of VGW purposefully operating in the state of Connecticut, promoting use of the United States Postal Service from Connecticut and further expanding VGW's interactions with Plaintiff and other Connecticut citizens through the online world to the physical realm.

56. In addition, VGW would target Connecticut citizens and attempt to entice them into gambling on VGW's websites by sending gifts of credits for Sweeps Coins to Connecticut citizens through emails, and even physically delivering gifts, like small appliances or birthday cakes to Connecticut citizens' homes.

57. VGW also identified those Connecticut citizens that VGW considers to be high value customers and assigns personal VIP "hosts" to those Connecticut citizens. The VGW hosts frequently proactively contacted those Connecticut citizens and offered gifts, free wagers, and

more, all with the purpose of incentivizing those Connecticut citizens to continue wagering on VGW's illegal gambling websites.

*58.* VGW's illegal gambling websites are highly interactive websites that maintained continual contact with Plaintiff and other Connecticut citizens. When Plaintiff and other Connecticut citizens were allowed to play the casino games and gamble on VGW's websites, Plaintiff and other Connecticut citizens submitted wagers and payments of money from Connecticut through the internet to VGW's websites. In response VGW sent internet communications back into Connecticut to Plaintiff and other Connecticut citizens, in the form of video images of slot machines, scratch offs, and card tables like blackjack and baccarat. VGW sent animations of cards being dealt and slot machine wheels spinning that notified Plaintiff and other Connecticut citizens whether their wagers or bets had been successful. These communications also revealed whether Plaintiff and other Connecticut citizens lost money and must continue making bets to attempt to recoup their losses or win additional money. These continuous communications and wagering interactions back and forth between VGW and Plaintiff and other Connecticut citizens constituted millions of transactions conducted into and out of Connecticut. VGW's contacts with the United States and Connecticut are precisely the type of activity that establish the minimum contacts sufficient to assert personal jurisdiction over VGW in this case and satisfying the standards identified by the courts in these cases. *Nelson v. Myrtle Beach Collegiate Summer Baseball League, LLC,* No. 12-cv-1655, 2013 WL 6273890, at *4 n.5 (D. Conn. Dec. 4, 2013); *Lis v. Delvecchio, No. 3:11cv00157 (AWT),* 2012 WL 3309384 (D. Conn. Aug. 13, 2012)*; The Cousteau Society, Inc. v. Cousteau*, 498 F. Supp. 287 (D. Conn. 2020); (cases adopting the test espoused in *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119 (W.D. Pa. 1997); *See, Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158 (2d. Cir.

2010) (delivering a product into stream of commerce with the expectation it will be purchased by consumers in the forum state and interactive website).

59. VGW's contacts with Plaintiff and other Connecticut citizens meet or exceed the minimum contacts recognized by the state of Connecticut and the United States Court of Appeals for the Second Circuit for VGW to be subject to personal jurisdiction within the state of Connecticut, as has been found by the Connecticut courts and the Second Circuit.

60. On February 9, 2024, the Connecticut Department of Consumer Protection issued a cease-and-desist letter to VGW (Exhibit "A"). The letter stated that VGW's operations were criminal gambling and it ordered VGW to "…immediately cease and desist offering its games and services to Connecticut Customers. …", and informed VGW that it may be "…action including, but not limited to, civil penalties under CUTPA and/or criminal penalties under Conn. Gen. Stat. §§ 53-278b and 53-278d. …" (Exhibit "A").

61. The state of Connecticut has an important public policy interest in adjudicating this case due to the brazen constant illegality VGW has demonstrated and therefore jurisdiction and venue of this Court and the court of Connecticut is appropriate.

62. VGW attempts to escape the jurisdiction of this Court and the Connecticut courts by including class waivers, forum selection and choice of law clauses in VGW's Terms of Service. However, these Terms of Service are illegal gambling contracts which are "void" according to Conn. Gen. Stat. §§ 52-553 and 52-554. Even if any such clauses in these illegal Terms of Service are severed and analyzed by themselves, they are "void". Therefore, the Terms of Service and any allegedly severable clauses including but not limited to arbitration agreements, forum selection, and choice of law clauses are "void" and unenforceable and VGW is therefore

subject to the jurisdiction of this Court. Further, such clauses are unenforceable because they are based on the consideration of "illegal gambling" and are illusory.

**Additional Reasons VGW Holdings, VGW Malta, and VGW GP Are Subject to Jurisdiction in Connecticut – Immunity in Malta**

63. Additionally, Plaintiff and all similarly situated Connecticut citizens ("the Class") are entitled by law to have their claims against VGW HOLDINGS, VGW MALTA, and VGW GP adjudicated in this Court for the claims of the illegal gambling operations of VGW MALTA and VGW GP because VGW MALTA and VGW GP will not be subject to liability if the claims against them are adjudicated in Malta, a foreign country.

64. VGW MALTA and VGW GP are licensed gambling operators in Malta, and as such, Malta will not litigate nor enforce Plaintiff's and the Class' claims against VGW MALTA and VGW GP. Evidence of the Malta licenses for VGW MALTA is attached as Exhibit "D", which shows that VGW MALTA and VGW GP are licensed holders permitted by Malta to operate internet gambling websites.

65. In 2023, Malta amended Chapter 583 of the Malta Gaming Act to include Article 56A, which states that "…(a) no action shall lie against a licence holder … relating to the provision of a gaming service … if such action:",

> (i) conflicts with or undermines the legality of the provision of gaming services in or from Malta by virtue of a licence issued by the Authority, or the legality of any legal or natural obligation resulting from the provision of such gaming services; and
>
> (ii) relates to an authorized activity which is lawful in terms of the Act and other applicable regulatory instruments; and
>
> (b) The Court shall refuse recognition and, or enforcement in Malta of any foreign judgment and, or decision given upon an action of the type mentioned in sub-article (a).

According to Article 56A, VGW MALTA and VGW GP, and by extension VGW HOLDINGS, are immune under Malta law for any violation of Connecticut or United States law regarding illegal gambling operations. Therefore, by having actively participated in illegal gambling operations in the United States and throughout Connecticut, VGW MALTA and VGWP, and by extension VGW HOLDINGS, are subject to the jurisdiction of this Court and Connecticut law, for otherwise they could be immune from any liability if Malta law is allowed to control or supersede Connecticut law. A copy of Article 56A of the Malta Gaming Act is attached as Exhibit "E". A copy of the Malta Gaming Act is attached as Exhibit "F". And the admission by counsel for VGW of the existence and authenticity of Article 56A can be found at Exhibit "G" (*Saulny v. VGW Holdings Limited, et al,* Case No. 3:24-cv-00619-HTW-LGI, U.S. Dist. Court, Southern District, Mississippi, Doc. 20, p. 17, ftn. 2)

66. Plaintiff and the Class are entitled to litigate the violations of Connecticut law in this Court in this action. This is because it is futile to require Plaintiff and the Class to litigate their claims of violation of Connecticut law in Malta, a country which will not recognize or apply Connecticut law regarding civil remedies for illegal gambling operations by VGW MALTA and VGW GP, and by extension VGW HOLDINGS. It is futile because Plaintiff and the Class should be entitled to return promptly to this Court to litigate the claims of violations of Connecticut law when the Malta courts refuse to follow or apply Connecticut law. This is confirmed by court decisions such as *Yavuz v. 61 MM, Ltd.*, 576 F.3d 1166 (10th Cir. 2009); *Sigalas v. Lido Mar.,* 776 F.2d 1512 (11th Cir. 1985); and *Behrens v. Arconic, Inc.*, 502 F. Supp. 3d 931 (E.D. Pa. 2020).

67. VGW has purposely operated within Connecticut by utilizing a sophisticated interactive website that maintains constant contact and back and forth interaction with Plaintiff and other Connecticut citizens. Also, VGW's business, revenue, and profits are contingent upon this constant contact and interactivity. In summary, VGW is subject to jurisdiction of this Court and the Connecticut courts and venue within the state of Connecticut because the claims (1) arise from VGW's activities; (2) the non-resident defendants, VGW, "purposefully availed" itself or themselves of the privilege of conducting activities within the forum; and (3) the exercise of personal jurisdiction comports with "traditional notions of fair play and substantial justice".

## HISTORY AND DESCRIPTION OF VGW'S ILLEGAL GAMBLING OPERATION

### VGW Formation, History, and Intent to Create Internet Online Gambling

68. For well over a decade VGW has sought to market and operate online gambling within the United States and Connecticut. As early as 2012, the billionaire founder/CEO of VGW HOLDINGS, Laurence Escalante, looking for "angel investors", expressed his intent to create virtual gambling casinos that initially would offer United States citizens the opportunity to gamble online with "real money" outside the United States, and at that time purportedly within the United States with "virtual currency", emphasizing, "…This is not a toy; it's a real casino. So, ladies and gentlemen, that's just a taste of some of the potential to us when we combine the world of gaming with gambling." (Exhibit "H")

69. Laurence Escalante outlined his plan during a televised or recorded conference at the "Launch Festival, March 7 and 8, 2012, at the San Francisco Design Center", before a group of tech investors. A video presentation of Laurence Escalante's presentation can be found at *https://www.youtube.com/watch?v=M-ekhp92V-0&list=PPSV*, and a written version of this video presentation is attached as Exhibit "H". From 2012 through the present VGW and Laurence

Escalante have advertised that they look to combine “virtual currency and gambling”. For many years VGW targeted Connecticut citizens and illegally operated online real money gambling casinos within Connecticut, a market known for having extensive restrictions, licensing, and regulations regarding gambling.

70. In the 12 to 13 years since VGW and Laurence Escalante made his pitch to the gathering of tech investors in San Francisco, the Australian Financial Review stated,

> …Escalante’s online gaming company, VGW, pioneered the use of a US legislative loophole that allowed it to offer casino-like experiences online with cash prizes in states where online gambling has long been banned [https://www.afr.com/companies/games-and-wagering/laurence-escalante-is-living-large-off-controversial-gambling-billions-20240304-p5f9kc]. The company managed to get around the ban partly by providing an option to play the games for free.
>
> VGW’s Chumba Casino has been the most popular sweepstakes casino in the US, and Craven’s Stake.us has also jumped on board and runs a similar online gaming portal. …

Exhibit “I”. Therefore, as VGW has evolved over the last decade it has grown from an internet game site to a multi-billion-dollar illegal gambling enterprise that attempts to camouflage and shield itself with legal procedural walls that no illegal enterprise should be allowed to do.

71. VGW HOLDINGS admitted in its audited financial statements filed with the Australian Securities & Investments Commission that it actively owns and operates at least five companies as its agents or alter egos to conduct gambling operations in the state of Connecticut. These five companies are VGW MALTA, VGW LUCKYLAND, VGW GP, VGW HOLDINGS US INC., and VGW US INC. These companies claim to be video game development business entities and operators of a “social casino”. In reality VGW has created and operates popular virtual internet gambling casinos that market internet gambling casino games under the names “Chumba Casino” (hereinafter also referred to as “Chumba”), which is operated by VGW MALTA,

"Global Poker", which is operated by VGW GP, and "LuckyLand Slots" (hereinafter also referred to as "LuckyLand"), which is operated by VGW LUCKYLAND. Collectively, these sites are also referred to as "the games" or "casino games" when the websites are described in general terms.

72. In these casino games VGW offers a multitude of electronic versions of slot machines, blackjack, poker, and other games of chance. The games are available to play online at chumbacasino.com for Chumba or VGW MALTA, luckylandslots.com for LuckyLand or VGW LUCKYLAND and globalpoker.com for Global Poker or VGW GP, which in addition to poker, provides both games of blackjack and slot machines. VGW HOLDINGS through VGW GP operates slot machines and blackjack games, like Chumba and LuckyLand.

73. In addition, VGW HOLDINGS through VGW GP, operates an on-line poker game where VGW GP takes a percentage of the money wagered by Plaintiff and other Connecticut citizens that ranges from 2.5 percent to 15 percent in what is identified on globalpoker.com as "the rake". This constitutes operating a gambling transaction or game of chance for which VGW wins money from each hand of poker.

74. VGW has misrepresented to Plaintiff and the other citizens of Connecticut that VGW operates legal video game or arcade game websites permitting just for fun gameplay. In reality, VGW intentionally and purposefully operated and continues to operate websites that are illegal, unregulated, and unlicensed internet gambling casinos where Connecticut citizens wagered and lose real money at classic casino games of chance.

75. All of VGW's games are virtually identical to gambling or games of chance that exist in legally permitted, but highly regulated brick-and-mortar physical gambling casinos within

Connecticut. The difference is that VGW's casino games are not legally permitted under Connecticut law.

76. In exchange for payment of "real money" or dollars from Connecticut citizens, VGW sells virtual currency, or "coins" that can be used to wager on games of chance. VGW established a scheme to deprive Plaintiff and other Connecticut citizens of their money or dollars by providing Plaintiff and the citizens the potential to win and collect real money prizes or dollars. VGW uses these coins to both give Connecticut citizens a false sense of security, while hiding that VGW is engaging in real money gambling. Likewise, VGW has used this scheme to attempt to mislead regulators about the true nature of VGW's operations.

77. However, the Connecticut regulators were not fooled by VGW and by February 9, 2024, the State of Connecticut Department of Consumer Protection ordered VGW to cease operations in Connecticut. After delaying for at least 7 months VGW finally chose to obey this order.

78. VGW's intentional disregard for the laws of the state of Connecticut has resulted in illegal gambling winnings going to VGW and ultimately Laurence Escalante.

**VGW's Predecessors and Model: Illegal Brick-and-Mortar "Sweepstakes Cafés"**

79. In the early 2010s, across the United States, the spread of "Internet Sweepstakes Cafés" or "Internet Sweepstakes Facilities" (hereafter "sweepstakes cafés") became an epidemic. Connecticut was no exception to this.

80. These illegal gambling operations would claim to sell internet time or phone cards to Connecticut citizens and, as part of an alleged "sweepstakes promotion", Connecticut citizens would receive "sweepstakes points" or "sweepstakes credits". These "points" or "credits" – which were redeemable for cash – would be used to wager and gamble on casino style games of chance that were played on computer terminals through the internet at the sweepstakes cafés.

81. This ploy to circumvent gambling laws was highly lucrative for a time, despite the scheme clearly being illegal gambling under Connecticut law.

82. In 2014, it appears the Connecticut Legislature amended CT Gen Stat § 42-295 and 42-301 to establish that these so called "sweepstakes promotions" and "internet sweepstakes cafes" like VGW's are in fact schemes of chance, which are recognized as illegal gambling under Connecticut law, and constitute per se deceptive trade practice under subsection (a) of CT Gen Stat § 42-110b.

83. However, innovation is a constant where there are financial incentives, and criminal activities are not exempt from that fact. These gambling sweepstakes café operations moved out of the strip malls and bars that they used to inhabit and now they call the internet home.

84. VGW pioneered this migration of "sweepstakes casinos" to the world wide web and for many years VGW has knowingly, intentionally, willfully, and illegally won billions of dollars from its gambling operations, while also lying to the public and proclaiming that VGW's operations are legal.

**VGW's Purposeful Replication of the Sweepstakes Café Business Model**

85. VGW parrots the same claim that brick-and-mortar internet sweepstakes facilities, formerly known as sweepstakes cafés, tried to justify their gambling operations across the United States, including in the state of Connecticut. However, legislators, judges, and juries roundly rejected this argument. The only material difference between VGW and the sweepstakes cafés is that VGW now operates exclusively on the internet rather than conducting gambling on the ground in Connecticut.

86. In a January 4, 2016, prospectus for a sale of stock, VGW admitted its Chumba website's business model copied the illegal “sweepstakes cafés” that proliferated Connecticut and throughout the United States. (Exhibit “J”)

87. VGW compared its market opportunity with the size of the sweepstakes café market. VGW even claimed there is "significant opportunity" in adopting this sweepstakes model.

88. The fact this prospectus was released in 2016 is noteworthy because only two years before, Connecticut had prohibited the operation of sweepstakes cafés and defined these sweepstakes cafés to be illegal gambling. Recognizing that sweepstakes cafes were illegal, VGW knowingly and intentionally set out to attempt to thwart Connecticut law by creating an internet sweepstakes cafe intended to operate on an enormous scale and cover all of the United States.

89. For example, VGW’s prospectus contains a report that was prepared by H2 Gambling Capital, which is described as “the leading authority regarding market intelligence on the global gambling industry”, further showing VGW’s intention to create nationwide illegal gambling.

90. The prospectus refers to “gambling” innumerous times and notes that “The US, despite significant prohibition, remains by far the largest gaming market in the world.”

91. The prospectus refers to "real-money" on many occasions and says that VGW is operating at the "convergence of social casino and real-money gaming offerings".

92. Furthermore, a 2015 press release sanctioned and approved by VGW states:

> …VGW is a developer and operator of social casino games with sweepstakes cash prize gameplay, which provides for the payout of cash prize winnings from casino games. Sweepstakes gameplay entails a real-money, online prize gaming alternative for all 50 states of the United States, where online gambling is largely prohibited. …

And "…VGW develops and operates proprietary technology in real-money gaming, enabling cash-prizes to be paid to international players, particularly those located in the United States, via its social casino games." And that "…VGW's strategy is to: continue to deploy sweepstakes gameplay technology in the United States and to expand the offering across other key gaming product lines, including casino, lottery, poker and sports… ." (Exhibit "K")

93. The same press release admitted that "…VGW operates a sweepstakes social casino, targeting the global casino market, particularly the unrealised United States real-money gaming market. …". (Exhibit "K" (Highlights))

94. These facts show that at least since 2012 VGW intentionally, purposefully, and continually took steps to target Plaintiff and other Connecticut citizens with its gambling websites. VGW clearly knew that sweepstakes cafés had been banned in Connecticut and throughout the United States. Likewise, VGW knew that it was using its online model to operate as a gambling organization, which it knew was already declared illegal under Connecticut law.

**VGW's Gambling Offerings and Games of Chance**

95. All VGW's games are games of chance. VGW markets and runs games on its websites that are identical, or virtually identical to games of chance that can be found in brick-and-mortar casinos.

96. VGW's games of chance include, but are not limited to, classic casino games such as slot machines, blackjack, roulette, and baccarat. VGW's games possess a user interface identical to games of chance that may be found in brick-and-mortar casinos. The images below are a sampling of games that are found on VGW's websites.


SC 701.59
JADE'S
JACKPOTS
SC 1,366.95
SC 1,658.70
SC 19,718.61
SC 94,891.01
WIN
1,024
WAYS
STOP
17
SC 15.00
TOTAL PLAY


BUY
GC 2,907,477
SC 19.40
REDEEM
Events
22
MEGA
SC 716.33
GRAND
SC 237,949.13
MINOR
SC 512.57
Max Play
Off
Playing
10 Lines
Total Play
SC 0.10
SPIN
HOLD FOR AUTO




97. VGW now also offers casino games of chance with a live dealer as well. The images below are a sampling of games with a live dealer, that are found on VGW's websites.









98. VGW has also boldly ventured into marketing and selling lottery scratch off card games, in direct competition with state-controlled lotteries, as shown below.









99. VGW's games, with the potential exception of their new offerings with live dealers, utilize algorithms to assign results after the wager is placed. Once a user, like Plaintiff, or other Connecticut citizen pressed a button on a computer, phone, tablet, or electronic device of any kind, VGW's computer servers displayed entertaining game images to Plaintiff and other Connecticut citizens / bettors, and the result of the game were decided by code on VGW's computer servers.

100. On VGW's websites once Plaintiff and other Connecticut citizens would spin the slot machine by pressing a button on Plaintiff and other Connecticut citizens' device communicates and send information to VGW's servers. VGW's servers then executed the games' algorithms that determine the spin's outcome. None of the outcomes in VGW's slot machine games depend

on any amount of skill to determine their outcomes – as all outcomes are based entirely on chance.

101. In VGW's blackjack, Plaintiff and other Connecticut citizens made choices and wagered coins in a manner identical, or nearly identical, to placing bets at a casino blackjack table. However, it is unknown if the player's choices or decisions affected the outcome as well as the chances of winning, due to the lack of transparency regarding the algorithms employed by VGW.

102. When playing VGW's games of chance, Plaintiff and other Connecticut citizens put at risk, wager, money or things of value in the hopes of winning more money or additional things of value. VGW operates an obvious illegal gambling business that is not permitted or licensed in the state of Connecticut.

103. VGW maintains win and loss records and account balances for Plaintiff and each Connecticut citizen. Indeed, once VGW's algorithms determine the outcome of a wager, VGW displays the outcome to Plaintiff and other Connecticut citizens, VGW then adjusts Plaintiff and other Connecticut citizens' account balance. So VGW has kept and continuously keeps detailed records of each wager, outcome, win, and the loss for every player of the games.

104. VGW maintains extremely detailed records of the identity of each individual user of VGW's sites. To create an account, users including Plaintiff and other Connecticut citizens, must verify their identity and address, and provide a copy of photo ID, such as a driver's license. VGW also maintains detailed records of every individual purchase that Plaintiff and other Connecticut citizens made and every redemption that Plaintiff and other Connecticut citizens received. VGW knows exactly how much Plaintiff and each individual Connecticut citizen has lost or won on VGW's websites and the outcome of every single wager every Connecticut citizen has made.

**VGW's Illegal Gambling Scheme and Pretextual Claim That It Is a Sweepstakes**

105. VGW for many years attempted to thwart Connecticut law by boldly and falsely claiming that the VGW websites were legal operations and part of a "social casino" that also offered to Plaintiff and other Connecticut citizens what VGW claims were legally permitted "sweepstakes promotions".

106. VGW's attempt to camouflage its patently illegal gambling scheme hinged upon its promotion of a two-tiered system of "coins".

107. On all its illegal gambling websites, VGW claimed to sell "Gold Coins" to Plaintiff and other Connecticut citizens. These Gold Coins could be used to play casino games on VGW's websites, and their alleged value is the extension of entertainment or credits by allowing Plaintiff and other Connecticut citizens to play the games just for fun. Gold Coins may be used only to play the games on the sites for entertainment.

108. However, when selling these Gold Coins VGW also issued Plaintiff and other Connecticut citizens an allocation of what VGW calls or categorizes as "Sweeps Coins".

109. Sweeps Coins could be redeemed for cash to the Plaintiff's or other Connecticut citizens' bank account or digital wallet, or as gift cards at an exchange rate of 1:1 (one "Sweeps Coin" being equivalent to $1) if, and only if, the Plaintiff or other Connecticut citizens illegally gambled on VGW's websites. Therefore, Sweeps Coins were synonymous with dollars, once the Plaintiff or other Connecticut citizens participated in illegal gambling. When using Sweeps Coins to wager on VGW's games of chance, it was the exact same as using dollars to wager on games of chance in a brick-and-mortar casino, except Plaintiff and other Connecticut citizens must use the Sweeps Coins solely to gamble on VGW's websites. Wagering Sweeps Coins on

games of chance was real money gambling and getting Plaintiff and other Connecticut citizens to wager Sweeps Coins was the goal of VGW.

110. When compared to the illegal sweepstakes cafés that VGW copied, the Gold Coins were analogous to the internet time or phone cards, and the Sweeps Coins were analogous to the sweepstakes credits used for wagering and which could be redeemed for cash or money after wagering them.

111. The sale of Gold Coins was nothing more than a pretext for the purchasing of, and wagering with, Sweeps Coins in what amounts to a real money online gambling casino – the exact type of operation that the Connecticut Legislature prohibited in 2014.

112. VGW makes money by taking the other side of Plaintiff or other Connecticut citizens' / bettors' wagers (betting against the Connecticut citizens) in all their games, except for the poker games that exist on VGW GP where VGW makes money by taking a "rake" (a percentage of every pot or wagers made in a hand of poker) or by charging a fee for organizing poker tournaments.

**VGW's Paper Thin Effort to Camouflage Its Illegal Gambling Operations**

113. Plaintiff and other Connecticut citizens could play games of chance on VGW's sites in what VGW refers to as "standard mode", or "standard play" using Gold Coins. Plaintiff and other Connecticut citizens could also play the exact same games of chance in what VGW refers to as "promotional mode" or "promotional play" using Sweeps Coins. Plaintiff and other Connecticut citizens could switch between these two modes easily and as frequently as they would like. An example of the toggle button (from Chumba) permitting this switching is shown

below:




114. It is important to note that it was only possible to play VGW's games through the wagering of either Gold Coins or Sweeps Coins. It was impossible for Plaintiff or other Connecticut citizens to play VGW's games when Plaintiff or other Connecticut citizens did not have a balance of coins in an account with VGW. Every one of VGW's games required a wager to participate.

115. When playing in standard mode, Plaintiff and other Connecticut citizens gambled or wagered Gold Coins and could only win or lose Gold Coins. This allowed the Plaintiff and other Connecticut citizens to continue playing the games if they won Gold Coins. However, when playing in promotional mode, Plaintiff and other Connecticut citizens gambled or wagered Sweeps Coins and could only win or lose Sweeps Coins – which they could later redeem for money – if they won.

116. When Plaintiff and other Connecticut citizens visited VGW's websites for the first time, Plaintiff or other Connecticut citizens were awarded a nominal allocation of "free coins". Plaintiff or other Connecticut citizens also received coins as a free daily bonus once a day when logging in to their accounts. An example of the popup message for this "Daily Bonus" (from

Chumba) is below:




117. As can be seen above, the Daily Bonus of Gold Coins was 200,000, which can only be used to play the casino games. However, the Daily Bonus of Sweeps Coins was much lower or "1", which was the equivalent of $1 dollar that could be redeemed for cash, if and only if Plaintiff or other Connecticut citizens wagered the Sweeps Coin to play the casino games and didn't lose the 1 Sweeps Coin or they won more Sweeps Coins.

118. When "standard mode" play with Gold Coins is compared to playing in "promotional mode" with Sweeps Coins, it is clear that accumulating Sweeps Coins was the goal offered to Connecticut citizens for gambling on VGW's platforms. There appears to be no evidence of testimonials by consumers of how they have won Gold Coins from VGW's websites. However, the internet contains numerous examples of testimonials from happy gamblers of how they have won Sweeps Coins, which they have redeemed for money. For example, message boards such as Reddit are populated with players discussing wins and losses of Sweeps Coins. YouTube "influencers", who are sponsored by VGW, have recorded themselves playing with Sweeps

Coins for years. LuckyLand's own website shows consumer testimonials telling of their large cash prizes consumers / bettors throughout the United States have won through the wagering of Sweeps Coins. A sample of such testimonials is shown below:




Likewise, video advertisements such as the one below from Facebook in October 2023 display gigantic sized checks to emphasize how consumers can win big money on VGW's sites. This money is only won through wagering Sweeps Coins, not Gold Coins.




119. Global Poker's own website displays wagerers holding the same style of giant-sized checks.




120. Chumba Casino also advertised on social networks successful gamblers holding gigantic checks to incentivize Connecticut citizens to wager Sweeps Coins on their website and attempt to win real money.



Chumba even advertises on social networks that they have ***"helped 50 people become millionaires."*** from gambling Sweeps Coins, not Gold Coins.




121. Indeed, VGW advertises that the websites function as gambling operations since the sites call themselves "Chumba **Casino**" "Global **Poker**" and "LuckyLand **Slots**". Furthermore, shown below is LuckyLand's own logo where it prominently displays stacks of cash with "SC" (an abbreviation frequently used by VGW for Sweeps Coins) written on them, emphasizing the importance of the Sweeps Coins versus Gold Coins.



122. When Plaintiff and other Connecticut citizens played VGW's games they wagered coins on games of chance with the hopes of winning more of the coins that they wagered. Routinely, after they begin playing, Connecticut citizens quickly lose their allotments of coins. This is because a Connecticut citizen is playing games of chance that are skewed heavily in the favor of VGW's casino operations – just like in brick-and-mortar casinos. Furthermore, as with brick-and-mortar casinos, the longer a Connecticut citizen plays VGW's games the more likely VGW will ultimately win, and the Connecticut citizen will exhaust the coins. To make matters even worse, VGW, unlike brick-and-mortar casinos, is not subject to a single regulation to ensure fair and legal practices.

123. When playing with Sweeps Coins – which was the equivalent of playing with real dollars since Sweeps Coins could be redeemed for real cash and cash equivalents – after Plaintiff or other Connecticut citizens would lose all the Sweeps Coins, VGW would immediately inform Plaintiff or other Connecticut citizens that they have insufficient coins to place a wager. On Chumba users were presented with the below message instructing them to purchase more Gold Coins – as a mechanism to receive Sweeps Coins.




On LuckyLand the users were immediately redirected to the store, as shown below:




On Global Poker the users receive the below message telling them to go purchase coins.




The message is clear. To keep wagering Sweeps Coins, spending money on Gold Coins was the quick and preferred way to go about it. What Plaintiff and other Connecticut citizens really valued and were actually purchasing were Sweeps Coins.

124. When playing on Chumba, upon clicking “Buy Gold Coins”, Plaintiff and other Connecticut citizens would be redirected to the “Store” where they could purchase more Gold Coins. The majority of the purchase packages also offered Sweeps Coins as part of the purchase of Gold Coins. The Sweeps Coins amounts are prominently highlighted by VGW in green,

likely intended to symbolize the color of money. Shown below is an image of the Chumba Store.




125. In LuckyLand, after exhausting their Sweeps Coins balance, Plaintiff and other Connecticut citizens were directed to the "LuckyLand Store" to purchase more Gold Coins. Every purchase package of Gold Coins provided Sweeps Coins which are likewise prominently displayed in green.

126. On Global Poker, when Plaintiff and other Connecticut citizens no longer have any Sweeps Coins available to wager, they are directed to the store to purchase more coins as well. It is clear that when purchasing Gold Coins Connecticut citizens receive Sweeps Coins. An image

from Global Poker is shown below:




127. In the VGW sites and stores Plaintiff and other Connecticut citizens are offered multiple options to purchase coins, and purchase packages can vary. However, for Chumba, prices generally range from $1.00 for 200,000 Gold Coins to $1,000 packages for 400,000,000 Gold Coins; for Global Poker $2 can be used to purchase 10,000 Gold Coins, up to $500 for 2,600,000 Gold Coins; for LuckyLand purchase packages range from $9.99 for 40,000 Gold Coins to $299.99 for 2,100,000 Gold Coins. So, there is enormous variance between sites in how much a $1.00 payment will net in terms of Gold Coins.

128. However, the amount of Sweeps Coins delivered in these packages is much more consistent as it tends to be approximately a 1:1 ratio to the "real money" purchase price Plaintiff or other Connecticut citizens pay – with some extra Sweeps Coins given when Plaintiff or other Connecticut citizens spend greater quantities of dollars. For example, on Chumba and LuckyLand a $300 purchase package would produce 315 Sweeps Coins; on Global Poker a $500 package would produce 515 Sweeps Coins. This small extra amount of Sweeps Coins compared to the dollars spent by Connecticut citizens is similar to brick-and-mortar casinos giving "comps" of meals, hotel stays or free wagers to Connecticut citizens who spend more money in

the brick-and-mortar casinos. VGW also often throws in, or comps, a bonus of extra Sweeps Coins to the Connecticut citizens so they will play more. This also shows that it is the Sweeps Coins that have value and are what Connecticut citizens are purchasing.

129. The larger the purchase package the more extra / "comped" Sweeps Coins the Connecticut citizen receives. For example, a purchase package that costs $5.00 for Gold Coins will come with 5.05 Sweeps Coins, a difference of 1%. But a package that costs $300 for Gold Coins comes with 315 Sweeps Coins, a difference of 5%. VGW rewards those players who purchase more expensive packages with extra Sweeps Coins, thus stimulating more purchases and more play. This is to incentivize players to purchase more, gamble more and inevitably lose more money.

130. It is clearly no mistake that at the time of purchase of Gold Coins, the amount of Sweeps Coins available to Plaintiff or other Connecticut citizens was nearly 1 to 1 for the dollars that the Plaintiff or other Connecticut citizens spent. Obviously, the Plaintiff or other Connecticut citizens would not spend, for example, $300 to receive 100 Sweeps Coins, much the same way that no one at a legally permitted Connecticut brick-and-mortar casino would pay $300 to receive only $100 in casino chips.

131. VGW's websites accept payment of dollars in exchange for coins through many forms, including, but not limited to, debit cards, credit cards, bank transfers, gift cards and digital wallet

transactions. An example of the payment options is shown below.




132. Once Plaintiff and other Connecticut citizens started wagering Sweeps Coins on VGW's websites and casino games of chance, and had a sufficient balance, the redemption button is prominently displayed and clearly identifies that the Plaintiff and other Connecticut citizens could redeem the Sweeps Coins for cash or cash equivalent gift cards. Redeeming Sweeps Coins for dollars was how Plaintiff and other Connecticut citizens could "cash out" – exactly like redeeming casino chips for dollars at a brick-and-mortar casino. Below are images showing the redemption process on Chumba Casino. The process was materially identical for LuckyLand and Global Poker.


Sweeps
BUY
REDEEM
HOME
SLOTS
JACKPOT
SLINGO
TABLE GAMES
Sound OFF
Gameplay History
Purchase & Prize History


CHUMBA CASINO
Sweepstakes Prize Redemption
SC0.10
Available Balance
Gift Cards
Gift cards will be emailed to
[redacted]
Cash Prize
Redeemable via bank
Pending Redemptions
You have no pending redemptions




133. Unlike legally permitted casinos, VGW used unpermitted and illegal techniques to force Plaintiff and other Connecticut citizens to play VGW's games and eventually lose their Sweeps Coins balance. These techniques included establishing restrictions on how and when Sweeps Coins could be redeemed and turned into money. For example, on Chumba and Global Poker the minimum permitted redemption amount was 100 Sweeps Coins to be redeemed for $100; on LuckyLand, the minimum was 50 Sweeps Coins to be redeemed for $50. Therefore, any balance below those thresholds remained stuck on the site and could not be redeemed or withdrawn. This holding of Sweeps Coins captive was VGW's way to force Plaintiff and other Connecticut citizens to continue gambling and more likely lose Sweeps Coins. Likewise, VGW also permitted only one redemption of Sweeps Coins per time that the Plaintiff and other Connecticut citizens were utilizing the websites. Further, VGW implemented weeks long delays to "approve" and "process" redemptions of Sweeps Coins. These restrictions were designed to further entice Plaintiff or other Connecticut citizens to cancel their redemption requests and continue playing

the casino games. But these techniques or restrictions aren't even legal at brick-and-mortar casinos in Connecticut where casino gambling is highly regulated and scrutinized.

134. Winning any actual money through accumulating Sweeps Coins was often a pipe dream, however, because these games of chance are not subject to regulation in the United States (VGW MALTA and VGW GP claim to be regulated in the Island of Malta), and the games certainly heavily favored VGW. In fact, VGW's Terms of Service state that it is the Plaintiff's or other Connecticut citizens' responsibility to check on the odds of each game. However, in many cases, these odds were nowhere to be found. Furthermore, VGW also states that VGW may change the odds at VGW's discretion whenever it chooses. VGW's games are therefore a black box that are not regulated or scrutinized in Connecticut or anywhere in the United States for that matter. In fact, this is by design because Connecticut regulations, if they were followed, would not allow VGW to operate in the state.

135. All games on VGW fit the Connecticut statutory definition of gambling.

136. Playing games of chance, specifically wagering with Sweeps Coins, but also including wagering Gold Coins on VGW's websites was clearly real money gambling as Sweeps Coins could be redeemed for cash or real money with an exchange rate of one Sweeps Coins equal to one dollar and Gold Coins could be redeemed for additional game play or credits.

137. VGW thus devised a scheme whereby players could utilize Sweeps Coins in a manner indistinguishable from a brick-and-mortar casino, but where VGW misled Plaintiff and other Connecticut citizens into believing that they are playing games that are permitted by Connecticut law. In fact, prior to the initial filing of this lawsuit VGW's websites knowingly, willfully, and prominently advertised the falsehood that the sites are operating legally in the United States and

Connecticut. This false claim was included in VGW's websites' Terms of Use for each website until VGW ceased operations in Connecticut in October 2024.

**VGW's Gambling Operations Utilized Sweeps Coins to Attempt to Avoid Connecticut Law and Reap Gambling Profits From Connecticut Citizens**

138. VGW may claim it is not a gambling operation and that in the past it operated as a legally permitted sweepstakes. VGW's claim is that the Sweeps Coins it marketed to Plaintiff and other Connecticut citizens had no value because the Sweeps Coins could not be redeemed for money by Plaintiff or other Connecticut citizens at the time of purchase or acquisition.

139. VGW's claim that "…Sweeps coins cannot be purchased and [have] no inherent value. …" *https://www.chumbacasino.com/about-us* is extremely disingenuous and contrary to VGW's own advertisements. The Gold Coins purchase packages sold to Plaintiff and other Connecticut citizens prominently displayed the amount of Sweeps Coins the Plaintiff and other Connecticut citizens received, VGW's websites advertised how Sweeps Coins can be redeemed with payment of money from VGW being sent directly to Plaintiff or other Connecticut citizens' bank accounts, digital wallets, or gift cards, where 1 Sweeps Coins is equal to 1 dollar. VGW's advertising strategy focused on showing winners of large amounts of Sweeps Coins.

140. As a part of VGW's gambling scheme and attempt to maintain a façade of legality and attempt to present itself as a legal sweepstakes, Plaintiff or other Connecticut citizens could accumulate Sweeps Coins in multiple ways:

a. By receiving Sweeps Coins upon the purchase of specifically marked packages of Gold Coins

b. By entering "Sweeps Coins no-cost give away contests" on the games' Facebook pages;

c. By sending a request letter through the United States Postal Service to VGW MALTA, VGW GP and VGW LUCKYLAND respectively; and,

d. As a "Daily Bonus" given when logging on to the players account (once per day). *https://www.chumbacasino.com/sweeps-rules*

Plaintiff or other Connecticut citizens, however, were highly incentivized toward option "a." This is because option "a" was instantaneous and allowed large amounts to be purchased. Whereas the other options varied from very difficult and slow (taking months to write, send letters and receive credits for sending a mail request) to very small (only receiving 1 Sweeps Coins per day from the "Daily Bonus"). The purchase of Gold Coins was the easiest and quickest way for Plaintiff and other Connecticut citizens to obtain Sweeps Coins and served as a pretext to sell Sweeps Coins and facilitate real money gambling. VGW used options "b.", "c.", and "d." to attract customers but the primary motivation was so VGW could attempt to argue no purchase was necessary and therefore there was no consideration; sweepstakes cafés futilely attempted this same tactic and argument.

141. Plaintiff and other Connecticut citizens were required to wager their Sweeps Coins before they were permitted to redeem Sweeps Coins. In its Terms of Service, VGW includes a link to its "Sweeps Rules" which VGW claimed governed its "sweepstakes promotions" (https://www.chumbacasino.com/sweeps-rules) where VGW claimed that it operated legally in Connecticut because Sweeps Coins were unable to be redeemed before wagering and therefore had no value. Only after wagering Sweeps Coins and, in the unlikely scenario that Plaintiff or

other Connecticut citizens won the wager, would the Sweeps Coins that were won have monetary value and could be redeemed. In VGW's own words in their Sweeps Rules, the Sweeps Coins "…that have been won through game play can then be redeemed for a prize with a value equal to US $1.00 per SC [Sweeps Coin]." This was VGW's way to force Plaintiff and other Connecticut citizens to wager and risk losing money. In other words, Plaintiff and other Connecticut citizens were required to play the games of chance or gamble on VGW's site with Sweeps Coins with a 1-time playthrough in order to later redeem the Sweeps Coins and collect a prize of cash or cash equivalents.

142. VGW may claim that the award of Sweeps Coins to Plaintiff or other Connecticut citizens was like an award of legitimate and legal sweepstakes prizes. In reality, Plaintiff and other Connecticut citizens were required to either purchase Sweeps Coins or otherwise provide some monetary consideration to obtain Sweeps Coins, whether in the form of direct purchases of Gold Coins or by expending the costs of preparing and mailing in requests to VGW. Any other methods of obtaining Sweeps Coins provided only nominal amounts of Sweeps Coins. In other words, as in the case of legally permitted brick-and-mortar casinos, Plaintiff and other Connecticut citizens were only able to obtain Sweeps Coins in much the same manner as a customer purchasing chips at the brick-and-mortar casino. Likewise, except for direct purchases of Sweeps Coins, VGW could and did arbitrarily limit the bonuses of Sweeps Coins upon purchases of Gold Coins to certain Connecticut citizens.

143. VGW often arbitrarily rejected submissions of mailed requests for Sweeps Coins, contrary to the normal, legitimate, sweepstakes process. VGW also frequently deactivated the accounts of Connecticut citizens who submitted mailed requests for Sweeps Coins and gave no explanation for doing so.

144. Plaintiff and other Connecticut citizens were encouraged by VGW's businesses to focus on wagering Sweeps Coins so that they could win "real money" in the form of winning more Sweeps Coins.

**Legal Sweepstakes Compared to VGW's Illegal Gambling Business**

145. An example of a legal and legitimate sweepstakes is the famous McDonald's Monopoly sweepstakes where, in exchange for purchasing a sandwich or drink, the consumer has a chance to win a prize.

146. A legal and legitimate sweepstakes is a limited-term event, designed to attract consumer attention and to expire after a few weeks or months. Whereas VGW – exactly like the sweepstakes cafés VGW was modeled after – offered perpetual "sweepstakes" and wagering to earn the perpetually offered "cash prizes" to Plaintiff and other Connecticut citizens.

147. A legal and legitimate sweepstakes is intended to increase consumer awareness and sales of its products – such as hamburgers, fries, and sodas. VGW, by contrast, claimed to be selling the Gold Coins as its primary product. However, customers amassed gigantic totals of unused Gold Coins while wagering with Sweeps Coins. Furthermore, VGW's own marketing campaigns and marketing materials targeting Plaintiff and other Connecticut citizens ignored the Gold Coins while emphasizing the Sweeps Coins.

148. A legal and legitimate sweepstakes pays out a trivial share of its revenue in prizes because the sponsor's business is selling other products, not offering wagers on chance. However, according to VGW's audited financial statements, VGW pays out billions of dollars annually representing a casino-like percentage of consumer purchases/deposits.

149. VGW operates an illegal gambling business and never operated a legal and legitimate promotional sweepstakes.

**Cease and Desist Letter from Connecticut Department of Consumer Protection and VGW's Continued Connecticut Operations**

150. The Connecticut Department of Consumer Protection sent VGW a cease-and-desist letter on February 9, 2024, but VGW continued to conduct illegal gambling operations in Connecticut, including taking Plaintiff's money in July 2024 and money from the Class as late as October 2024.

151. Because VGW refused to immediately obey the cease-and-desist order and continued to operate for nearly 7 more months, a court order granting injunctive relief is also appropriate and necessary to ensure that VGW does not attempt to return to Connecticut and further conduct illegal gambling operations into Connecticut.

**VGW's Casino Games and Illegal Scheme of Chance Cause Immense Losses to Citizens of Connecticut:**

152. VGW proactively defrauded Plaintiff and other Connecticut citizens because VGW advertises that its operations are legitimate and legal. VGW publishes the intellectually dishonest claim that VGW does not operate gambling platforms. VGW claims to operate a "social casino" which does not allow real money gambling; VGW claimed that in conjunction with the "social casino" VGW merely offered "sweepstakes promotions" that provided "cash prizes". This is the same attempted scheme that the previously described brick-and-mortar sweepstakes cafés unsuccessfully argued.

153. Actually, VGW knowingly and willfully operates what constitutes an illegal gambling enterprise. The Terms of Service across VGW's various sites further defrauded Plaintiff and other Connecticut citizens by stating that citizens would not be allowed to play on VGW's

platforms in states where they are prohibited. VGW claimed that Connecticut permitted VGW's operations when it knew that to be untrue.

154. VGW's audited financials show VGW spends hundreds of millions of dollars advertising VGW's platforms and, in such advertisements, erroneously advertise its own legality and thus VGW has defrauded and manipulated Plaintiff and other Connecticut citizens into engaging in illegal gambling and losing money.

155. VGW used targeted advertising across social networks, advertises on search engines such as Google, sponsors YouTube gambling channels and more, to entice Plaintiff and other Connecticut citizens to gamble on VGW's platforms. For example, VGW has sponsored Ferrari's Formula One racing team and has become a sponsor of a NASCAR racing team, 23XI – owned by basketball legend Michael Jordan. Furthermore, VGW hires celebrities, such as Ryan Seacrest, DJ Khaled, and famous athletes Michael Phelps, Karl Anthony Towns, and Paul George (shown below) to create a veneer of legitimacy – exactly like infamous illegal gambling sites Full Tilt Poker and PokerStars used to do before those sites were shut down in the United States.




Chumba Casino @ChumbaCasino
Ad
Discover why players love Chumba!
Play over 100+ games for FREE anywhere, anytime
Check this out:
Chumba Casino rated 15/10 by players!
Play for free
Play to Win & Redeem Prizes
SPONSORED BY CHUMBA CASINO. NO PURCHASE NECESSARY. VGW Group. Void where prohibited by law. See T&Cs. 18+
CHUMBA CASINO


CHUMBA CASINO
THIS COULD BE YOU!
$ 82,310.60
Thousand Three Hundred Ten and 60/100
58188729
pede Fury™ 2
Chumba Casino
580356: 00600023241 1423
SPONSORED BY CHUMBA CASINO.
NO PURCHASE NECESSARY.
VGW Group. Void where prohibited by law. See T&Cs. 18+
CHUMBA CASINO

YouTube ryan seacrest chumba




**Fall in love with Chumba this Valentine's!**

233 views 4 months ago

Love is just a spin away at Chumba Casino!
Play now 👉 https://www.chumbacasino.com/ryan-sea... ...more

Chumba Casino
1.92K subscribers
Subscribe

3

Comments 2 Sort by

Add a comment...

@smcf3109 3 months ago
🎉
Reply

@cotyreed047360 2 months ago

VGW
19,027 followers
3d •
+ Follow

We're excited to announce our newest partnership between Chumba Casino and 23XI Racing!

Kicking off February 2 with the start of the NASCAR season, the vibrant colours of Chumba Casino will be seen across all three Toyota Camry 23XI cars.

Drivers Bubba Wallace, Tyler Reddick, and Riley Herbst will be behind the wheel and sporting Chumba Casino's branding on their fire suits and team gear all season long.

We couldn't be more excited for this collaboration with an iconic U.S. brand, and can't wait to see Chumba on the track!

Read more here: https://lnkd.in/gb2fAkcd

#vgw #chumbacasino #23XIracing #nascar






We got a fresh, new look for the 23, 35, and 45. The No. 35 Chumba Casino Toyota Camry will debut at COTA. Stay tuned for when the 23 and 45 will hit the track 👀

ChumbaCasino.com
NO PURCHASE NECESSARY. VGW Group. Void where prohibited by law. See T&Cs. 21+.
#paidpartnership



156. VGW's illegal gambling operation has been extremely lucrative as evidenced by a portion of VGW's audited financial statements (where all numbers are in thousands of Australian dollars) for the fiscal year ended June 30, 2024, shown below. For example, in 2024, VGW obtained revenue of Six Billion One Hundred Thirty-Three Million Six Hundred Ninety-Five Thousand Australian dollars. ($6,133,695,000), or approximately Four Billion American dollars ($4,000,000,000).

**CONSOLIDATED STATEMENT OF PROFIT OR LOSS AND OTHER COMPREHENSIVE INCOME FOR THE YEAR ENDED 30 JUNE 2024**

| **Continuing operations** | Note | **2024 $'000** | **2023 $'000** |
|---|---|---|---|
| Revenue from contracts with customers | 4 | 6,133,695 | 4,835,148 |
| Sweepstakes prizes | | (4,344,531) | (3,355,545) |
| Merchant fees | | (306,713) | (248,902) |
| Finance income | 5 | 13,529 | 5,753 |
| Finance costs | 5 | (41,656) | (10,849) |
| Foreign currency loss | 5 | (7,116) | (22,654) |
| Other income | 5 | 127 | 217 |
| Marketing and advertising fees | 5 | (418,005) | (359,987) |
| Contract labour, legal and professional fees | | (44,132) | (53,231) |
| Game development and licence fees | | (27,396) | (12,153) |
| Employee benefits expense | 6 | (151,994) | (116,862) |
| Share-based payments expense | | (783) | (24,396) |
| Depreciation and amortisation expense | | (9,441) | (6,927) |
| Technology and other communication expense | | (66,350) | (47,984) |
| Property and occupancy expense | | (2,594) | (2,281) |
| Sponsorship, general and administration expense | | (49,462) | (33,199) |
| Total operating expenses | | (5,456,517) | (4,289,000) |
| **Profit before income tax** | | **677,178** | **546,148** |

157. It is thus clear that VGW through its websites, chumbacasino.com, globalpoker.com, and luckylandslots.com conducted illegal gambling operations in the state of Connecticut. VGW has paid no taxes to the state of Connecticut and has never obtained permits from the state of Connecticut for its operations.

158. VGW's audited financial statements, and investor reports, clearly show that VGW has earned billions of dollars in gambling wins from United States citizens. An untold amount of these losses come directly from Plaintiff and other citizens of the state of Connecticut.

159. In fact, as VGW has continued to operate with impunity, over the past five years VGW's revenue has increased at an average annual growth rate of approximately 75%. Over the past five years VGW's advertising expenditures increased at an average annual growth rate of approximately 50%. Over the past five years losses sustained by consumers playing on VGW's illegal gambling internet websites have increased at an average annual growth rate of 58%. Over the past five years VGW's pretax income has increased at approximately 92%.

160. Furthermore, the fact that VGW has continued to operate freely and achieve such large economic profits has spurned the creation of many copycat websites which operate illegally, deprive consumers of their money, and deprive the government of tax revenue.

161. VGW maintains detailed records of every individual bettor's identity, individualized data about each bettor's purchase and redemption history, and the bet-by-bet history of the results of every single bet that was made. In fact, VGW has admitted under oath on several occasions that VGW captures detailed consumer data at the point of sale of the coins. Therefore, VGW maintains all records necessary to calculate and reveal the losses sustained by Plaintiff and other citizens of the state of Connecticut.

**VGW Continuously Breaking the Law**

162. VGW was sued in the Commonwealth of Kentucky in 2022 and expeditiously reached a class action settlement that required VGW to pay $11,750,000 for violations of Kentucky's gambling laws.

163. Despite paying this large sum and being on official notice that its operations are illegal, VGW has brazenly chosen to continue breaking the law and operate its illegal gambling business within Kentucky.

164. VGW also received an order to cease operating in the state of Delaware on February 23, 2023, but refused that order and continued to operate in Delaware for over 2 more years (April 2025). (Exhibit "C")

165. VGW received an order to cease operating in Connecticut on February 9, 2024, but chose to ignore the order for at least seven months before finally adhering to Connecticut's order to leave.

166. VGW is currently being sued in at least ten states but has chosen to continue operating its unambiguously illegal gambling websites across the majority of the United States.

**VGW Preys Upon Connecticut Citizens and Is Societally Dangerous**

167. The state of Connecticut has long considered illegal gambling operations to be a nuisance and societally dangerous. Legal, permitted gambling is highly regulated and subject to immense government oversight.

168. VGW's illegal online gambling business is particularly insidious and dangerous because it leverages modern technology (the internet, smartphones, tablets, computers, and algorithms) to manipulate Connecticut citizens into becoming gambling addicts and provide these Connecticut citizens with the ability to satisfy this addiction 24 hours a day, 7 days a week, 365 days a year, from their home, work, on vacation, or almost anywhere Connecticut citizens have internet access.

169. Every type of gambling has the potential to be highly addicting. It is well documented that even non-paying "social casino" offerings – those which do not provide the ability to redeem

coins for real money – generate immense financial damage to their customers. A 2020 NBC News article, "Addicted to losing: How casino-like apps have drained people of millions", found on the internet at https://www.nbcnews.com/tech/technews/addicted-losing-how-casino-apps-%20have-drained-people-millions-n1239604, chronicled how a sample of 21 people described how they were hooked on casino-style apps, and emphasized the story of a nurse in Houston who played social casino games for "at least two hours a day." This nurse estimated that she and her husband together have lost $150,000 on these kinds of websites. She said that she and her husband "lie in bed next to each other, we have two tablets, two phones, and a computer and all these apps spinning Reel Rivals at the same time." Tragically, her story is not a unique one.

> NBC News spoke to 21 people, including Shellz [the Houston nurse] and her husband, who said they were hooked on the casino-style games and spent significant sums of money. They described feelings of helplessness and wanting to quit but found themselves addicted to the games and tempted by the company's aggressive marketing tactics.
>
> Most of the 21 players wished to remain anonymous, as they were ashamed of their addictions and did not want their loved ones to find out about their behavior.

170. As recently as 2022, the Australian community has seen instances of adults becoming addicted to online, so-called social casino games. In a post titled "What are social casino games, and why do people become addicted?" at https://www.abc.net.au/news/2022-03-01/social-casino-games-and-why-people-become-addicted/100861446, the Australian website noted the following:

> …Actual online casino gambling — as in, playing these games for money — is banned in Australia. But in social casino games, you can't win anything — so it's technically not gambling and is much less regulated than the real thing.
>
> The global social casino market generates billions in revenue each year. For some people, these gambling simulators are just as harmful as the real thing.
> Last month, a Mackay woman was jailed after stealing nearly $1 million to fund her social casino game addiction, while a Perth man spoke of sinking $800 on a virtual slot game in a matter of minutes. …

This is ironic since VGW HOLDINGS, the parent company controlling and operating all VGW games and websites is an Australian company that is prohibited from spreading its illegal internet gambling into its home country, while attempting to flourish in the North American markets.

171. And it is not just news media and internet authors who have raised the concerns regarding internet social casinos. In the Second Amended Complaint filed in the case of *Benson v. Double Down Interactive, LLC*, Case No. 2:18-cv-00525-RSL (W.D. Wash. 2018) the plaintiffs cited to several studies in support of their argument that internet gambling sites like VGW's sites have led to gambling addiction. The result in *Benson v. Double Down, supra,* was a nationwide class action settlement of $415,000,000 that was approved in 2022. A portion of that complaint and the citations to studies is attached as Exhibit "L".

172. Even as recently as December 23, 2024, as part of the plaintiffs' Third Amended Complaint in *Larsen v. PTT, LLC and High 5 Entertainment LLC,* Case No. 3:18-cv-05275-TMC (W.D. Wash. 2018), allegations and citations to additional authors and texts describe the addictive propensities of online social gambling games such as VGW's. A portion of that complaint and the citations are attached as Exhibit "M". The result in that case was a jury verdict and judgment of nearly $25,000,000, which is included as part of Exhibit "M".

173. Gambling is highly regulated for a reason and illegal gambling is strictly prohibited in the state of Connecticut. However, VGW is attempting to skirt all Connecticut laws and escape the jurisdiction of the Connecticut courts by crafting illegal and "void" Terms of Service. These void terms include arbitration clauses, forum selection clauses, and choice of law provisions which are likewise "void" since under Connecticut law they are contracts based on illegal gambling consideration. Also, there is an important public policy interest in adjudicating this case in this court in the state of Connecticut.

174. In addition, VGW's Terms of Service, including each and every clause attempting to compel arbitration, and all attempts at creating class waivers, forum selection clauses and choice of law provisions are likewise "void" and unenforceable because VGW's Terms of Service are so one-sided that they are unconscionable and illusory. In part, this is because, VGW has inserted approximately 60 provisions within its Terms of Service that allow VGW to arbitrarily refuse to pay winning gamblers including Plaintiff and other Connecticut citizens their prizes or money, unlike properly legalized, licensed, and regulated brick-and-mortar casinos and gambling operations that are prohibited from exercising such unfettered power. A table describing these clauses in VGW's Terms of Service is attached as Exhibit "N" and incorporated as part of this Complaint. These type clauses make each and every part of the VGW Terms of Service void and unenforceable by VGW.

**Plaintiff's Lawsuit to Simultaneously Deter Illegal Gambling and Compensate Victims**

175. This action is being brought under Conn. Gen. Stat. §§ 52-553 and 52-554 statutes that are enacted for the purposes of simultaneously compensating those who have lost money to illegal gambling operations but also deter illegal gambling by making illegal gambling operations, such as VGW's, unprofitable by forcing them to return their illegal earnings. Conn. Gen. Stat. §§ 52-553 and 52-554 provides a powerful enforcement mechanism to disincentivize illegal gambling, protect Connecticut citizens, and protect the regulated, legal gambling operators' businesses which are threatened by these illegal online gambling operations such as VGW's.

176. The Connecticut legislature has also emphasized its public policy to deter illegal gambling and provide remedies.

177. Finally, in its cease-and-desist letter to VGW, the Connecticut Gaming Commission expressly advised VGW that it is subject to civil litigation under the Connecticut Unfair Trade Practices Act and at least implicitly Conn. Gen. Stat. §§ 52-553 and 52-554 – further underscoring the statute's importance and applicability to this case. (Exhibit "A").

## CLASS REPRESENTATION ALLEGATIONS

178. Plaintiff seeks to sue VGW and Plaintiff seeks to represent a class defined as and limited to all citizens of the state of Connecticut who suffered losses of money by playing the games on the websites operated by VGW MALTA chumbacasino.com / Chumba Casino, VGW GP globalpoker.com / Global Poker, or VGW LUCKYLAND, luckylandslots.com / LuckyLand Slots and VGW during the applicable limitations period (hereafter the citizens of the state of Connecticut are also referred to as the "Class").

179. VGW may argue that their Terms of Service contain a class waiver prohibiting wagerers from participating in class action lawsuits and therefore no class should be certified. However, VGW's Terms of Service are illegal gambling contracts and are therefore void under Connecticut law. Furthermore, like the arbitration clauses, forum selection clauses, and choice of law provisions, class waiver – even if severed from the Terms of Service – are formed or based on illegal gambling consideration and therefore void under Conn. Gen. Stat. §§ 52-553 and 52-554.

180. Specifically excluded from the Class are VGW, their officers, directors, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint ventures, or entities controlled by VGW, and the heirs, successors, assigns, or other persons or entities related to or affiliated with VGW and or VGW's officers and or directors, the judge assigned to this action, and any member of the judge's immediate family.

181. Subject to additional information obtained through further investigation and discovery, the foregoing definition of the Class may be expanded or narrowed by amendment or amended complaint.

182. **Numerosity**: On information and belief numerous Connecticut citizens fall into the definition of the Class. Members of the class can be identified through VGW's records, discovery and other third-party sources.

183. **Commonality and Predominance**: Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting only individual Class members. The common legal and factual questions include, but are not limited to, the following:

184. **Typicality**: Plaintiff's claims are typical of the claims of the other members of the Class and that among the other things all Class members were similarly situated and were comparably damaged through VGW's wrongful conduct as set forth herein. The claims of all Class members are similar in that they all lost money playing the games owned and operated by VGW. Further there are no defenses available to VGW that are unique to Plaintiff.

185. **Adequacy of Representation**: Plaintiff will fairly and adequately protect the interests of the Class, which is estimated to consist of numerous Connecticut citizens. Plaintiff has retained counsel that has been a longstanding member of the Connecticut Bar and has decades of extensive litigation experience and Plaintiff intends to vigorously prosecute the action on behalf of the Class. Furthermore, Plaintiff has no interests that are antagonistic to those of the Class.

186. **Superiority**: A class action is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriments suffered by individual Class members are relatively small compared to the burden and expense of individual litigation on their claims against VGW. It would thus be virtually impossible for the Class to

obtain effective redress for the wrongs committed against the members on an individual basis. Furthermore, even if Class members could afford such individualized litigation, the court system could not. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by the action. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances.

## CAUSES OF ACTION

## COUNT I

## SUIT– RECOVER MONEY LOSSES

## Conn. Gen. Stat. §§ 52-553 and 52-554

187. Plaintiff, individually and on behalf of the Class sues VGW and realleges paragraphs 1-186, above.

188. The Connecticut legislature has established in Conn. Gen. Stat. §§ 52-553 and 52-554 that all agreements and contracts for gambling transactions are void and that the Plaintiff may sue and recover, on behalf of the Plaintiff and other similarly situated individuals, all money lost and paid or delivered to the winner of the gambling transaction or from the person knowingly receiving the money from the gambling transaction.

189. Specifically, Conn. Gen. Stat. § 52-554 states in part:

> …Any person who, by playing at any game, or betting on the sides or hands of such as play at any game, excluding any game permitted under chapter 226 or any activity not prohibited under the provisions of sections 53-278a to 53-278g, inclusive, loses the sum or value of one dollar in the whole and pays or delivers the same or any part thereof, may, within three months next following, recover from the winner the money or the value of the goods so lost and paid or delivered, with costs of suit in a civil action, without setting

> forth the special matter in his complaint. If the defendant refuses to testify, if called upon in such action, relative to the discovery of the property so won, the defendant shall be defaulted; but no evidence so given by the defendant shall be offered against him or her in any criminal prosecution. Nothing in this section shall prohibit any person from using a credit card to (1) participate in online casino gaming, online sports wagering, retail sports wagering or fantasy contests, as such terms are defined in section 12-850, and conducted pursuant to sections 12-852 to 12-865, inclusive, as applicable, or (2) participate in keno through or purchase tickets for lottery draw games through the Internet web site, online service or mobile application of the Connecticut Lottery Corporation, pursuant to section 12-853. …

*Id.*

190. An exception is contained within the statute for legally permitted brick and mortar casinos ("structures") and online casinos that have been specifically licensed and permitted by the state of Connecticut and its regulatory agencies. VGW is not such a legally permitted entity, structure or online casino. Likewise, Connecticut citizens have to pay by credit or credit cards in order to gamble on VGW's websites, which has long been prohibited by Connecticut law.

191. Plaintiff is authorized to proceed with litigation against VGW to recover all losses that Plaintiff suffered and those losses suffered by the Class, the other citizens of Connecticut, at least for the last three (3) months prior to the filing of this complaint.

192. Plaintiff and the Class are recognized and entitled by Connecticut law to the return of all gambling or gaming losses suffered by Plaintiff and the Class because any such gambling agreements are void, as stated in Conn. Gen. Stat. § 52-553, which provides:

> …All wagers, and all contracts and securities of which the whole or any part of the consideration is money or other valuable thing won, laid or bet, at any game, horse race, sport or pastime, and all contracts to repay any money knowingly lent at the time and place of such game, race, sport or pastime, to any person so gaming, betting or wagering, or to repay any money lent to any person who, at such time and place, so pays, bets or wagers, shall be void, provided nothing in this section shall (1) affect the validity of any negotiable instrument held by any person who acquired the same for value and in good faith without notice of illegality in the consideration, (2) apply to the sale of a raffle ticket pursuant to section 7-172, (3) apply to online casino gaming, online sports wagering, retail sports wagering and fantasy contests, as such terms are defined in section 12-850,

> and conducted pursuant to sections 12-852 to 12-865, inclusive, as applicable, (4) apply to the operation of keno through or the purchase of tickets for lottery draw games through the Internet web site, online service or mobile application of the Connecticut Lottery Corporation, pursuant to section 12-853, or (5) apply to any wager or contract otherwise authorized by law. …

*Id.*

WHEREFORE, Plaintiff requests a judgment against Defendants VGW HOLDINGS LIMITED, including its subsidiaries VGW MALTA LIMITED, VGW LUCKYLAND INC., and VGW GP LIMITED for all money paid or property delivered to each and all of the above-named Defendants as authorized by Conn. Gen. Stat. § 52-554 for the monetary losses incurred by Plaintiff and the citizens of the state of Connecticut, the Class, for all amounts permitted under Connecticut law, together with costs and that the Court grant such other just and appropriate relief.

**COUNT II**

**SUIT– RECOVER MONEY LOSSES AND INJUNCTIVE RELIEF**

**UNFAIR TRADE PRACTICES**

**Conn. Gen. Stat. §§ 42-110(b) and 42-110(g)**

193. Plaintiff, individually and on behalf of the Class sues VGW and realleges paragraphs 1-186, above.

194. VGW is covered by Conn. Gen. Stat. § 42-295 through 42-300 in that VGW has falsely claimed and advertised that it is a sweepstakes, but in reality, VGW operates internet gambling operations, including simulated gambling devices and simulated gambling displays, as defined by Conn. Gen. Stat. § 42-295(11) and (12).

195. VGW has violated Conn. Gen. Stat. § 42-296 where VGW has for more than three years prior to the filing of this complaint, advertised its simulated casino games to Plaintiff and the

Class as a sweepstakes but VGW has attached conditions and restrictions to the receipt of any prize (money) that VGW pays to Plaintiff and the Class.

196. VGW has violated Conn. Gen. Stat. § 42-297 by advertising its illegal gambling games as a sweepstakes, however, VGW has failed to properly disclose the odds of winning prizes or money on its games expressed in arabic numerals.

197. VGW has violated Conn. Gen. Stat. § 42-298 where VGW has for more than three years prior to the filing of this complaint, advertised its simulated casino games and yet required Plaintiff and the Class to pay entry fees or purchase goods (Gold Coins).

198. VGW's violations of Conn. Gen. Stat. §§ 42-295, 42-296, 42-297 and 42-298 constitute per se violations of Conn. Gen. Stat. § 42-110(b), as stated in Conn. Gen. Stat. § 42-300.

199. The cease-and-desist letter issued by the Connecticut Department of Consumer Protection and the act by VGW of ceasing operations in Connecticut should constitute prima facie evidence that VGW employed a method, act or practice prohibited by subsection (a) of Conn. Gen. Stat. §§ 42-110(b).

200. Pursuant to Conn. Gen. Stat. § 42-110(g), Plaintiff and the Class have suffered ascertainable loss of money as a result of the VGW illegal gambling operations and VGW's attempts to falsely deceive Plaintiff and the Class that VGW's operations and websites are legally permitted sweepstakes under Connecticut law.

201. Plaintiff and the Class are entitled to recover actual damages, punitive damages, injunctive relief, and attorney's fees.

202. Punitive damages are especially warranted and appropriate because VGW received a cease-and-desist letter from the Connecticut Department of Consumer Protection on or about

February 9, 2024, but VGW continued to conduct illegal gambling operations in Connecticut, including taking Plaintiff's money and money from the Class as late as September 2024.

203. Because VGW continued to operate for nearly 7 months after a cease-and-desist letter from the Connecticut Department of Consumer Protection, a court order granting injunctive relief is also appropriate and necessary to ensure that VGW does not attempt to further conduct illegal gambling operations into Connecticut.

204. VGW has further violated Conn. Gen. Stat. § 42-110(b)(a) by making false representations to Plaintiff and the Class that VGW's websites were operating legally in Connecticut when VGW knew that it was committing illegal gambling and that at least for 8 to 10 months VGW knew that the Connecticut Department of Consumer Protection had informed VGW that it should cease and desist its illegal gambling operations.

205. Plaintiff and the Class reasonably relied on the false representations by VGW to purchase the "coins" necessary to play VGW's games of chance and such misrepresentations by VGW were material and likely to entice Plaintiff and the Class to gamble through VGW's websites.

206. VGW has further violated Conn. Gen. Stat. § 42-110(b)(a) by making false representations to Plaintiff and the Class that VGW's websites were sweepstakes when VGW knew that it was not in compliance with the Connecticut law regarding sweepstakes, as outlined above.

207. VGW knew that it was not operating in compliance as a permitted sweepstakes at least for 7 months after VGW knew that the Connecticut Department of Consumer Protection had informed VGW that it should cease and desist its illegal gambling operations. Despite this knowledge, VGW intentionally and falsely continued to misrepresent that its gambling

operations are legally permitted sweepstakes and such misrepresentations by VGW were material and likely to entice Plaintiff and the Class to gamble through VGW's websites.

208. Plaintiff and the Class reasonably relied on the false representations by VGW to purchase the "coins" necessary to play VGW's games of chance or otherwise participate in the activities.

209. VGW's illegal gambling websites additionally violated Conn. Gen. Stat. § 42-110(b)(a) since being internet gambling websites or online gambling websites, not properly licensed in Connecticut, VGW had offended clearly established public policy, as established by Conn. Gen. Stat. § 52-553.

210. Punitive damages are likewise appropriate because VGW had prior knowledge that it was prohibited from conducting illegal online gambling in the states of Washington, Idaho, and Montana. Likewise, VGW or its subsidiaries have received cease and desist letters from at least two other state agencies, Delaware and Michigan, prior to the cease-and-desist letter from the Connecticut Department of Consumer Protection. Despite these other states' prohibitions and governmental notices, for nearly 7 months VGW continued to operate its illegal gambling operations in Connecticut even after it received the Connecticut Department of Consumer Protection cease and desist letter.

WHEREFORE, Plaintiff requests a judgment against Defendants VGW HOLDINGS LIMITED, including its subsidiaries VGW MALTA LIMITED, VGW LUCKYLAND INC., and VGW GP LIMITED for all money paid or property delivered to each and all of the above-named Defendants for the monetary losses incurred Plaintiff and the citizens of the state of Connecticut, the Class, for all damages permitted under Connecticut law, including punitive damages, attorney's fees and costs and that the Court grant such other just and appropriate relief, including but not limited to appropriate injunctive relief.

## COUNT III - FRAUD

211. Plaintiff, individually and on behalf of the Class sues VGW and realleges paragraphs 1-186, above.

212. Plaintiff and the Class were defrauded because VGW advertised that its operations are legitimate and legal when, in reality, VGW knowingly and willfully operated what constituted an illegal gambling enterprise.

213. The Terms of Service across VGW's various sites further defrauded the plaintiff by stating that residents would not be allowed to play on VGW's platforms in states where they are prohibited. However, VGW claims that Connecticut permits VGW's operations, and has fraudulently done so through September or October 2024.

214. VGW's audited financials show VGW spent hundreds of millions of dollars advertising VGW's platforms and, in such advertisements, deceptively advertise their own legality and thus VGW has defrauded and manipulated the plaintiff into engaging in illegal gambling and losing money. (Exhibit "C").

WHEREFORE, Plaintiff requests a judgment against Defendants VGW HOLDINGS LIMITED, including its subsidiaries VGW MALTA LIMITED, VGW LUCKYLAND INC., and VGW GP LIMITED for all money paid or property delivered to each and all of the above-named Defendants for the monetary losses incurred Plaintiff and the citizens of the state of Connecticut, the Class, for all damages permitted under Connecticut law, including punitive damages, attorney's fees and costs and that the Court grant such other just and appropriate relief, including but not limited to appropriate injunctive relief.

## COUNT IV -

## 6 Del. C. § 2511(9), 2513 and 2525 - the Delaware Consumer Fraud Act

215. Plaintiff, individually and on behalf of the Class sues VGW and realleges paragraphs 1-186, above.

216. Alternatively, Plaintiff individually and on behalf of the Class sues VGW for violations of Delaware law.

217. VGW claims that Plaintiff agreed to terms and conditions that require any disputes be submitted for litigation in Delaware and that Delaware law should apply and control to resolve their disputes.

218. Plaintiff disagrees with VGW and states that she specifically notified VGW that she "…opt[ed] out of the forum selection clause, choice of law clause, and the class waiver in the past, present, and future in perpetuity as well. …" (Exhibit "B").

219. However, alternatively in the event that it is determined that this facts and issues of this case are subject to and controlled by Delaware law, Plaintiff individually and behalf of the Class sues VGW pursuant to 6 Del. C. § 2513 and 2525, the Delaware Consumer Fraud Act.

220. As early as February 23, 2023, Laurence Escalante and VGW Luckyland were notified by the Delaware Division of Gaming Enforcement found that VGW was violating Delaware law and operating an illegal gambling operation. The Delaware Division of Gaming Enforcement demanded that it "…immediately suspend all such account accessed by users physically located with the State of Delaware. …" and "…terminate any and all illegal operations occurring within the physical territory of the State of Delaware. …" (Exhibit "C").

221. Before February 23, 2023, but especially by February 23, 2023, VGW knew that all of its internet gambling websites were violating Delaware law.

222. Instead of terminating its illegal gambling operations in Delaware and other states, VGW continued to advertise its websites, target Plaintiff and other Connecticut citizens, and fully operate its illegal gambling websites.

223. VGW concealed from Plaintiff and the Class the material facts that VGW knew it was operating illegally under Delaware law.

224. VGW further concealed from Plaintiff and the Class that VGW interpreted Delaware law to not allow Plaintiff and the Class to effectively resolve disputes with VGW or recover damages for VGW's acts of illegal gambling, constituting an unfair practice under 6 Del. C. § 2511(9).

225. VGW falsely claimed it was a sweepstakes permitted under Delaware law and VGW knowingly concealed from Plaintiff and the Class that VGW was not entitled under Delaware law to operate as a sweepstakes and that it was making rules and doing acts that were contrary to Delaware law regulating sweepstakes.

226. VGW falsely claimed it was a sweepstakes by providing "Alternate Means of Entry" (AMOE) in the form of giving nominal amounts free Sweeps Coins or allowing Plaintiff and the Class to submit written requests for Sweeps Coins to gamble on the VGW websites. However, VGW knew that the amount of Sweeps Coins awarded for free or in return for written requests are so nominal in comparison to the amount issued as part of the sale of Gold Coins, or so difficult to obtain, that VGW knew its websites were illegal gambling websites under Delaware law, and VGW concealed this information and misrepresented it to Plaintiff and the Class. *See, State v. Eckerd's Suburban, Inc.,* 164 A.2d 873 (1960); *Affiliated Enterprises v. Waller,* 5 A.2d 257 (1937).

227. VGW falsely represented to Plaintiff and the Class that VGW was operating legally under Delaware law and that any disputes could be resolved under Delaware law in order to induce

Plaintiff and other citizens to gamble on VGW's websites and to convince Plaintiff and other Connecticut citizens that they could effectively resolve disputes in accordance with Delaware law.

228. Instead, VGW attempted to deceive Plaintiff and the Class to agree to resolution of legal disputes under Delaware law when VGW believed there was no viable method or remedy under Delaware law for Plaintiff and other Connecticut citizens to win any disputes with VGW.

229. VGW's audited financials show VGW spent hundreds of millions of dollars advertising VGW's platforms and, in such advertisements, deceptively advertised their own legality and thus VGW has defrauded and manipulated the plaintiff into engaging in illegal gambling and losing money. (Exhibit "C").

230. Under 6 Del. C. § 2525, Plaintiff the Class are entitled to initiate private causes of action against VGW and to recover damages.

231. Under 6 Del. C. § 2583 members of the Class who are 65 years of age or older are entitled to recover treble damages.

WHEREFORE, Plaintiff requests a judgment against Defendants VGW HOLDINGS LIMITED, including its subsidiaries VGW MALTA LIMITED, VGW LUCKYLAND INC., and VGW GP LIMITED for all money paid or property delivered to each and all of the above-named Defendants for the monetary losses incurred Plaintiff and the citizens of the state of Connecticut, the Class, including treble damages for those Class members 65 years or older, for all damages permitted under Connecticut law, including punitive damages, attorney's fees and costs and that the Court grant such other just and appropriate relief, including but not limited to appropriate injunctive relief.

**COUNT V**

**RESTITUTION – DELAWARE LAW**

232. Alternatively, Plaintiff, on behalf of himself and the Class, incorporates the foregoing allegations in paragraphs 1-231 as if fully set forth herein and sues VGW for restitution or disgorgement of losses pursuant to Delaware law.

233. Alternatively, if the Court should determine that Delaware law is the law that should apply in this case, Plaintiff and the Class have a right to recovery of their gambling losses as restitution.

234. Under the Delaware Constitution, Del. Const. art. II, § 17, contracts or agreements based on illegal gambling consideration are *void ab initio.* Connecticut and Delaware recognize that contracts based on illegal gambling consideration are *void ab initio*.

235. This was confirmed in the Supreme Court of Delaware decisions in *Lincoln Nat. Life Ins. Co. v. Joseph Schlanger,* 2006 Ins. Tr., 28 A. 3d 436, 441 (Del. 2011) and *PHL Variable Ins. Co. v Price Dawe 2006 Ins. Trust,* 28 A. 3d 1059, 1070 (Del. 2011) where the Supreme Court of Delaware stated that illegal gambling contract are *void ab initio* and under Delaware law, all parts of any illegal gambling contracts are likewise void, non-existent and have no effect.

236. In the cases of *Wilmington Trust, Nat'l Ass'n v. Sun Life Assurance Co. of Can*, 294 A.3d 1062 (Del. 2023) and *Geronta Funding v. Brighthouse Life Ins. Co.,* 284 A.3d 47 (Del. 2022) the Supreme Court of Delaware recognized that Delaware law permits a losing gambler in an illegal wagering or illegal gambling agreement to recover gambling losses as restitution and that the illegal gambling organization must disgorge the money that it has taken from the losing gamblers.

237. In the case of *Wilmington Trust, Nat'l Ass'n v. Sun Life Assurance Co. of Can*, 294 A.3d 1062 (Del. 2023) the Supreme Court of Delaware found that Delaware has applied the criteria of Sections 197, 198, and 199 of the Restatement (Second) of Contracts to allow for claims of restitution to losing gamblers.

238. Under the Supreme Court of Delaware's application of Sections 197, 198, and 199 of the Restatement (Second) of Contracts, the losing gamblers are entitled to a trial of the facts to determine whether (1) there would be a disproportionate forfeiture if the losing gambler's funds are not returned; (2) the losing gambler is excusably ignorant; (3) the parties are not equally at fault; (4) the losing gambler seeking restitution did not engage in serious misconduct and withdrew before the invalid nature of the gambling agreement became effective; or (5) the party seeking restitution did not engage in serious misconduct, and restitution would put an end to the situation that is contrary to the public interest.

239. VGW's casino games constitute an illegal internet gambling operation under Delaware law because the players, and in particular Plaintiff and the Class members have tendered money by purchase of Gold Coins and Sweeps Coins and then wager the Gold Coins or Sweeps Coins on gambling games, games of chance and games of skill. By an element of chance (e.g., spinning a virtual slot machine, choosing numbers on a roulette table, playing blackjack, or playing poker) VGW creates a right to credits and or other things of value such as Sweeps Coins that can be redeemed for money, or additional Gold Coins is provided to allow for further play of VGW's games.

240. Plaintiff and the Class suffered losses or damages from gambling operations conducted by VGW when Plaintiff and the Class purchased coins or expended money to obtain coins (Gold Coins and Sweeps Coins) to wager at VGW's games.

241. Plaintiff and each member of the Class staked money in the form of coins purchased with money or acquired by expenditures of money, to play VGW's games of chance (VGW's slot machines, roulette, blackjack, and poker within VGW's websites) for the chance of winning additional things of value (e.g., coins that grant additional free plays (Gold Coins), or coins that can be redeemed for prizes or cash (Sweeps Coins)).

242. The Gold Coins Plaintiff and the Class have had the chance of winning in VGW's virtual casino games are things of value under Delaware law because the Gold Coins are credits that allow for the extension of entertainment and the privilege of continuing to play the games without additional charge.

243. The Sweeps Coins Plaintiff and the Class had the chance of winning in VGW's virtual casino games are things of value under Delaware law because they can be redeemed for cash and cash equivalents.

244. As a direct and proximate result from VGW's operations of their games and virtual casino, Plaintiff and each member of the Class have lost money wagering at VGW's games of chance, games of skill, or gambling games in violation of Delaware law.

245. Because the gambling transactions between Plaintiff, the Class members and VGW are void and of no effect, the moneys gambled and lost to VGW should be disgorged and returned to Plaintiff and the Class.

246. Delaware has a strong public policy against illegal gambling operations and illegal gambling agreements.

247. Plaintiff and the Class are entitled to restitution because there would be a disproportionate forfeiture if the losses suffered by Plaintiff and the Class are not returned as VGW will be allowed to retain well over five million dollars of money it received from Plaintiff and the Class

as gambling revenue and to fail to require VGW to disgorge the money it has received would reward VGW for its illegal gambling operations.

248. Plaintiff and the Class are excusably ignorant of the illegal gambling operations operated by VGW because VGW intentionally and fraudulently represented to Plaintiff and the Class that VGW's gambling operations are legal under Connecticut and Delaware law, and VGW intentionally failed to disclose to Plaintiff and the Class that VGW was violating Connecticut and Delaware law and that the State of Delaware had issued cease-and-desist notice to VGW in February 2023. Further, VGW intentionally and fraudulently misrepresented to Plaintiff and the Class that VGW was a "sweepstakes" when VGW knew that it was operating illegal gambling websites.

249. VGW is more at fault regarding the illegal gambling agreements with Plaintiff and the Class because VGW knew that it was operating illegal gambling websites and in 2023, VGW was specifically ordered by the state of Delaware to cease and desist its operations.

250. Plaintiff and the Class did not engage in serious misconduct regarding the VGW illegal gambling operations and illegal gambling agreements imposed by VGW. Plaintiff and the Class expended relatively small amounts of money only in the state of Connecticut to gamble on VGW's websites, whereas VGW has profited billions in revenue through its extensive gambling operations that span across the United States.

251. Plaintiff and portions of the Class sought to withdraw from the illegal gambling agreements with VGW.

252. Allowing Plaintiff and the Class to proceed and recover restitution of their gambling losses would put an end to VGW's illegal gambling operations in Connecticut which are contrary to the public interest and the strong public policy of Connecticut and Delaware.

WHEREFORE, Plaintiff, on behalf of himself and the Class, requests an order or judgment:

(1) requiring VGW to cease operations of their gambling devices and operations in Connecticut; and

(2) disgorgement or return from VGW to Plaintiff and the Class all monies lost by Plaintiff and the Class to VGW, together with interest, expenses, costs, and reasonable attorney's fees to the extent allowable by law, and other just and appropriate relief including injunctive relief.

**COUNT VI – UNJUST ENRICHMENT**

**(DELAWARE)**

253. Alternatively, Plaintiff, on behalf of himself and the Class, incorporates the foregoing allegations in paragraphs 1-252 as if fully set forth herein and sues VGW for restitution or disgorgement of losses because VGW has become unjustly enriched at the expense of Plaintiff and the Class.

254. Alternatively, if the Court should determine that Delaware law is the law that should apply in this case, Plaintiff and the Class have a right to recovery of their gambling losses on the basis of unjust enrichment.

255. VGW has been enriched by the money it has taken from Plaintiff and the Class through VGW's illegal gambling websites.

256. Plaintiff and the Class have suffered an impoverishment resulting from the money that they have lost by playing the games of chance on VGW's illegal gambling websites.

257. Plaintiff's and the Class' impoverishment resulting from gambling on VGW's illegal gambling websites has caused VGW to be enriched.

258. VGW is not legally justified in receiving the money it has taken from Plaintiff and the Class through VGW's illegal gambling websites.

259. In the event that Plaintiff and the Class are barred from seeking recovery of their gambling losses from VGW under 6 Del. C. § 2511(9), 2513 and 2525 - the Delaware Consumer Fraud Act (Count IV) or through restitution (Count V) then Plaintiff and the Class should be allowed to recover their losses on the basis of unjust enrichment.

WHEREFORE, Plaintiff, on behalf of himself and the Class, requests an order or judgment of disgorgement or return from VGW to Plaintiff and the Class all monies lost by Plaintiff and the Class to VGW, together with interest, expenses, costs, and reasonable attorney's fees to the extent allowable by law, and other just and appropriate relief including injunctive relief.

## DEMAND FOR JURY TRIAL

Plaintiff demands trial by jury of any and all issues in this action so triable by Connecticut law.

Dated this 9th day of May 2026

THE PLAINTIFF
STEPHANIE COX

**/s/John Kadaras**
John Kadaras
Law Office of John Kadaras
124 Jefferson St.
Hartford, CT. 06106-2404
(203) 627-2494
Fed Bar CT23172
Email: mariasdad@aol.com

# EXHIBIT "A"

# STATE OF CONNECTICUT

*DEPARTMENT OF CONSUMER PROTECTION*

February 9, 2024

**Via Certified Mail**

VGW US Inc.
442 Post Street, Suite 900
San Francisco, CA 94102

To Whom it May Concern:

The Department of Consumer Protection ("Department") has become aware that VGW Holdings Limited ("VGW"), located at 442 Post Street, Ste 900 is conducting unlicensed online gambling. VGW's actions are in violation of Connecticut General Statutes (Conn. Gen. Stat.) §§ 53-278b, 53-278d, 42-296, and 42-301, and the Connecticut Unfair Trade Practices Act ("CUTPA"). The Department, therefore, orders VGW to cease and desist advertising and offering its games and services to Connecticut customers.

Conn. Gen. Stat. § 53-278b prohibits gambling and professional gambling. Gambling is defined as "risking any money, credit, deposit or other thing of value for gain contingent in whole or in part upon lot, chance or the operation of a gambling device . . . ." Conn. Gen. Stat. § 53-278a. Professional Gambling means "accepting or offering to accept, for profit, money, credits, deposits or other things of value risked in gambling . . . ." Id.

Public Act 21-23 authorized online gambling in Connecticut, but only for specific licensed entities. VGW does not possess an online gaming operator's license under Conn. Gen. Stat. § 12-857 or any other relevant qualification that would all VGW to provide online gaming to Connecticut residents; nor do VGW's actions fall within any of the excepted activities to the prohibition on gambling listed in Conn. Gen. Stat. § 53-278g.

VGW's promotion of unlicensed and illegal gambling services is also an unfair trade practice, which violates CUTPA.

# STATE OF CONNECTICUT

*DEPARTMENT OF CONSUMER PROTECTION*

VGW is hereby ordered to immediately cease and desist offering its games and services to Connecticut Customers. Failure to comply may result in additional action including, but not limited to, civil penalties under CUTPA and/or criminal penalties under Conn. Gen. Stat. §§ 53-278b and 53-278d.

Sincerely,

Maureen Magnan

Maureen Magnan,
Deputy Commissioner

# EXHIBIT "B"

From: [redacted]
Date: Mon, Jul 15, 2024 at 7:22 PM
Subject: Opting Out of Arbitration - All Three Sites in Connecticut
To: <arbitrationoptout@chumbacasino.com>, <arbitrationoptout@luckylandslots.com>, <arbitrationoptout@globalpoker.com>

Hello,

My name is Stephanie Marie Cox.

My postal address and home address is [redacted]

My email address is [redacted] with all three sites (Chumba Casino, Luckyland Slots and Global Poker).

As is my right under the terms of use I am opting out of the arbitration agreement included in the terms of use. I am opting out of the past arbitration agreement, the current arbitration agreement, and opting out of any future arbitration agreements in perpetuity. I am opting out of the forum selection clause, choice of law clause, and the class waiver in the past, present and future in perpetuity as well.Opting out legally, and according to your own terms, does not impact my ability to play on your site or receive free SC from the AMOE.

# EXHIBIT "C"

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISON

CASE NO. 6:24-cv-00413

ERIC A. KNAPP,
On behalf of himself and all
Other Florida citizens similarly situated,

Plaintiff, **CLASS ACTION**

vs.

VGW HOLDINGS LIMITED, VGW MALTA LIMITED, VGW LUCKYLAND INC., VGW GP LIMITED, FIDELITY NATIONAL INFORMATION SERVICES, INC., a Florida Corporation, and WORLDPAY, INC., a Delaware Corporation,

Defendants.
_______________________/

**DECLARATION OF GREGORY D. NOLT**

I, GREGORY D. NOLT, hereby attest that the following is true and correct:

1. I am over 18 years of age, and I am competent to make this declaration.

2. I am the Director of the Delaware Department of Safety and Homeland Security, Delaware Division of Gaming Enforcement for the State of Delaware.

3. I have reviewed the records maintained in the office of the Delaware Department of Safety and Homeland Security, Delaware Division of Gaming Enforcement and I can confirm that the letter attached to this Declaration as Exhibit "A" is a true and correct copy of the cease-and-desist letter that was sent to VGW Luckyland, Inc. on or about February 23, 2023.

4. The signature at the bottom of the letter (Exhibit "A") is my signature.

5. To the best of my knowledge and based on the records maintained in the office of the Delaware Department of Safety and Homeland Security, Delaware Division of Gaming Enforcement, it does not appear that VGW Luckyland, Inc. submitted a written response to my office.

I declare under penalty of perjury, under the laws of the United States of America, that the foregoing is true and correct.

Executed this 11th of April 2024 at Dover Delaware 19901.

Gregory D. Nolt, Director
Delaware Division of Gaming Enforcement

**INDIVIDUAL ACKNOWLEDGMENT**

State/Commonwealth of Delaware
County of Kent } ss.

On this the 11 day of April, 2024, before me,
Day Month Year

Deborah Renee Walker, the undersigned Notary Public,
*Name of Notary Public*

personally appeared Gregory D. Nolt,
*Name(s) of Signer(s)*

☒ personally known to me – **OR** –

☐ proved to me on the basis of satisfactory evidence

to be the person(s) whose name(s) is/are subscribed to the within instrument, and acknowledged to me that he/she/they executed the same for the purposes therein stated.

WITNESS my hand and official seal.

Deborah Renee Walker
*Signature of Notary Public*

Deborah Renee Walker

-NA-
*Any Other Required Information*
*(Printed Name of Notary, Expiration Date, etc.)*

*Place Notary Seal/Stamp Above*

**OPTIONAL**

*This section is required for notarizations performed in Arizona but is optional in other states. Completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**

Title or Type of Document: Exhibit "A" - Class Action

Document Date: April 11, 2024 Number of Pages: 3

Signer(s) Other Than Named Above: ------- NA --------

©2018 National Notary Association

# EXHIBIT "A"

**State of Delaware**
**Department of Safety & Homeland Security**
**DIVISION OF GAMING ENFORCEMENT**
**600 S. Bay Road , Suite#2**
**Dover, Delaware 19901**

February 23, 2023

Laurence Escalante, CEO
VGW Luckyland, Inc.
c/o The Corporation Trust
1209 North Orange Street
Wilmington, DE 19801-1120

**RE: Cease and desist LUCKYLAND SLOTS Operations within the State of Delaware**

Dear Mr. Escalante:

The Delaware Division of Gaming Enforcement ("DDGE") has been made aware of your company's website "https://luckylandslots.com". DDGE is tasked with the enforcement of gambling related crimes pursuant to 28 *Del. C.* § 8236. A review of your online website (https://luckylandslots.com) shows that you are offering casino games where one may pay to play games of chance for an opportunity to win cash prizes. Further, in your "Eligibility to Play Luckyland Slots" disclosure you indicate that eligible participants are legal residents of the permitted territories which include the United States except for Idaho and Washington. Permitting those people who reside in Delaware to participate in these games is in violation of Delaware law.[1]

DDGE hereby demands that VGW Luckyland, Inc. take immediate action to ensure that persons physically located in the State of Delaware are not permitted to participate in pay to play games of chance for cash prizes. We further demand VGW Luckyland, Inc. immediately suspend all such accounts accessed by users physically located within the State of Delaware.

---

[1] *See* Del. Const. art II, § 17; 11 *Del. C.* §§ 501, 511, 531, 1402-1406, and 1411 (establishing the various crimes and theories of criminal liability relating to illegal gambling in the State of Delaware.)

We trust that VGW Luckyland, Inc. will act quickly to comply with the demands set forth herein and ensure that it acts reasonably to terminate any and all illegal operations occurring within the physical territory of the State of Delaware. Please confirm that VGW Luckyland, Inc. has taken action consistent with the demands set forth herein by written response no later than March 31, 2023.

Sincerely,

Gregory Nolt
Director
Delaware Division of Gaming Enforcement

cc: Helene Keeley, Director, Delaware State Lottery
Lt. Thomas Paskevicius, Delaware State Police, Deputy Director DDGE
Stacey Bonvetti, Deputy State Solicitor, Delaware Department of Justice

# EXHIBIT "D"

MGA

# Dynamic Seal Of Authorisation

« Go Back

**Licensee Information:** VGW Games Limited

**Address:** Trident Park, Notabile Gardens, No6 – Level 3, Central Business District, Mdina Road, Zone 2, Birkirkara, CBD2010, Malta

**Email Address:** info@vgw.co

**Contact No.:** 21228535

**Status Of Licence:** Licensed

Licenses

| Licence Number | Licence Type | Class Type | Status |
|---|---|---|---|
| MGA/B2C/188/2010 | B2C - Gaming Service Licence | Service (B2C) - A licence to provide a service for the purposes of engaging with end consumers | Licensed |

Game Types

| Licence Number | Game Type Approved | Service Providers Approved | Vertical Approved |
|---|---|---|---|
| MGA/B2C/188/2010 | Type 1 Gaming Services | • G Gaming Limited RN/110/2019<br>• Relax Gaming Limited MGA/B2B/246/2013<br>• Playtech P.L.C. MGA/CRP/137/2007<br>• Swintt Malta Ltd MGA/B2B/745/2019<br>• Evolution NetEnt Malta Limited MGA/CRP/109/2004<br>• Slotmill Limited MGA/B2B/851/2020<br>• 1x2 NETWORK MALTA LTD MGA/CRP/635/2018<br>• AlchemyBet Limited RN/103/2018<br>• Arrise Solutions (Malta) Limited MGA/B2B/317/2016 | • Casino |
| MGA/B2C/188/2010 | Type 3 Gaming Services | | • Peer-to-Peer Bingo or Games |

ADRs

| Approved ADRs |
|---|
| Pardee Consulta Limited |

**Website Urls:**
http://www.globalcasino.com
http://globalpoker.com
http://www.chumbacasino.com

For authenticity, make sure that the address of this website starts with https://authorisation.mga.org.mt If not report misuse.

# Licensee Register

Interested parties can search by licensee name, authorisation status, URL or Gaming Service. Each heading holds a comprehensive list of all operators. Additional Information can also be viewed through the dynamic seal.

The information is constantly being updated by the MGA in order to keep the latest information readily available. If you encounter any issues while using this tool, or should you need further assistance contact us on info.mga@mga.org.mt or +356 2546 9000.

**Licensee Name**
Licensee Name

**Authorisation Status**
Licence Status

**Gaming Service**
Gaming Service

Search → View All → Clear All ✖

Last Updated: 26/11/2024 17:08

# URL Checker

## Search Results

Success! **URL found** in Licensee database.

← Back to Search

| Company Name | URL | Company Seal |
|---|---|---|
| VGW Games Limited | http://www.chumbacasino.com | Click to View |

Items per page: 10 1 – 1 of 1



Copyright © 2024
Malta Gaming Authority
All Rights Reserved.

Designed By Redorange
Developed By 9H Digital

Your Europe
EQUALITY CERTIFIED NCPE
SERVIZZ.GOV

# EXHIBIT "E"

competent authority, and any directives or other binding instruments which may be issued by the Authority in accordance with the provisions of this Act or any other regulatory instrument, may be published in the English language only.

Inapplicability of certain provisions. Cap. 16.

**54.** Articles 1713 and 1716 of the Civil Code shall not apply with respect to a game lawfully provided in terms of this Act or any other regulatory instrument and, or any game which is provided by an operator lawfully authorised by or under this Act.

Retention of information. Cap. 586.

**55.** Notwithstanding any other law, including the Data Protection Act, the Authority may, for the purpose of carrying out its functions under this Act or any other regulatory instrument, retain any information, including personal information, for such period of time as it may in its discretion deem necessary, or indefinitely as the case may be.

Peremptory period.

**56.** Any claim of whatsoever nature brought against the Authority shall be filed within two years from when the interested person knew or could have become aware of the act which gave rise to the claim, whichever is earlier:

Provided that for the sake of clarity such period shall be a peremptory period and shall not be subject to suspension, interruption, or any other extension of such period.

*Added by: XXI.2023.2.* Cap. 12.

**56A.** Notwithstanding any provision of the Code of Organization and Civil Procedure or of any other law, as a principle of public policy:

(a) no action shall lie against a licence holder and, or current and, or former officers and, or key persons of a licence holder for matters relating to the provision of a gaming service, or against a player for the receipt of such gaming service, if such action:

(i) conflicts with or undermines the legality of the provision of gaming services in or from Malta by virtue of a licence issued by the Authority, or the legality of any legal or natural obligation resulting from the provision of such gaming services; and

(ii) relates to an authorised activity which is lawful in terms of the Act and other applicable regulatory instruments; and

(b) The Court shall refuse recognition and, or enforcement in Malta of any foreign judgment and, or decision given upon an action of the type mentioned in sub-article (a).

# EXHIBIT "F"

# CHAPTER 583

## GAMING ACT

*AN ACT to make provision for the governance and regulation of gaming services and products from and within Malta, together with all such activities and matters that are ancillary or incidental thereto or connected therewith, and for the establishment and functions of the Malta Gaming Authority.*

1st August, 2018

*ACT XVI of 2018 as amended by Legal Notice 204 of 2018 and 418 of 2018 and 278 of 2019 and Acts XLI of 2018 and XXI of 2023.*

ARRANGEMENT OF THE ACT


| | | Articles |
|---|---|---|
| Part I | Preliminary | 1 - 2 |
| Part II | Regulatory Objectives and Governing Principles | 3 - 4 |
| Part III | Establishment, Functions, Powers and Conduct of Affairs of the Malta Gaming Authority | 5 - 12 |
| Part IV | Authorisations | 13 |
| Part V | Protection of Minors and Vulnerable Persons | 14 - 17 |
| Part VI | Rights and Obligations of Players | 18 - 22 |
| Part VII | Enforcement and Sanctions | 23 - 33 |
| Part VIII | Financial Provisions | 34 - 41 |
| Part IX | Administrative Review | 42 - 45 |
| Part X | Administration | 46 |
| Part XI | Miscellaneous | 47 - 59 |

| | |
|---|---|
| First Schedule - | Composition and conduct of affairs of the Board |
| Second Schedule - | Detailing of public officers for duty with the Authority |
| Third Schedule - | Criminal Offences |
| Fourth Schedule - | Amendment of other enactments |

PART I - Preliminary

Short title and commencement.
*Amended by: L.N. 204 of 2018.*

**1.** (1) The short title of this Act is the Gaming Act.

(2) (a) The provisions of this Act shall, without prejudice to paragraph (b), come into force on the 1st August, 2018.

(b) With respect to gaming devices, commercial tombolas and all other services provided in gaming premises and, or controlled gaming premises, this Act and all regulations made hereunder shall come into force on 1st January, 2019.

Interpretation.

**2.** (1) In this Act, unless the context otherwise requires:

"agent" means a person acting for and on behalf of another person;

"ancillary gaming supply" or "ancillary supply" means a gaming supply other than a material supply;

"Authority" means the Malta Gaming Authority established by this Act;

"authorisation" means a licence, approval, certificate, recognition notice or similar instrument issued by the Authority authorising a person to provide a gaming service, gaming supply or a key function;

"authorised person" or "authorisation holder" means a person who holds an authorisation from the Authority;

"binding instrument" means an act, document or other pronouncement of the Authority having binding effect on those to whom it is addressed, as may be prescribed by or under this Act, and shall include the conditions attached to an authorisation;

"Board" shall mean the Board of Governors of the Authority;

"Chairperson" means the Chairperson of the Board and includes the deputy chairperson or another person appointed to act as chairperson in circumstances established in this Act or as decided by the Board;

"Chief Executive" means the chief executive officer of the Authority appointed in accordance with this Act;

"confidential information" means any and all information, whether written or otherwise, whether in electronic form or otherwise, and whether or not described specifically by the person disclosing it as confidential, which is related to or connected with the commercial operation of the disclosing person, but shall not include

information that:

(a) is in the public domain;

(b) is or becomes generally available to the public other than as a result of its disclosure by the recipient in breach of confidentiality;

(c) was available to the recipient on a non-confidential basis prior to disclosure by the disclosing party;

(d) was, is or becomes available to the recipient on a non-confidential basis from a person who, to the recipient's knowledge, is not bound by a confidentiality agreement with the disclosing party or is otherwise prohibited from disclosing the information to the recipient;

(e) was lawfully in the possession of the recipient before the information was disclosed to it by the disclosing party;

(f) the parties agree in writing is not confidential or may be disclosed; or

(g) is developed by or for the recipient independently of the information disclosed by the disclosing party;

"consumer" shall have the meaning prescribed by the Consumer Affairs Act; Cap. 378.

"critical gaming supply" or "critical supply" means a material supply which is (a) indispensable in determining the outcome of game or games forming part of the gaming service, and, or (b) an indispensable component in the processing and, or management of essential regulatory data;

"directorate" means a division of the Authority as may be established from time to time;

"economic activity" means any activity which by its nature is or could be carried out for the purpose of making a profit, whether or not such profit is for philanthropic or other fund raising purposes;

"financial year of the Authority" means a period from 1 January to 31 December of a year;

"game" means a game of chance or a game of skill;

"game of chance" means an activity the outcome of which is determined by chance alone or predominantly by chance, and includes but is not limited to activities the outcome of which is

determined depending on the occurrence or outcome of one or more future events;

"game of skill" means an activity the outcome of which is determined by the use of skill alone or predominantly by the use of skill, but excludes a sport event, unless otherwise established by or under this Act;

"gaming" means an activity consisting in participating in a game, offering a gaming service or making a gaming supply;

"gaming device" means any device or object, including any electrical, electronic, or mechanical device, ticket or any other thing, that is used or is by its nature intended for use as part of a gaming service or in connection therewith in a gaming premises;

"gaming premises" means any premises accessible to the public, which is used or intended to be used for players to participate in a gaming service;

"gaming sector" means the economic sector focused on the provision of gaming services and gaming supplies and other services and goods in connection therewith or related thereto;

"gaming service" means making a game available for participation by players, whether directly or indirectly, and whether alone or with others, as an economic activity;

"gaming supply" means a supply, directly or indirectly, of a good or service, in relation to a gaming service, which is either a material gaming supply or ancillary gaming supply, but does not include provision of a key function;

"material supply" or "material gaming supply" means a gaming supply of such importance that any weakness or failure in its provision could have a significant impact on the operator's (a) ability to meet the operator's obligations under the Act and all applicable regulatory instruments; or (b) to manage the risks related to such supply; or (c) to continue in business, and the term "material supply" shall include a "critical supply";

"minor" means a physical person under the age of eighteen years, except where prescribed otherwise in specific instances under this Act or any other regulatory instrument;

"Minister" means the Minister responsible for the gaming sector;

"money and, or money's worth" includes, without limitation, currency accepted as legal tender in the jurisdiction or jurisdictions of its issue, virtual currencies, units of value, tokens of value, goods, services and any form of property which may be traded, sold,

converted into, or otherwise exchanged for money, goods or services;

"National Lottery games" means the Grand Lottery, Super 5 and Lotto, in the form envisaged in the National Lottery licence as well as any variation of any of the said National Lottery Games;

"National Lottery licence" means a licence granted by the Authority in virtue of a concession by the Minister granted under article 11(3), to operate the National Lottery games and such other games as authorised by the Authority, and subject to such terms and conditions therein, and "National Lottery licensee" shall be construed accordingly;

"operator" means a person who carries out a gaming service;

"player" means an end customer who participates or takes preparatory steps to participate in a game;

"player funds" means player's money and money's worth held by an operator under an arrangement made between an operator and the player for the provision of a gaming service and includes, but is not limited to, funds that the player has the right to withdraw and funds committed directly by players to games, pending determination of the outcome of such games;

"player funds account" means an account held by or for or on behalf of an operator with a licensed credit, financial and, or payment institution in which player funds are kept;

"prize" means the reward of money or money's worth offered to one or more participants in a game in accordance with the rules of the game;

"recognition notice" means a notice issued by the Authority whereby an authorisation issued by another Member State of the EU or the EEA, or a State which is deemed by the Authority to offer safeguards largely equivalent to those offered by Maltese law, and is recognised as having the same effect as an authorisation issued by the Authority for the purpose of providing a gaming service, gaming supply and, or key function in or from Malta;

"regulatory data" means data which an authorised person is obliged to compile, retain and, or report to the Authority by or under this Act or any other regulatory instrument;

"regulatory instrument" means this Act, regulations made under this Act, and the Authority's binding instruments;

"stake" means money or money's worth that is or must be committed in order for a player to participate in a game, whether or not it is risked directly on a result of the game;

"vulnerable person" means any person who is known to have a gambling problem, any person whose social circumstances may make him or her more susceptible to problem gambling, or any person who, by virtue of a defect in the capacity of will and understanding, is rendered more susceptible to problem gambling, and this shall include players who are undergoing a period of self-exclusion, persons who have been diagnosed by medical professionals as being pathological or otherwise problem gamblers, persons who are currently seeking treatment for problem gambling and persons under the influence of alcohol or drugs.

(2) In this Act and any binding instrument made thereunder, if there is any conflict between the English and Maltese texts, the English text shall prevail.

PART II - Regulatory Objectives and Governing Principles

Gaming sector to be supervised.

**3.** (1) The gaming sector in Malta shall be governed and supervised by means of proper regulation of relevant activities and practices in line with the regulatory objectives and governing principles established by this Act.

(2) The Minister shall determine Malta's general policies not inconsistent with the provisions of this Act for the gaming sector and its governance and supervision.

Main regulatory objectives.

**4.** (1) Governance and supervision of the gaming sector shall pursue the following main regulatory objectives:

(a) to ensure that regulation of the gaming sector is carried out in the public interest;

(b) to ensure, through the powers vested in the Authority, that gaming is free from crime and is not used as a source or an instrument of crime;

(c) to ensure that gaming is conducted in a fair, safe and transparent manner;

(d) to ensure that the interests of minors and other vulnerable persons are adequately safeguarded;

(e) to promote the development of a sustainable gaming sector and economic growth;

(f) to promote the development of Malta as a centre of excellence and expertise for gaming-related competences and skills, knowledge building and knowledge transfer, in particular in technology-rich and player assistance services;

(g) to promote responsible innovation in the gaming sector.

Governing principles.

(2) The pursuit of the regulatory objectives, governance and supervision of the gaming sector shall be guided by the following governing principles:

(a) regulatory action shall be proportionate to the aims it strives to achieve and not more burdensome than necessary for the achievement of the said aims;

(b) requirements to be imposed on regulated persons shall be non-discriminatory, transparent and accessible, consistent, objective and made public in advance;

(c) regulatory action affecting rights and obligations of persons shall be timely and shall be reasoned and taken on the basis of appropriate and relevant considerations;

(d) regulatory procedures and requirements shall be such as to avoid, as much as reasonably possible without prejudicing regulatory objectives, duplication of requirements and controls;

(e) regulation shall, where appropriate and possible, use a risk-based approach, so that regulatory objectives are pursued in the most efficient and effective way;

(f) prior to taking regulatory action or imposing regulatory requirements, where appropriate and opportune, consultation shall be carried out with regulated persons, other stakeholders in the gaming sector and, or the wider public as the case may be;

(g) in case of a conflict between public interest and economic considerations, public interest considerations shall prevail;

(h) where the public interest considerations so require, the Minister shall be empowered to amend any relevant policies and regulatory actions shall be adjusted accordingly:

Provided that the Authority may deviate from these governing principles if such deviation is objectively justified by an overriding reason relating to public policy, public security, public health or the protection of the environment.

## PART III - Establishment, Functions, Powers and Conduct of Affairs of the Malta Gaming Authority

Establishment of the Malta Gaming Authority.

**5.** (1) There shall be an authority, to be called the Malta Gaming Authority.

(2) The Authority shall be a body corporate having distinct

legal personality and shall be capable of entering into contracts, of acquiring and disposing of property of any kind for the purposes of its functions under this Act or any other law, of suing and of being sued, and of doing all such things and entering into all transactions as are incidental to or conducive to the exercise or performance of its functions as aforesaid.

Composition of the Authority.

**6.** (1) The Authority shall consist of a Board of Governors.

(2) (a) The Board shall appoint a Chief Executive for the day-to-day management of the affairs of the Authority.

(b) The Board shall, on the recommendation of the Chief Executive, appoint such other persons whether from within the Authority or not, to form part of an Executive Committee to assist the Chief Executive in his functions.

(3) It shall be the duty of the other organs of the Authority to provide the Board with all such information as may be required for the proper performance of its functions and in particular to enable it to ensure that its policies are being properly carried out.

(4) The Board and other organs of the Authority shall be composed of such members, and shall conduct their affairs, as prescribed in the First Schedule.

Powers and functions of the Authority.

**7.** (1) Without prejudice to any other power or function conferred to it by this Act or any other law, in pursuing the main regulatory objectives in line with the governing principles established by this Act, it shall be the function of the Authority:

(a) to regulate, supervise and keep under review all practices, operations and activities relating to any matter regulated by or under this Act, and the performance of the gaming sector;

(b) to promote the general interests of players, and to provide the relevant information and guidance to the public;

(c) to ensure that gaming services are advertised fairly and in a responsible manner in accordance with applicable law;

(d) to receive and investigate complaints by players and to assist and promote timely, fair and competent resolution of disputes between players and players and, or operators;

(e) to monitor the gaming sector in Malta and to undertake or commission such study, research or investigation which it may deem necessary;

Case 3:26-cv-00363-SFR Document 33 Filed 05/29/26 Page 108 of 210



(f) to provide information and issue guidelines and, or reports to the public relating to any matter regulated by or under this Act;

(g) to consult with the general public or a specific segment thereof, as the case may be, on all matters which the Authority considers necessary and, or desirable;

(h) to request, collect, compile and maintain records of all relevant data as the Authority may deem appropriate in connection with its functions and objectives;

(i) to develop the necessary strategy and action plans to achieve the policies, strategies and objectives set by Government or by the Authority;

(j) to advise the Government generally on the formulation of policies directly or indirectly connected with gaming and the gaming sector, and to make recommendations to Government on actions which in the opinion of the Authority would be expedient in relation to matters falling within the regulatory and supervisory functions of the Authority;

(k) to advise the Minister on new developments, needs and risks in gaming and the gaming sector and to make proposals as may be deemed necessary or expedient to respond thereto;

(l) to advise the Minister on the making of regulations;

(m) to establish the minimum requirements to be satisfied by any person who is engaged or employed in any activity, function or involved in any matter regulated by or under this Act;

(n) to inquire into the suitability of any person engaged or employed in any activity or involved in any matter regulated by or under this Act to ensure that these persons are fit and proper and suitable to carry out their functions;

(o) to grant any licence, approval, recognition or other authorisation for the carrying out of any operation or activity relating to any matter regulated by or under this Act, as may be required in terms of this Act or regulations made thereunder;

(p) to assess whether persons comply with the requirements imposed by or under this Act;

(q) to impose such proportionate requirements and

conditions, in conformity with European Union law and Malta's international obligations, as it may deem necessary in fulfilment of its functions under this Act, or as the Minister may direct the Authority by virtue of article 11, in respect of gaming and related activities which are authorised by a competent authority of any other jurisdiction and made available in Malta;

(r) to ensure high standards of conduct and management throughout the gaming sector;

(s) to prevent, detect and ensure the prosecution of any offence against this Act or regulations made thereunder;

(t) to collaborate with other local or foreign bodies, Government departments, international organisations, and other entities which exercise regulatory, supervisory or licensing powers under any law in Malta or abroad, or which are otherwise engaged in overseeing or monitoring areas or activities in the gaming sector or sectors connected therewith, and to make arrangements for the mutual exchange of information and for other forms of assistance or collaboration in regulatory and supervisory matters;

(u) to ensure that international obligations entered into by Malta or by the Authority relative to matters regulated by or under this Act are complied with;

(v) to pursue the establishment of common standards in the gaming sector;

(w) to foster advancements in the educational sector for matters relating to the gaming sector;

(x) to do such other things as are necessary, ancillary or conducive to the attainment of its objectives and, or the performance of its functions under this Act.

Additional powers.

(2) In addition to and without prejudice to the above, the Authority shall have the power:

(a) to issue and, or publish authorisations and binding instruments, howsoever named, whether addressed to the general public or to categories of persons or to a specific person or persons, as provided for by or under this Act:

Provided that where a binding instrument is issued and addressed to the general public, or to one or more categories of persons, the Authority shall issue such binding instrument in consultation with the Minister;

(b) to issue and, or publish reports, guidelines,

policies and, or consultation papers as may be required, appropriate and, or opportune for the carrying into effect of the provisions of this Act and of any other regulatory instrument;

(c) to create or participate in the creation and operations of entities whose function shall be necessary, ancillary or conducive to the attainment of the functions and, or objectives of the Authority under this Act or regulations made thereunder;

(d) to request any kind of information from its authorised persons, applicants or any other person, as it may in its discretion consider necessary for the performance of its functions or the fulfilment of the objectives under this Act or any other law;

(e) to establish, impose and collect fees, contributions, administrative fines and other dues which it is empowered to impose and, or collect in terms of this Act or any other law;

(f) to collect gaming devices levy, gaming tax and other money which it is empowered to collect in terms of this Act or any other law; and

(g) to give such directions and impose such sanctions as it may consider necessary in connection with a breach of this Act or any other regulatory instrument or binding instrument:

Provided that any direction and, or sanction imposed in accordance with this paragraph, and any amendment or revocation thereof shall be in writing and shall state the reasons on which it is based, and shall be notified to the person concerned.

(3) The Authority shall, where it considers appropriate, consult and, or exchange information with all competent authorities responsible for any such other areas as may impact on the matters regulated by or under this Act. Consultation and exchange of information.

(4) The Authority shall also have such other functions, responsibilities and powers as are set out by or under this Act or as may be assigned to it by or under any other law, including all such powers as are necessary for or incidental to the performance of its functions by or under this Act or any other law or regulatory instrument.

(5) It shall be the duty of the Authority to carry out its functions as established by or under this Act or any other law in an impartial, transparent and timely manner and to ensure compliance

therewith.

(6) The Authority may, instead of using its officers or employees to carry out any action sanctioned by or under this Act, authorise a third party to carry out such action, and in such cases the contractor of the Authority shall have such powers and obligations as an officer or employee of the Authority carrying out those actions:

Provided that decision-making functions and responsibility thereof shall lie solely with the Authority.

Secrecy and disclosure. Cap. 377.

**8.** (1) Without prejudice to the provisions of the Professional Secrecy Act, any confidential information disclosed to the Authority or any member, officer or employee thereof, shall be secret and, when attributable to an identified or identifiable person, shall not be disclosed or produced other than with the consent of the person who has submitted that information:

Provided that the above is without prejudice to the provisions of article 25(4) of this Act:

Provided further that notwithstanding the above, the Authority may disclose such information to the Police for the purposes of any investigation or prosecution of a criminal offence or when requested to do so by a court of law in any criminal proceedings. The Authority may also disclose such information in any civil proceedings involving the Authority.

(2) The Authority shall be empowered to share any relevant personal data in its possession with local and, or foreign regulators entrusted with the governance and regulation of a particular sector, when such transfer of data is (i) considered by the Authority as a necessary measure in the public interest, and (ii) necessary for the process of detecting, preventing and investigating activities constituting a criminal offence in Malta, or in accordance with Maltese law, and the law of the country of the relevant foreign regulator:

Provided that the public interest requirement shall be deemed *ipso jure* satisfied where the transfer of data is required in relation to the process of detecting, preventing and investigating activities relating to any of the following offences:

(a) money laundering;

(b) terrorist financing;

(c) fraud, identity theft and misappropriation of funds;

(d) computer misuse; and

(e) manipulation of sports competitions:

Provided further that for the purposes of detecting, preventing and investigating the manipulation of sports competitions, the Authority may also share information, including any relevant personal data, with sport governing bodies and other platforms whose function includes the detection of suspicious betting activities and, or are responsible to take action to prevent such manipulation of sports competitions from taking place, and with whom the Authority has signed an agreement establishing the necessary safeguards to protect any personal data being shared:

Provided further that all processing operations shall be in accordance with the applicable data protection legislation.

Legal personality and representation of the Authority.

**9.** (1) The legal and juridical representation of the Authority shall vest in the Chief Executive:

Provided that the Chief Executive may appoint any one or more of the Authority's members, officers or employees to appear, sign or otherwise act in the name and on behalf of the Authority in any judicial proceedings and, or in any act, contract, instrument or other document whatsoever:

Provided further that in respect of any matter falling within the functions vested in any member of the Executive Committee, the legal representation of the Authority shall also vest in such Executive Committee member acting alone, or in such member, officer or employee of the Authority, as the Executive Committee member may appoint or authorise for the purpose.

(2) Any document purporting to be an instrument made or issued by the Authority and signed by the Chief Executive, or by a member of the Executive Committee in relation to any matter falling within the functions vested in the relative directorate by the Authority, shall be received in evidence and shall, until the contrary is proved, be deemed to be an instrument made or issued by the Authority.

Audit Committee.

**10.** (1) There shall be an Audit Committee, composed of such members and with such functions as the Board may determine.

(2) Without prejudice to the generality of the provisions of sub-article (1), the Audit Committee shall perform an internal audit function, providing oversight of all processes, internal controls, and checks and balances within the Authority, ensuring good corporate governance, as well as the compliance of the Authority with its functions, objectives and obligations at law.

Matters affecting public interest.

**11.** (1) The Minister may, in relation to matters that appear to him to affect public interest, from time to time give to the Authority directions in writing of a general character, consistent with

the provisions of this Act, and the Authority shall, as soon as is practicable, give effect to all such directions:

Provided that the Authority shall act independently and shall not seek or take instructions from any other body on matters related to the general regulation of the gaming sector:

Provided further that in matters that appear to the Authority to affect public interest, the Authority may advise the Minister and make proposals on the measures it deems necessary and, or desirable to address such matters.

(2) The Authority shall afford to the Minister facilities for obtaining information with respect to its property and activities and furnish him with returns, accounts and other information with respect thereto, and afford to him facilities for the verification of information furnished, in such manner and at such times as he may reasonably require.

(3) (a) It shall be lawful for the Minister to grant concessions to persons to open and operate casinos in gaming premises, for such consideration and under such terms and conditions as the Minister deems fit.

(b) It shall be lawful for the Minister to grant concessions to one or more persons to operate the National Lottery games and such other games as the Minister may, in such concession, determine, for such consideration and under such terms and conditions as the Minister deems fit.

(c) The grant of a concession in terms of paragraphs (a) or (b) shall be without prejudice to the requirement of such concessionaire to obtain any licences required in terms of this Act, any other regulatory instrument, or any other applicable law.

Powers of the Minister.

**12.** (1) The Minister may, acting on the advice of the Authority, make regulations to give effect to the provisions of this Act, or to prescribe anything that is to be or which may be prescribed in terms of this Act or any other regulatory instrument and provide for any matter consequential, incidental to or connected therewith.

(2) Without prejudice to the generality of the foregoing the Minister may, by such regulations:

(a) establish the categories of authorisations under this Act and the overall requirements and conditions for authorisations, their grant, amendment, renewal, suspension, revocation and termination and other similar actions;

(b) regulate games, specified categories of games or specified games, and all matters related thereto including the exemption of certain games or categories of games from any or

all requirements of authorisation;

(c) regulate persons involved in activities regulated by or under this Act, and all matters related thereto including the exemption of certain persons or categories of persons from any or all requirements of authorisation;

(d) amend, revoke, add to or substitute the Schedules to this Act:

Provided that the Minister may authorise the Authority to devise all necessary details of such requirements and conditions referred to in paragraphs (a), (b) and (c) by way of binding instruments to be issued by the Authority.

(3) Without prejudice to the generality of the foregoing, the Minister may, acting on the advice of the Authority, make regulations providing for the taxation of the persons and entities regulated by the Authority and any other matter related thereto.

PART IV - Authorisations

Requirement for authorisation.

**13.** Where this Act or any other regulatory instrument prescribe that an activity, of whatsoever nature, requires an authorisation in order to be performed, it shall be an offence against this Act to perform such activity, or to promote, aid, abet or otherwise facilitate such activity unless it is duly authorised.

PART V - Protection of Minors and Vulnerable Persons

Protection of minors.

**14.** Subject only to exceptions specified under this Act, no person shall offer, permit, entice, cause, invite or induce a minor to participate in a game which must, in terms of this Act or any other regulatory instrument, solely be offered to persons who are not minors, whether by means of allowing entrance into gaming premises, selling a gaming ticket, employment or engagement in the provision of a gaming service, advertising or promotion of a gaming service or by any other means whatsoever:

Provided that a person shall not be deemed to be in contravention of this article due to advertising or promotion of a gaming service if such advertising or promotion is carried out in accordance with applicable regulatory instruments:

Provided further that casinos in gaming premises operating in virtue of a concession granted by the Minister in terms of article 11 shall not allow a citizen of Malta under the age of twenty-five years to make use of the casino's gaming service during its hours of operation.

Prohibition of provision of credit.

**15.** It shall be an offence against this Act for a provider of a gaming service or an agent thereof to provide credit to players for

participation in games.

Social Causes Fund.

**16.** (1) There shall be a fund to be known as the "Social Causes Fund", which shall be composed of monies collected in such manner as may be prescribed by the Minister in regulations, which shall be used for the fulfilment of responsible gaming endeavours and other good causes.

(2) There shall be a Social Causes Fund Committee, composed of such members and with such functions as the Minister responsible for Finance may determine, to administer the Social Causes Fund.

(3) The funds from time to time standing to the credit of the Social Causes Fund shall be paid out by the Committee to such persons, organisations, bodies or other entities pursuing deserving causes in the public interest, in such manner as may be determined by the Minister, in consultation with the Minister responsible for Finance, in regulations made under this Act.

Protection of vulnerable persons.

**17.** The Minister shall, by regulations, establish the overall parameters, criteria and conditions for protecting vulnerable persons in order to minimise potential risk to their health associated with participation in games; provided that the Minister may authorise the Authority to devise all reasonable parameters, criteria, conditions and standards by way of directives or other binding instruments to be issued by the Authority.

PART VI - Rights and Obligations of Players

Receipt of player complaints.

**18.** (1) Without prejudice to the functions established in article 7, the Authority shall also have the function of receiving complaints from players arising out of or in connection with any gaming service, without prejudice to any other function which may be assigned to it by the Board from time to time.

(2) The Authority may carry out this function by means of an internal unit or otherwise.

(3) In carrying out this function, the Authority shall, to the extent possible, assist and cooperate with bodies responsible for out-of-court settlement of consumer disputes in Malta and in other EEA States in the resolution of local and cross-border consumer disputes concerning gaming services provided by an authorised person.

Safeguarding of player funds.

**19.** An operator, and any third party holding player funds for or on behalf of such operator, shall be responsible for safeguarding the player funds in accordance with the Player Protection Regulations, 2018 and any other applicable law.

**20.** Where a group of players are owed player funds by an operator, articles 2, and 4 to 23 of the Collective Proceedings Act shall apply *mutatis mutandis* and such players may institute collective proceedings to recover such player funds.

Collective proceedings by players.
Cap. 520.

**21.** (1) Authorised persons, in particular authorised persons providing a gaming service, shall ensure that their operation is carried out with due regard to responsible gaming measures as envisaged in the Player Protection Regulations, 2018 and any other regulatory instrument and any other applicable law.

Responsible gaming measures.

(2) The Authority shall, in ensuring that authorised persons act as required in terms of sub-article (1), liaise and collaborate with other competent authorities, including but not limited to the Malta Competition and Consumer Affairs Authority.

**22.** (1) Players shall behave in a fair and honest manner in making use of a gaming service and shall not mislead or deceive operators.

Responsibility of players.

(2) The Authority shall, from time to time, issue a manifesto detailing the rights and obligations of players making use of a gaming service provided by an operator.

PART VII - Enforcement and Sanctions

**23.** (1) Any person guilty of a breach stipulated in the Third Schedule shall, on conviction, be liable to a fine (*multa*) of not less than ten thousand euro (€10,000) and not more than five hundred thousand euro (€500,000) or to imprisonment for a term of not more than five years, or to both such fine and imprisonment:

Penalty for criminal offences against this Act.

Provided that where the person convicted of an offence against this Act is a recidivist of an offence against this Act, he shall be liable to a fine (*multa*) of not less than twenty thousand euro (€20,000) and not more than one million euro (€1,000,000), or to imprisonment for a term of not less than six months and of not more than six years, or to both such fine and imprisonment:

Provided further that where the person so found guilty is the president, director, manager, or any other officer exercising executive functions in a company or other undertaking, organisation, club, society or other association or body of persons, the said person shall, for the purpose of this article, be deemed to be vested with the legal representation of the same company or other undertaking, organisation, club, society or other association or body of persons, which shall accordingly be liable in solidum with the person found guilty for the payment of the said fine.

(2) The fine referred to in sub-article (1) shall be considered as a civil debt owed and payable to the Authority in respect of which there is an executive title.

Cap. 446.
Cap. 9.

(3) The provisions of the Probation Act and of article 21 and articles 28A to 28I of the Criminal Code shall not apply with respect to offences referred to in sub-article (1).

Offences to be tried by the Court of Magistrates and sanction of the Authority.

**24.** (1) The Court of Magistrates, in its criminal jurisdiction, shall be the competent court to take cognizance of offences against this Act or any regulations made thereunder.

(2) No criminal proceedings under this Act or any other regulatory instrument shall be taken except at the instance or with the sanction of the Authority, and proceedings that have been so taken may, at any time before final judgment, be withdrawn at the request of the Authority.

Cap. 9.

(3) Notwithstanding the provisions of the Criminal Code, the Attorney General shall have a right of appeal to the Court of Criminal Appeal from any judgment given by the Court of Magistrates in respect of criminal proceedings under this Act or any other regulatory instrument.

(4) In any criminal proceedings under this Act or regulations made thereunder, any officer of the Authority may, notwithstanding the provisions of any other law, produce the evidence, plead and otherwise conduct the prosecution jointly with the Police.

(5) Should the evidence of the officer designated by the Authority as aforesaid be required as part of the case for the prosecution, he shall be heard before assuming the duties of a prosecuting officer unless the necessity of his giving evidence arises at a later stage:

Provided that said officer may state the facts constituting the offence before giving evidence.

Cap. 9.

(6) The punishments provided in this Act shall apply unless the fact constitutes a more serious offence under the Criminal Code or any other law, in which case the provisions of the Criminal Code or of such other law shall apply.

Cap. 9.

(7) Notwithstanding the provisions of the Criminal Code, criminal proceedings for an offence against this Act or any other regulatory instrument shall be barred by prescription by the lapse of six years.

Penalty by agreement and other sanctions.

**25.** (1) Notwithstanding any other provision of this Act, and without prejudice to any other proceedings to which the person in breach may be liable to under any other law, in the case of any breach mentioned in the Third Schedule, the Authority may, with the concurrence of the person committing the breach and subject to the rectification of the breach, impose a penalty not exceeding five hundred thousand euro (€500,000) for each infringement or failure to

comply and, or a sum not exceeding five thousand euro (€5,000) for each day of infringement or non-compliance, and, or any other administrative sanctions as an alternative to criminal court proceedings. Upon conclusion of such agreement, the offender's criminal liability under this Act with regard to the offence or offences in relation to which the agreement has been entered, shall be extinguished:

Provided that the agreement shall not be concluded and the criminal liability of the offender shall not be extinguished unless the agreement is accompanied by the payment of the sum due or the provision of sufficient security for its payment, in the case of a fine, or in the case of another form of sanction by adherence thereto or sufficient security of adherence:

Provided further for the sake of clarity that the agreement, and payment of any fine due in virtue thereof, shall not exonerate the person in breach from rectifying such breach and becoming duly compliant with this Act and other applicable regulatory instruments:

Provided further that any forfeiture contemplated in this Act or the relevant regulatory instrument as a consequence of the offence to which the agreement relates shall, notwithstanding such agreement, still take effect.

(2) The provisions of sub-article (1) shall apply also in any case where the offender has been charged before a court in relation to the offence, but before final judgement has been given in the case.

(3) In the case of a breach of any regulatory instrument which is not mentioned in the Third Schedule, the Authority may impose an administrative penalty not exceeding twenty-five thousand euro (€25,000) for every breach or non-compliance and, or an administrative penalty not exceeding five hundred euro (€500) for each day on which the breach persists.

(4) The Authority may, by means of a public statement, disclose the name of the person sanctioned, the particular breach of a regulatory instrument committed, and the penalty or administrative measure imposed, where it deems that lack of disclosure would be detrimental to the interests of players or cause disproportionate damage to the parties involved.

(5) Any imposition of a fine or administrative sanction shall be without prejudice to the right of the Authority to recover any and all fees, contributions, levies, taxes and other dues which are imposed by or under this Act that remain unpaid after their due date. Such fees and taxes shall be due to the Authority as a civil debt and shall upon the service by judicial act of a copy of a notice for payment on the person indicated in the notice, constitute an executive title for all effects and purposes of Title VII of Part I of Book Second of the Code of Organization and Civil Procedure.

Cap. 12.

Presumptive evidence of gaming.

**26.** (1) In the case of any infringement of any provision of this Act or any other regulatory instrument, any moneys or effects representing the gaming activity, as well as any instruments or other means used in gaming and which may have been found and seized by the Police and, or the Authority on the occasion of any search effected on any person suspected of having committed such infringement or which may have been found in any place suspected of being used for such purpose, may, until the contrary is proved, be taken as sufficient evidence that such moneys, effects or place were actually used for gaming and that the persons found therein and located within direct proximity of the moneys or effects used for gaming at the time of the search were taking part in such gaming, even though no such bets or wagers were actually going on in the presence of the Police officers and, or officers of the Authority.

(2) Where any Police officer or any officer of the Authority lawfully authorised to enter any premises suspected to be used in contravention of any regulatory instrument is wilfully prevented from or obstructed or delayed in entering the same or any part thereof, or where any door or any contrivance whatsoever is found in such premises for preventing, delaying or obstructing the entry into the same, or for giving an alarm or warning in case of such entry, or if any such premises or part thereof is found fitted or provided with any means or contrivance for unlawful betting or wagering or for concealing, removing or destroying any instruments used for such unlawful purposes, it shall be evidence, until the contrary is made to appear, that such premises are used for bets or wagers and that the persons found therein were taking part in activities in contravention of the relevant regulatory instrument.

(3) In the case of a prosecution under the provisions of this Act or any other regulatory instrument, any person who in any way whatsoever has taken part in or has been a partner of any person in any bet or wager, and whose evidence is required in support of such charge as aforesaid, shall be compellable to answer any question respecting that charge, notwithstanding that the answer thereto will expose him to criminal prosecution; but in any such event, any person who shall have given evidence in respect of such charge, and who shall have made a true and faithful statement touching such charge, to the best of his knowledge, shall thereupon obtain from the court a

certificate to that effect, and he shall, in consequence, be exempted from all criminal responsibility in respect of his participation in the bet or wager forming the subject-matter of the charge upon which he gave evidence as witness.

Forfeiture in favour of the Authority.

**27.** In addition to any penalty under any other provision of this Act or regulations made thereunder, any machine or other device whatsoever and any moneys relating to or used in the commission of any offence listed in the Third Schedule, or which has served or was intended to serve for the commission of any such offence, shall be seized and forfeited in favour of the Authority and shall be appropriated in favour of the Gaming Fund.

Saving as to higher punishments established in any other law.

**28.** Where the fact which constitutes a breach of any regulatory instrument also constitutes an offence under any other law and is liable to a higher punishment under such law, such higher punishment shall be applied in lieu of the punishment established in this Act.

Counterfeiting and forgery.

**29.** (1) It shall not be lawful for a person -

(a) to forge, counterfeit or tamper with any device or any authorisation or other document whatsoever issued under, used or to be used for the purposes of this Act or any other regulatory instrument; or

(b) knowingly to utter any such forged, counterfeit or tampered with device or authorisation or other document.

(2) It shall not be lawful for a person to use, or have in his possession, any device, authorisation or other document issued under, used or to be used for the purposes of this Act or any other regulatory instrument, which the person knows or ought to know to have been forged, counterfeited or otherwise tampered with.

(3) Whosoever shall contravene the provisions of sub-articles (1) or (2) shall be guilty of an offence against this Act. Furthermore, any device, authorisation or other document and any gains which that person may have made due to said device, authorisation or other document referred to in the said sub-articles shall be forfeited in favour of the Authority and appropriated in favour of the Gaming Fund.

Place used for unlawful gaming.

**30.** (1) Any person who knowingly permits the use of any place for the purpose of the operation, promotion, sale or playing of any game in contravention of any provision of this Act or any other regulatory instrument or in breach of any conditions attached to an authorisation issued by the Authority, or the storage of a device involved in the contravention of this Act or any other regulatory instrument, or who wilfully prevents any Police officer or an officer of the Authority from lawfully entering into such premises, or obstructs or delays such officer from entering by any other means or

contrivance whatsoever, or a person who gives any alarm or warning to such person, shall be guilty of an offence against the Act.

(2) Where any Police officer or officer of the Authority is wilfully prevented or obstructed or delayed as aforementioned, it shall be evidence, until the contrary is made to appear, that such premises are used for the said unlawful purposes and that the persons found therein were taking part in the relevant unlawful activities.

(3) In addition to any penalty under any provision of this Act or any other regulatory instrument, the money and effects representing the stakes as well as any other money and devices used in the playing of the unlawful game found in any place referred to under sub-article (1) shall be seized and forfeited in favour of the Authority and shall be appropriated in favour of the Gaming Fund.

Investigation with or without notice.

**31.** Notwithstanding any other provision of this Act or of any other law, the Authority may, whether through its members, officers, inspectors or other employees or through third parties engaged for such purpose, conduct an analysis and investigation of the conduct of operations by an authorised person, with or without prior notice, and with or without informing the relevant authorised person that the person carrying out such analysis and, or investigation is acting on behalf of the Authority.

Power to demand documents etc..

**32.** (1) Without prejudice to any power exercisable by virtue of the provisions of this Act or any other regulatory instrument or any other law, the Authority may at any time serve on an authorised person a notice requiring him, in such manner and within such reasonable time as may be specified in the notice, to produce or supply for inspection by or on behalf of the Authority, any books, documents, video, audio, information or any other thing which the Authority knows, or has reasonable cause to believe, to be in the possession of, or to be known to, the authorised person for the purpose of carrying out any of its functions.

(2) If without reasonable excuse any requirement imposed by a notice served by virtue of sub-article (1) is not complied with, the authorised person shall be guilty of an offence under this Act.

False, misleading or incomplete statements.

**33.** Whosoever, in order to gain any advantage or benefit for himself or others, shall, in any document intended for the Authority, knowingly make a false, misleading or otherwise incomplete declaration or statement, or otherwise knowingly give false, misleading or otherwise incomplete information to the Authority, shall be guilty of an offence against this Act.

PART VIII - Financial Provisions

Authority to meet expenditure from revenue.

**34.** (1) Without prejudice to the following provisions of this article, the Authority shall so conduct its affairs that the expenditure required for the proper performance of its functions

shall, as far as practicable, be met out of its revenue.

(2) The revenue of the Authority shall consist of:

(a) income derived in respect of authorisations and other fees, rates or charges, including tax, contribution, levy and other payments payable under this Act or any other law in respect of which the Authority exercises supervisory, regulatory or similar functions;

(b) rents, interests and profits accruing from property, deposits and other assets of the Authority; and

(c) any other money receivable or received by the Authority.

(3) Notwithstanding the provisions of any other law, the claim of the Authority of any amount due by way of any such fees, rates, charges, taxes, duties and other payments including administrative penalties shall constitute a privileged claim, ranking immediately after the wages of employees due in terms of article 20 of the Employment and Industrial Relations Act and claims by the Director of Social Security in terms of article 116 of the Social Security Act, and equally with claims by the Commissioner for Revenue in terms of article 23(11) of the Income Tax Management Act, and shall be paid after such wages and social security claims and together with such income tax claims in preference to all other claims whether privileged or hypothecary.

Cap. 452.
Cap. 318.
Cap. 372.

(4) The Authority shall also be paid by Government out of the Consolidated Fund such sums as the House may from time to time authorise to be appropriated to meet the costs of specified works to be continued or otherwise carried out by the Authority, being works of infrastructure or a similar capital nature.

(5) Any funds of the Authority not immediately required to meet expenditure may be invested in accordance with the provisions of this Act.

(6) The Authority may establish an "Ordinary Reserves Fund" to which may be appropriated surplus funds to be used for the purposes of the Authority.

(7) The surplus funds of the Authority mentioned in sub-article (6) for each financial year of the Authority shall be determined after the Authority meets all current expenditure for that year and after making such provisions, including provisions for contingencies, as it deems fit.

(8) After the allocations referred to in sub-articles (6) and (7) have been made, the remainder of the surplus funds shall be paid to the Government.

Authority's control of its finances.

**35.** (1) The Authority may:

(a) hold accounts with any bank;

(b) obtain loans, overdrafts or any other form of credit as may be necessary;

(c) invest any of its liquid assets in short and medium term first class securities as approved by the Board;

(d) acquire, purchase, lease or dispose of any movable or immovable property required for the conduct of its business or for any purposes ancillary or incidental to the performance of its functions under this Act.

(2) For the purposes of carrying out its functions under this Act, the Authority may borrow or raise such sums as it may require:

Provided that for any amount in excess of five hundred thousand euro (€500,000) there shall be required the approval of the Minister in writing.

Advances from Government.

**36.** The Minister may make advances to the Authority of such sums as he may agree to be required by the Authority for carrying out any of its functions under this Act, and may make such advances on such terms and conditions as he may deem appropriate. Any such advance may be made by the Minister out of the Consolidated Fund, and without further appropriation other than this Act, by warrant under his hand authorizing the Accountant General to make such advance.

Exemption from taxes.

**37.** The Authority shall be exempt from any liability for the payment of income tax, duty on transfers and documents, customs and excise duty, under any law for the time being in force.

Estimates and expenditure.

**38.** (1) The Authority shall cause to be prepared in every financial year of the Authority, and shall not later than six weeks after the end of each such year prepare for adoption by the Board of Governors, within six weeks of presentation with or without amendments, estimates of the income and expenditure of the Authority for that financial year.

(2) In the preparation of such estimates the Authority shall endeavour to ensure that the total revenues of the Authority are at least sufficient to meet all sums properly chargeable to its income and expenditure account, including, but without prejudice to the generality of that expression, depreciation.

(3) The estimates shall be made out in such form and shall contain such information and such comparisons with previous years as the Board may direct.

(4) Notwithstanding the provisions of sub-article (1), if in respect of any financial year of the Authority it is found that the amount approved by the Board of Governors is not sufficient or a need has arisen for expenditure for a purpose not provided for in the estimates, the Executive Committee may adopt supplementary estimates for approval by the Board, and in any such case the provisions of this Act applicable to the estimates shall as near as practicable apply to supplementary estimates.

(5) The Minister shall, at the earliest opportunity and not later than six weeks after he has received a copy of the estimates from the Authority, approve the same with or without amendment.

**39.** (1) The Authority shall cause to be kept proper books of accounts and other records in respect of its operations and shall cause to be prepared a statement of accounts in respect of each financial year of the Authority. Accounts and audit.

(2) The accounts of the Authority shall be audited by auditors appointed by the Board from among persons who are qualified to be appointed as auditors of a company:

Provided that the Minister may require the books and accounts of the Authority to be audited or examined by the Auditor General who shall for the purpose have all the powers set out in the Auditor General and National Audit Office Act. Cap. 396.

**40.** The Authority shall, as soon as may be but not later than five months after the close of each financial year of the Authority, transmit to the House through the Minister, a copy of its annual accounts duly audited together with a report on its activities during the previous year. Annual report and audited financial statements.

**41.** (1) The Authority shall create and maintain a fund, to be styled as the "Gaming Fund", to which there shall be credited and paid by the Authority, upon receipt thereof: The Gaming Fund.

(a) such percentage of the gross sums, fees, duties and, or taxes paid by authorised persons to the Authority as may be prescribed by regulations made by the Minister under this Act;

(b) such sums as may be paid in terms of any law or private contract or any other legal instrument or document whatsoever, be it domestic, foreign or international, to the Responsible Gaming Fund; and

(c) any other amounts which the Authority is required to credit and pay into the Gaming Fund by or under this Act or any other law.

(2) All funds standing to the credit of the Gaming Fund

may, after deducting the amount to be appropriated in favour of the Social Causes Fund and, or the Responsible Gaming Fund, be used for such lawful purposes as the Authority may, in its discretion, deem necessary or desirable in furtherance of its functions or the main objectives of this Act.

PART IX - Administrative Review

Administrative Review Tribunal. Cap. 490.

**42.** (1) The Administrative Review Tribunal established by article 5 of the Administrative Justice Act, hereinafter referred to as the "Tribunal", shall be competent to hear and determine appeals in accordance with this Act.

(2) The Tribunal shall carry out such functions as are assigned to it in terms of this Act.

(3) The provisions of the Administrative Justice Act, in so far as they apply to the Administrative Review Tribunal, shall apply to any proceedings before the said Tribunal in terms of this Act, except to the extent that such provisions conflict with the provisions of this Act, in which case the provisions of this Act shall prevail, and the words "public administration" in the said enactment shall be construed as a reference to the Authority.

(4) The Tribunal shall have the power to summon any person to give evidence or to produce books or other documents before it:

Provided that:

(a) the clerk, agent, employee or other person confidentially employed in the affairs of the appellant and the parent, spouse or children of the appellant shall not be called to give evidence or to be examined except on the request of the appellant;

(b) except at the request of the appellant, no person shall be examined in relation to any information concerning the appellant in respect of which the said person is under the duty of professional secrecy. This exception does not apply to members or employees or former members or employees of the Authority which the Authority requests to give evidence in order to make its case.

(5) (a) The Tribunal shall ensure that the members thereof that are selected to adjudicate an appeal in accordance with this Act shall be free from any conflict of interest.

(b) Any Tribunal member shall abstain in cases of conflict of interest, and in the absence of such abstention may be challenged by either party to the appeal:

Provided that for the purposes of this sub-article a Tribunal member shall be deemed to have a conflict of interest:

(i) on the grounds on which a judge or magistrate may be challenged or abstain in terms of the Code of Organization and Civil Procedure; Cap. 12.

(ii) if he has previously expressed his professional opinion in relation to the subject matter of the appeal or an issue which is an important consideration with respect to the subject matter of the appeal; or

(iii) if he provides ongoing professional services to a direct competitor of one of the parties to the appeal in such a manner as to undermine his impartiality, or to give the reasonable appearance of a lack of impartiality.

(6) The Tribunal members shall not be personally liable for any act or default of the Tribunal done or omitted to be done in good faith in the course of the operations of the Tribunal.

**43.** (1) Any person who feels aggrieved by a decision of the Authority may enter, within twenty days after the date of service upon him of notice of the Authority's decision, an appeal to the Administrative Review Tribunal: Right of appeal.

Provided that where the decision appealed from related to the exercise of discretion by the Authority, the Tribunal shall not query the Authority's decision so long as such discretion has been exercised properly:

Provided further that no appeal shall lie from:

(a) any decision of the Authority imposing a fine not exceeding two thousand euro (€2,000) or from any reprimand or warning; and, or

(b) a decision of the Authority to refuse to grant, or to suspend or cancel a licence or other authorisation on grounds of national interest or for the safeguarding of the reputation of Malta.

(2) An appeal made under this article shall not suspend the operation of any decision from which the appeal is made:

Provided that a decision to cancel a licence or to impose an administrative penalty in terms of this Act or any other regulatory instrument shall not become operative until the expiration of the period within which an appeal lies under this article and, if an appeal is made within such period, the decision shall become operative on

the date of the decision of the Tribunal dismissing the appeal or the date on which the appeal is abandoned:

Provided further that when a decision to cancel a licence or other authorisation is appealed, pending the determination of the appeal the relevant licence or authorisation shall be deemed suspended.

(3) Every person appealing shall appear before the Tribunal either in person or by agent on the day and at the time fixed for the hearing of the appeal:

Provided that if it be proved to the satisfaction of the Tribunal that owing to absence from Malta, sickness or other reasonable cause, any person is prevented from attending at the hearing of his appeal on the day and at the time fixed for that purpose, the Tribunal may postpone the hearing of such appeal for such reasonable time as it thinks necessary for the attendance of the appellant.

(4) The onus of proving that the decision of the Authority is unjust shall rest on the appellant.

(5) Subject to the provisions of sub-article (2), the Tribunal shall have the power to confirm or annul the decision or make such order thereon as it shall deem fit.

Certain provisions to be followed in the hearing of appeals.

**44.** The following provisions shall have effect for the purposes of an appeal made under article 43:

(a) the Tribunal shall summarily reject any appeal before it unless *prima facie* proof is brought to the effect that, by the time when the appeal was filed, the appellant had filed all documentation and information in support of his argument with the Authority in connection with the decision forming the subject of the appeal:

Provided that new evidence may be brought on appeal if the party producing the evidence proves that it had no knowledge of such evidence before the appeal or could not, with the means provided by law, have produced such evidence;

(b) the Tribunal shall summarily reject any appeal that is deemed by the Tribunal to be frivolous and, or vexatious. In any such case all costs shall be borne by the appellant, and the Tribunal may also impose on the appellant a nominal fine not exceeding one thousand euro (€1,000), which shall be recoverable by the Authority as a civil debt owed and due to the Authority on which there is an executive title.

Appeals on a point of law.

**45.** (1) Any person who, having appealed to the Tribunal, feels aggrieved by its decision may, by application filed

within twenty days of the Tribunal's decision, appeal to the Court of Appeal (Inferior Jurisdiction), on a point of law only.

(2) The Authority may, if it is aggrieved by the decision of the Tribunal, by application filed within twenty days of the Tribunal's decision, appeal to the Court of Appeal (Inferior Jurisdiction), on a point of law only.

(3) Unless any regulatory instrument provides a longer period, the parties shall be given no less than five working days' notice of the date fixed for the hearing of the appeal.

(4) The Court may confirm or annul the Tribunal's decision or make such orders thereon as it may deem fit.

(5) The cost of the appeal shall be at the discretion of the Court, and shall be a sum fixed by the registrar:

Provided that if the Court determines that an appeal is frivolous or vexatious, costs shall be borne by the appellant.

(6) The Minister may, after consulting the Minister responsible for justice, by regulations establish the fees payable in the registry of the courts in relation to the filing of judicial acts in connection with an appeal to the Court of Appeal (Inferior Jurisdiction) under this article:

Provided that until such fees have been so established by the Minister, the fees contained in Schedule A to the Code of Organization and Civil Procedure shall apply. Cap. 12.

PART X - Administration

**46.** (1) Without prejudice to the powers conferred to the Authority by or under this Act, the Authority may, in exceptional circumstances where it is reasonably satisfied that this would be preferable to any other action, proceed to take any one or more of the following measures: Appointment of administrator.

(a) nominate an administrator to take charge of the assets of the authorised person, or any portion of them, for the purposes of safeguarding player funds, the interests of players, and the interests of the employees of the authorised person;

(b) nominate an administrator to assume control of the business of the authorised person, either to carry on that business or to carry out such other function or functions in respect of such business, or part thereof, as the Authority may direct,

and by application seek the appointment of such administrator by the Civil Court (Voluntary Jurisdiction Section), with such remuneration

as the Court may deem fit:

Provided that, where the assets of the authorised person are insufficient to satisfy its liabilities, the remuneration due to the administrator and any lawful expenses and disbursements incurred by the administrator in the performance of his functions shall be paid in the same order of priority as expenses and other disbursements incurred by a liquidator, and the remuneration due thereto, in an insolvent winding up in accordance with article 258 of the Companies Act.

Cap. 386.

(2) Where an administrator is so appointed -

(a) under sub-article (1)(a), it shall be the duty of the authorised person to deliver to such appointed administrator all the assets, whether movable or immovable, of which he is placed in charge, and all the powers, functions and duties of the authorised person in respect of those assets, including those exercisable by the authorised person in a general meeting, or by the directors, or by any other person, including the legal and judicial representation of the authorised person, shall be exercisable by and vest in the administrator appointed under the said sub-article to the exclusion of any other person;

(b) under sub-article (1)(b), the authorised person shall submit its business to the control of such appointed administrator and shall provide such person with such facilities as may be required to carry on that business or to carry out the functions assigned to such person under the said paragraph; and all the powers, functions and duties of the authorised person, including the legal and judicial representation of the authorised person, shall be exercisable by and vest in the administrator appointed under the said sub-article to the exclusion of any other person.

(3) The Authority may, where it feels it is in the best interest of the players or the general public so to do, make or issue public statements or notices giving warnings or information about any measure taken in terms of this article.

(4) The Authority may require the authorised person concerned to pay all the expenses of, and incidental to, the publication or issue of public statements or notices pursuant to this article, or such part thereof as it may deem appropriate; and any sum so due shall be recoverable by the Authority as a civil debt.

(5) The administrator holds office -

(a) for the duration established by the Court; or

(b) in the absence of an established period of duration, until such time as the Court, or the Authority, deems necessary,

unless before such time he resigns by means of a note filed before the Court and notified to the Authority.

(6) The Authority may, by means of a binding instrument, specify in further detail the responsibilities of an administrator appointed in accordance with this Part, the procedures to be followed in connection with such appointment, and other ancillary matters.

PART XI - Miscellaneous

Conflict between this Act and any other law.

**47.** Unless otherwise stated in this Act or in any other regulatory instrument, in case of any conflict between this Act or any other regulatory instrument and any provision relating to gaming in any other law, this Act or such regulatory instrument, as the case may be, shall prevail.

Appointment of officers and employees.

**48.** (1) Without prejudice to the other provisions of this Act, the appointment of officers and other employees of the Authority, and the establishment of terms and conditions thereof, shall be made by the same Authority.

(2) The Authority shall appoint and employ, at such remuneration and upon such terms and conditions as it may in accordance with this article determine, such officers and employees of the Authority as may, from time to time, be necessary for the due and efficient discharge of the functions of the Authority. Without prejudice to the other provisions of this article and this Act, the appointment and employment of officers and employees shall be regulated by the provisions of the Second Schedule.

(3) No member, employee or other officer of the Authority may participate in gaming offered by an operator regulated by the Authority.

Cap. 9.

(4) For the purposes of the Criminal Code and of any provision of penal nature in any other law, the members of the Authority and every officer or employee thereof shall be deemed to be public officers.

Limitation of liability.

**49.** The Authority and the officers and employees of the Authority shall not be liable in damages for anything done or omitted to be done in the discharge or purported discharge of any function under this Act or any other law administered by the Authority, or otherwise in the exercise of their official duties, unless the act or omission is shown to have been done or omitted to be done, as the case may be, in bad faith.

Consultants and advisers.

**50.** The Authority may engage such consultants or advisers as it may consider necessary to assist it in the fulfilment of its functions.

Name of the Authority not to be used without consent.

**51.** No person shall, without the prior written consent of the Authority, make or cause to be made any representation in any visual, aural or other form, either specifically or by implication, to the effect that any activity carried out by such person has the approval or is conducted with the cooperation or assistance of the Authority, or that such person is otherwise collaborating with or assisting the Authority.

Service of notices.

**52.** Where a notice howsoever described is required to be given by the Authority to any person whether under this Act or under any other law administered by the Authority, the notice shall be addressed to that person and shall be given to the person in any of the following ways:

(a) by delivering it to the person on whom it is to be served or to whom it is to be given;

(b) by leaving it at the usual or last place of abode of the person, if such person has furnished such an address or, if such person has furnished an address for service, at such address;

(c) by sending it by registered mail addressed to that person at the place or abode or address for service as aforesaid;

(d) in the case of a body corporate or other body of persons, by delivering it to an officer or employee thereof at the registered or principal office, or by sending it by registered mail addressed to the body aforesaid at that office;

(e) in any case where the Authority considers that the immediate giving of the notice is required, by sending it by electronic means, such as by electronic mail to the person:

Provided that the means used must be such as to enable the production of proof of delivery; or

(f) in any case in which it is not reasonably possible to effect service or give notice in any of the foregoing manners, whether on all or on any one or more of the persons on whom service is to be made or notice is to be given, by affixing the document to be served or given in a conspicuous place on the premises to which it relates, and keeping it so affixed for a period of not less than seven working days, and by publishing the contents thereof in the Gazette.

Language of regulations and directives.

**53.** Regulations which may be made by the Minister upon the advice of the Authority or after consultation therewith under any Act in respect of which the Authority has been appointed as the

competent authority, and any directives or other binding instruments which may be issued by the Authority in accordance with the provisions of this Act or any other regulatory instrument, may be published in the English language only.

**54.** Articles 1713 and 1716 of the Civil Code shall not apply with respect to a game lawfully provided in terms of this Act or any other regulatory instrument and, or any game which is provided by an operator lawfully authorised by or under this Act.

Inapplicability of certain provisions. Cap. 16.

**55.** Notwithstanding any other law, including the Data Protection Act, the Authority may, for the purpose of carrying out its functions under this Act or any other regulatory instrument, retain any information, including personal information, for such period of time as it may in its discretion deem necessary, or indefinitely as the case may be.

Retention of information. Cap. 586.

**56.** Any claim of whatsoever nature brought against the Authority shall be filed within two years from when the interested person knew or could have become aware of the act which gave rise to the claim, whichever is earlier:

Peremptory period.

Provided that for the sake of clarity such period shall be a peremptory period and shall not be subject to suspension, interruption, or any other extension of such period.

**56A.** Notwithstanding any provision of the Code of Organization and Civil Procedure or of any other law, as a principle of public policy:

*Added by: XXI.2023.2.* Cap. 12.

(a) no action shall lie against a licence holder and, or current and, or former officers and, or key persons of a licence holder for matters relating to the provision of a gaming service, or against a player for the receipt of such gaming service, if such action:

(i) conflicts with or undermines the legality of the provision of gaming services in or from Malta by virtue of a licence issued by the Authority, or the legality of any legal or natural obligation resulting from the provision of such gaming services; and

(ii) relates to an authorised activity which is lawful in terms of the Act and other applicable regulatory instruments; and

(b) The Court shall refuse recognition and, or enforcement in Malta of any foreign judgment and, or decision given upon an action of the type mentioned in sub-article (a).

Repeal of Acts and construction of references therein.
*Amended by:*
*L.N. 204 of 2018;*
*XLI.2018.2.*
Cap. 438.
Cap. 400.
Cap. 70.
Cap. 122.

**57.** (1) Saving the provisions of sub-articles (4), (5), (6) and (7), the Lotteries and Other Games Act, the Gaming Act, the Public Lotto Ordinance and the Director of Public Lotto (Powers and Functions) Act, hereinafter collectively referred to as "the repealed legislation", are hereby repealed, without prejudice to anything done or omitted to be done thereunder.

(2) Any reference in any law or private contract or any other legal instrument or document whatsoever, be it domestic, foreign or international, to the repealed legislation shall be read and construed as a reference to the Malta Gaming Authority established by this Act.

(3) Any reference in any law or private contract or any other legal instrument or document whatsoever, be it domestic, foreign or international, to the repealed legislation and, or any subsidiary legislation made or binding instrument issued thereunder shall, until their repeal, be read and construed as a reference to this Act and any applicable regulatory instrument.

(4) All provisions of the repealed legislation including subsidiary legislation made thereunder shall remain in force until 31 December 2018:

Provided that in so far as these provisions apply to gaming provided by means of distance communication, such provisions shall only remain in force until 31st July, 2018.

(5) (a) Until 31 December 2018, where there is any conflict between this Act and regulatory instruments issued thereunder, and any of the provisions relating to gaming provided in gaming premises in the repealed legislation, including subsidiary legislation made thereunder, the provisions of the repealed legislation shall prevail.

(b) For the sake of removing any doubt, after 1st August 2018, where there is any conflict between this Act and regulatory instruments issued thereunder, and any of the provisions relating to gaming by means of distance communications in the repealed legislation, including subsidiary legislation made thereunder, the provisions of this Act and the regulatory instruments issued thereunder shall prevail.

S.L. 583.01
S.L. 583.02
S.L. 583.03.

(6) Notwithstanding the provisions of the preceding sub-articles, the Responsible Gaming Fund Regulations, the GamingMalta Fund Regulations and the Gaming Licence Fees Regulations, shall be kept in force and shall continue to have effect as though made under this Act.

(7) Notwithstanding the provisions of the preceding sub-articles and the provisions of this Act, all leases granted to the Government of Malta and, or the Director of Public Lotto to be sub-leased as lotto booths, as well as all such sub-leases granted by the Government of Malta and, or the Director of Public Lotto, as well as anything done thereunder or by virtue thereof, shall be kept in force within their terms, and shall continue to have effect as administered by and in the name of the Government of Malta.

Detailing of public officers for duty with the Authority.

**58.** The Prime Minister may, at the request of the Authority, from time to time direct that any public officer shall be detailed for duty with the Authority, in accordance with the Second Schedule.

Amendment and revocation of other enactments.
*Amended by: XLI.2018.3.*

**59.** (1) Subject to the provisions of sub-article (2), the enactments in the First Column of Part A of the Fourth Schedule shall have effect subject to the amendments appearing relative thereto in the Second Column of the said Schedule.

(2) Notwithstanding the provisions of sub-article (1) the amendment referred to in item 3 of Part A of the Fourth Schedule shall come into force upon a notice being issued by the Minister to this effect in the Gazette.

(3) Subject to the provisions of sub-article (4), the enactments referred to in Part B of the Fourth Schedule, hereinafter referred to as "the revoked enactments", shall be revoked.

(4) Notwithstanding the provisions of sub-article (3) the revocation of the Racecourse Betting (Use of Totalisator) Rules referred to in the sixth point of Part B of the Fourth Schedule shall come into force upon a notice being issued by the Minister to this effect in the Gazette. S.L. 78.01.

FIRST SCHEDULE

(Article 6(4))

Composition and conduct of affairs of the Board

1. (1) The Board shall establish the policies to be pursued by the Authority. In determining such policies, the Board shall follow such policy guidelines as may be set out by the Minister. The Board shall also be responsible for advising the Government in furtherance of the functions and in the attainment of the objectives of the Authority in terms of this Act.

(2) The Board of Governors shall consist of the following:

(a) a Chairperson, appointed by the Minister;

(b) not less than four but not more than six other Governors appointed by the Minister from among persons who have distinguished themselves in business, financial activities, the professions, the public services or academic affairs and who in his opinion are able to represent the points of view of the industry and players; and

(c) The Chief Executive of the Authority, who shall be a member of the Board but shall not have the right to vote on the decisions to be made thereby.

(3) The Chairperson and the other members of the Board shall be appointed for a term being not more than three years, as may be specified in the instrument of appointment. However, the members so appointed may be re-appointed on the expiry of their term of office.

(4) The Minister may designate one of the other members of the Board as Deputy Chairperson, and the member so designated shall have all the powers and perform all the functions of the Chairperson during his absence or inability to act as Chairperson, or while the Chairperson is on vacation or during any vacancy in the office of Chairperson:

Provided that the Minister may also, in any of the circumstances mentioned in this sub-article, appoint another person to act as Chairperson, and in such case the provisions of this sub-article and the provisions of the following sub-article shall apply in respect of such person.

(5) (a) A person shall not be eligible to be appointed as Chairperson or as a member of the Board of Governors, or of any other organ of the Authority, or to hold any other office with the Authority, if he:

(i) is the holder of any licence or authorisation issued by the Authority, or otherwise falls under the regulatory or supervisory functions of the Authority;

(ii) is a director, an officer or employee of such holder or other such person mentioned in sub-paragraph (i);

(iii) has a financial or other interest in any enterprise or activity directly related to gaming;

(iv) is a Minister, Parliamentary Secretary or a member of the House of Representatives;

(v) is a judge or magistrate of the courts of justice;

(vi) has been declared bankrupt or has made a composition or arrangement with his creditors;

(vii) is legally incapacitated or interdicted;

(viii) has been convicted of an offence punishable by imprisonment for a period of six months or more;

(ix) has been found guilty of an offence under this Act or any other law relating to gaming or of an offence against public trust;

(x) has engaged in or been associated with any other business practice or otherwise conducted himself in such manner as to cast doubt on his competence or soundness of judgement; or

(xi) is otherwise not a fit and proper person to hold that office.

(b) In determining whether a person is a fit and proper person, the Minister shall have regard to that person's probity, competence and soundness of judgement for fulfilling the responsibilities of that office, to the diligence with which he is fulfilling or is likely to fulfil those responsibilities, and to whether the interests of any person are, or are likely to be, in any way threatened by his holding of that office.

(6) Subject to the provisions of this article, the office of a member of the Board shall become vacant:

(a) at the expiry of his term of office;

(b) if he resigns;

(c) if any circumstances arise that disqualify such member from holding office as a member of the Board; or

(d) if he is removed from office in terms of this article.

(7) A member of the Board may be removed if:

(a) such member is, in the opinion of the Minister, unfit to continue in office or has become incapable of properly performing his duties as a member;

(b) the behaviour or performance of the member brings into question his suitability or ability to continue as a member, in particular for behaviour that affects or may affect his reputation, independence or autonomy, or the reputation, independence or autonomy of the Authority;

(c) the member has been convicted of a criminal offence affecting public trust, or of theft or fraud, or of

knowingly receiving property obtained by theft or fraud, or of bribery or of money laundering, provided that the Minister may suspend the member if he is being investigated for a criminal offence;

(d) the member fails to perform his duties for a prolonged period without any valid justification:

Provided that notwithstanding the above, it shall be a cause for the removal of a member if that member, for any reason, fails to perform his duties including attending for Board meetings, for a continuous period exceeding six months;

(e) if the member acts in contravention of sub-article (9); and, or

(f) one or more of the grounds for ineligibility envisaged in sub-article (5) arises after that member's appointment to the Board.

(8) If a member resigns, or if the office of a member of the Board is otherwise vacant, or if a member is for any reason unable to perform the functions of his office, the Minister may appoint a person who is qualified to be appointed as a member, to be a temporary member of the Board. Any person so appointed shall, subject to sub-articles (6) and (7) hereof, cease to be a member when a person has been appointed to fill the vacancy or, as the case may be, when the member who was unable to perform the functions of his office resumes those functions.

(9) Any member of the Board who has any direct or indirect interest in any decision made or proposed to be made by the Board in pursuance of its functions under this Act or any other law shall disclose the nature of his interest at the first meeting of the Board after the relevant facts have come to his knowledge. Such disclosure shall be recorded in the minutes of the Board, and the member having an interest as aforesaid shall withdraw from any meetings at which such decision is discussed. Any such disclosure shall be communicated to the Minister without delay. Where the interest of the member is such as to disqualify him from holding office as a member of the Board, he shall report the fact immediately to the Minister and tender his resignation.

2. (1) The meetings of the Board shall be called by the Chairperson as often as may be necessary, either of his own motion or at the request of two or more members of the Board:

Provided that the Board shall meet as often as may be necessary, but not less than five times every year.

(2) (a) The Chairperson and at least two other members of the Board shall form a quorum. Decisions shall be adopted by a simple majority of the votes of the members present and voting:

Provided that, without prejudice to the other requirements of this Act, no decision shall be valid which is not supported by at least two members of the Board.

(b) Each member of the Board shall be entitled to one vote:

Provided that the Chairperson shall have an initial vote, and in the event of an equality of votes, a casting vote.

(3) Subject to the provisions of this Act, the Board may regulate its own procedure.

(4) Subject to the foregoing provisions of this article, no act or proceeding of the Board shall be invalidated merely by reason of the existence of any vacancy among its members.

(5) All acts done by any person acting in good faith as a member of the Board shall be valid as if he were a member notwithstanding that some defect in his appointment or qualification be afterwards discovered. No act or proceeding of the Board shall be questioned by a member on the ground of the contravention, by a member, of article 1(9) of this Schedule.

3. (1) The Executive Committee shall be responsible for executing the policies decided upon by the Board and for taking the necessary decisions in pursuance thereof as well as decisions in furtherance of the day-to-day management of the Authority.

(2) The Executive Committee shall be composed of the Chief Executive and the heads of the Authority's directorates, and any other persons as necessary, all of whom shall be appointed by the Board on the recommendation of the Chief Executive.

(3) The members of the Executive Committee shall be appointed for such period as may be established by the Chief Executive in the letter of appointment.

(4) The Executive Committee shall meet as often as may be necessary and, subject to the provisions of this Act, may regulate its own proceedings.

---

SECOND SCHEDULE

(Article 58)

Detailing of public officers for duty with the Authority

1. (1) The Prime Minister may, at the request of the Authority, from time to time direct that any public officer shall be detailed for duty with the Authority in such capacity and with effect from such date as may be specified in the Prime Minister's direction.

(2) The period during which a direction as aforesaid shall apply to any officer specified therein shall, unless the officer retires from the public service or otherwise ceases to hold office at an earlier date, or unless a different date is specified in such direction, cease to have effect after one year from the effective date of such direction unless the direction is revoked earlier by the Prime Minister.

2. (1) Where any officer is detailed for duty with the Authority under any of the provisions of article 1 of this Schedule, such officer shall, during the time in which such direction has effect in relation to him, be under the administrative authority and control of the Authority but he shall, for other intents and purposes, remain and be considered and treated as a public officer.

(2) Without prejudice to the generality of the foregoing, an officer detailed for duty as aforesaid:

(a) shall not, during the time in respect of which he is so detailed:

(i) be precluded from applying for a transfer to a department of the Government in accordance with the terms and conditions of service attached to the appointment under the Government held by him at a date on which he is so detailed for duty; or

(ii) be so employed that his remuneration and conditions of service are less favourable than those which are attached to the appointment under the Government held by him at the date aforesaid or which would have become attached to such appointment, during the said period, had such officer not been detailed for duty with the Authority; and

(b) shall be entitled to have his service with the Authority considered as service with the Government for the purposes of any pension, gratuity or benefit under the Pensions Ordinance and the Widows' and Orphans' Pension Act and of any other right or privilege to which he would be entitled, and shall be liable to any liability to which he would be liable, but for the fact of his being detailed for duty with the Authority.

(3) Where an application is made as provided in sub-article (2)(a)(i), the same consideration shall be given thereto as if the

applicant had not been detailed for service with the Authority.

(4) The Authority shall pay to the Government such contributions as may from time to time be determined by the Minister in respect of the cost of pensions and gratuities earned by an officer detailed for duty with the Authority as aforesaid during the period in which he is so detailed.

3. (1) The Authority may, with the approval of the Prime Minister, offer to any officer detailed for duty with the Authority under the provisions of article 1 of this Schedule, permanent employment with the Authority at a remuneration and on terms and conditions not less favourable than those enjoyed by such officer at the date of such offer.

(2) The terms and conditions comprised in any offer made as aforesaid shall not be deemed to be less favourable merely because they are not in all respects identical with or superior to those enjoyed by the officer concerned at the date of such offer, if such terms and conditions, taken as a whole, in the opinion of the Prime Minister offer substantially equivalent or greater benefits.

(3) Every officer who accepts permanent employment with the Authority offered to him under the provisions of sub-article (1) shall, for all purposes other than those of the Pensions Ordinance and of the Widows' and Orphans' Pension Act, be deemed to have ceased to be in service with the Government and to have entered into service with the Authority on the date of his acceptance, and for the purposes of the said Ordinance and of the said Act, insofar as this applies in his case, service with the Authority shall be deemed to be service with the Government within the meanings thereof respectively.

(4) Every such officer as aforesaid who, immediately before accepting permanent employment with the Authority was entitled to benefit under the Widows' and Orphans' Pension Act, shall continue to be so entitled to benefit thereunder to all intents as if his service with the Authority were service with the Government.

(5) The Authority shall pay to the Government such contributions as may from time to time be determined by the Minister in respect of the cost of pensions and gratuities earned by an officer who has accepted permanent employment with the Authority as aforesaid during the period commencing on the date of such officer's acceptance.

*Amended by:*
*L.N. 278 of 2019.*

THIRD SCHEDULE

(Article 23)

Criminal offences

(a) Providing a gaming service and, or a critical gaming supply which requires a licence, without the necessary licence issued by the Authority or another competent authority in the European Union or the European Economic Area, or aiding, abetting or otherwise facilitating such a provision.

(b) Acting contrary to, or not adhering to the fullest extent possible to, an order issued by the Authority, howsoever named.

(c) Committing one or more of the breaches envisaged in articles 29, 30, 32 and 33 of this Act.

(d) Preventing, obstructing, or delaying any Police officer or any officer of the Authority lawfully authorised to enter any premises suspected to be used in contravention of any regulatory instrument, or giving an alarm or warning in case of such entry.

(e) Using, transferring the possession of, sending or delivering to any person or place, acquiring, receiving, keeping, transporting, transmitting, altering, disposing of or otherwise dealing with, in any manner or by any means, any money, property (whether movable or immovable) or any proceeds of any such money or property with intent to conceal or convert that money or property or those proceeds and knowing or suspecting that all or a part of that money or property, or of those proceeds, was obtained or received, directly or indirectly, as a result of any act of commission or omission which constitutes an offence against this Act.

(f) Failing to effect payments to players when lawfully due:

Provided that where it is disputed whether a payment is lawfully due or otherwise, such payment will be deemed to be lawfully due for the purpose of this provision when there is a final binding decision to that effect by a competent court of law or dispute resolution entity.

(g) Failing to ensure the integrity and availability of essential regulatory data.

(h) Any other breach specified in any regulatory instrument

which is defined therein as giving rise to a criminal offence or an offence against this Act.

FOURTH SCHEDULE

(Article 59)

PART A - Amendment of other enactments

| | | |
|---|---|---|
| 1. | Criminal Code - Cap. 9: | The following provisions thereof shall be repealed:<br>(a) article 379; and<br>(b) the proviso to article 643. |
| 2. | Conduct Certificates Ordinance - Cap. 77: | In the Fourth Schedule thereof, for the words "Lotteries and Gaming Authority" there shall be substituted the words "Malta Gaming Authority", and for the words "Lotteries and Other Games Act" there shall be substituted the words "Gaming Act". |
| 3. | Racecourse Betting Ordinance - Cap. 78: | The following provisions thereof shall be repealed:<br>(a) articles 6 to 13, both inclusive;<br>(b) paragraph (d) of article 14;<br>(c) the second proviso to article 15; and<br>(d) article 16. |
| 4. | Broadcasting Act - Cap. 350: | (a) Article 10(6C) thereof shall be repealed.<br>(b) Immediately after paragraph (c) of sub-article (4) of article 16M thereof there shall be added the following new provisos:<br>"Provided that notwithstanding the above, gambling products which are strictly related to a sporting event may be advertised on such programme throughout the duration of such event, subject to such restrictions and conditions as the Authority and, or the Malta Gaming Authority may impose thereon: |

Provided further that notwithstanding the first proviso hereof, if the Authority deems that, in the interest of public health and, or for the protection of minors and, or vulnerable persons as defined in the Gaming Definitions Regulations, 2018 the advertising envisaged in the first proviso hereof shall not occur, it may restrict and, or prohibit such advertising as it deems fit in its sole discretion.".

5. Services (Internal Market) Act - Cap. 500:

In paragraph (g) of sub-article (2) of article 3 thereof, for the words "the Gaming Act and the Lotteries and other Games Act", there shall be substituted the words "the Gaming Act".

6. Registration of Clubs Regulations - S.L. 10.21

(a) In paragraph (b) of regulation 5 thereof, immediately after the word "gambling" there shall be added the words "and provided that he has verified that prior authorisation has been issued by the Malta Gaming Authority in terms of the Gaming Act"; and

(b) Regulation 9 thereof shall be amended as follows:

(i) in paragraph (d) thereof, immediately after the word "premises" there shall be added the words "provided that the Commissioner of Police has verified that prior authorisation has been issued by the Malta Gaming Authority in terms of the Gaming Act";

(ii) in paragraph (e) thereof, immediately after the word "gambling" there shall be added the words "provided that the Commissioner of Police has verified that prior authorisation has been issued by the Malta Gaming Authority in terms of the Gaming Act".

7. Fees leviable by Government Departments Regulations - S.L. 35.01

The following provisions within the Schedule thereof shall be repealed:

"Lotto

(a) For a permit to hold a tombola or lottery, inclusive of the duty leviable ......... 0.17

Such fees shall be denoted by means of stamps to be affixed to the permit.

(b) Fee in respect of an application filed later than the term specified in regulation 7 of the Public Tombolas Regulations - exclusive of the fees payable under paragraph (a) above .................... 1.16".

8. Smoking in the Public Places Regulations - S.L. 315.04

In paragraph (c) of sub-regulation (2) of regulation 4 thereof, for the words "Lotteries and Gaming Authority" there shall be substituted the words "Malta Gaming Authority".

9. Satellite Television Broadcasting Licence (Empowerment) Order - S.L. 350.13

Article 2 thereof shall be repealed.

10. Requirements as to Standards and Practice applicable to the Conduct of Competitions and the Award of Prizes - S.L. 350.22

(a) Immediately after sub-paragraph (iv) of paragraph 1.2.2 of regulation 1 thereof there shall be added the following new paragraph:

"1.2.3 Provided that in the exercise of this regulation, the Gaming Act and the regulatory instruments made thereunder applicable to it, shall be complied with.";

(b) Immediately after paragraph 3.3 of regulation 3 thereof there shall be added the following new paragraph:

"3.4 Provided that in the exercise of this regulation, the Gaming Act and the regulatory instruments made thereunder applicable to it, shall be complied with.";

(c) Immediately after paragraph 4.1 of regulation 4 thereof there shall be added the following new paragraph:

"4.2 Provided that in the exercise of this regulation, the Gaming Act and the regulatory instruments made thereunder applicable to it, shall be complied with.";

(d) Immediately after paragraph 5.3 of regulation 5 thereof there shall be added the following new paragraph:

"5.4 Provided that in the exercise of this regulation, the Gaming Act and the regulatory instruments made thereunder applicable to it, shall be complied with.";

(e) Immediately after paragraph 6.2 of regulation 6 thereof there shall be added the following new paragraph:

"6.3 Provided that in the exercise of this regulation, the Gaming Act and the regulatory instruments made thereunder applicable to it, shall be complied with.";

(f) Immediately after sub-paragraph (iv) of paragraph 10.1 of regulation 10 thereof there shall be added the following new paragraph:

"10.2 Provided that in the exercise of this regulation, the Gaming Act and the regulatory instruments made thereunder applicable to it, shall be complied with.";

(g) Immediately after paragraph 11.1 of regulation 11 thereof there shall be added the following new paragraph:

"11.2 Provided that in the exercise of this regulation, the Gaming Act and the regulatory instruments made thereunder applicable to it, shall be complied with.".

11. Requirements as to Advertisements, Methods of Advertising and Directions Applicable to Gambling Advertisements - S.L. 350.25

(a) In paragraph 2.2 of regulation 2 thereof, the words "since any such advertising is prohibited in terms of article 49 of the Gaming Act (Chapter 400 of the Laws of Malta)" shall be deleted;

(b) In paragraph 4.1 of regulation 4 thereof, the first reference to the words "the Lotteries and Other Games Act" shall be deleted, and for the words "Lotteries and other Games Act or any subsidiary legislation made thereunder" there shall be substituted the words "Gaming Act or any other regulatory instruments issued thereunder";

(c) Immediately after sub-paragraph (xvii) of paragraph 5.4 of regulation 5 thereof there shall be added the following new paragraph:

"5.5 Without prejudice to the generality of the foregoing, in the exercise of this provision, the Code of Commercial Communications, howsoever named, as issued by the Malta Gaming Authority shall be complied with.".

PART B - Revocation of other enactments

*Amended by: L.N. 418 of 2018.*

The following subsidiary legislation is being revoked:

- the Betting on the Result of Football Matches Order - S.L. 9.02;
- the Importation of Mechanical Gambling Contrivances Regulations - S.L. 37.03;
- the Permits application for Lotteries, Tombolas or Small Games Regulations - S.L. 70.01;
- the Public Tombolas Regulations - S.L. 70.02;
- the Public Lotto Regulations - S.L. 70.03;
- the Racecourse Betting (Use of Totalisator) Rules - S.L. 78.01.

# EXHIBIT "G"

Case 3:24-cv-00619-HTW-LGI Document 20 Filed 12/20/24 Page 1 of 21

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

**MAKAYLA DARIELLE SAULNY,**
**On behalf of herself and all other**
**Mississippi citizens similarly situated** — **PLAINTIFF**

**v.** — **CASE NO. 3:24-cv-00619-HTW-LGI**

**VGW HOLDINGS LIMITED, VGW MALTA LIMITED, VGW LUCKYLAND INC., and VGW GP LIMITED** — **DEFENDANTS**

---

**DEFENDANTS' REPLY MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS THE COMPLAINT FOR LACK OF PERSONAL JURISDICTION, OR, IN THE ALTERNATIVE, TO TRANSFER, IN PART, AND OTHERWISE DISMISS THE COMPLAINT**

---

Case 3:24-cv-00619-HTW-LGI Document 20 Filed 12/20/24 Page 17 of 21

But even if Plaintiff had met her "heavy burden" of establishing that Article 56A would permit a Malta court to ignore the parties' ***contractual agreement*** to apply Delaware law, Article 56A, by its plain terms, would not preclude Plaintiff from asserting claims under Delaware or Mississippi (or even Malta) law if she were to establish that VGW Malta's and VGW GP's games fail to comply with their licenses or otherwise violate Malta law. Article 56A forbids any action or recognition of a foreign judgment that, among other things, "conflicts with or undermines the legality of" activity licensed by Malta. Doc. 16-5 at 5-6 (Article 56A).[2] If the activity violates the terms of the license, that prohibition presumably would not apply. Moreover, even if one were to accept Plaintiff's rank speculation about how a Malta court would apply Article 56A here, Plaintiff would, if anything, be better off litigating her claims against VGW Malta and VGW GP in a Malta court, rather than this Court, because a Malta court would refuse to recognize or enforce a judgment from this Court per Article 56A(b). *Id.* at 6 (Article 56A(b)).

Plaintiff has not met her heavy burden of showing she would be completely "deprived of all remedies" if she were held to her mandatory forum selection agreements and required to litigate her claims in Delaware and Malta court. *Vasquez v. Bridgestone/Firestone, Inc.*, 325 F.3d 665, 671 (5th Cir. 2003); *see also Weber*, 811 F.3d at 774 ("[I]t is the ***availability*** of a remedy that matters, not predictions of the likelihood of a win on the merits. And the fact that ***certain types of remedies*** are unavailable in the foreign forum does not change the calculus if there exists a basically fair court system in that forum that would allow the plaintiff to seek ***some*** relief.") (emphasis in original); *Sultana Ent., LLC v. Gutierrez*, 4:17-CV-0702, 2018 WL 11606294, at *5 (S.D. Tex. Nov. 16, 2018) ("Although Plaintiff's remedy may not include an enforceable injunction in the United States if Plaintiff prevailed in Mexican court, Plaintiff has not shown that it has no remedy for its breach of contract claim in the Monterrey courts.").

---

[2] Article 56A of the Malta Gaming Act is also available at https://legislation.mt/eli/cap/583/eng/pdf.

# EXHIBIT "H"

**<u>Laurence Escalante Presenting VGW to Investors in YouTube Video Titled "Virtual Gaming Worlds – LAUNCH Festival 2012 Presentation":</u>**

<u>Jason Calacanis:</u> "Virtual Gaming Worlds… are you there? Great, welcome."

<u>Laurence Escalante:</u> "Hello. So what we do is very simple but very powerful. We combine social gaming with gambling. So in the United States, that's virtual currency only gambling, but outside the United States, that's licensed real money casino play. So if Farmville is about building your own farm and sharing that with your friends, then what if there was a game like Casinoville, where you could build your own casino, populate it with games, and monetize and earn real money from all the gaming traffic that came through your casino, whether it was virtual currency or real currency? Well, that game exists, we've built it, and that's exactly what I'm going to show to you today."

*(Begins to demonstrate the product)*

"So this is Sarah. Sarah is from the States, but she now lives in London, and all her friends are all across the globe. To hang out and chat, she's created a virtual environment, a virtual room, and she's populated it with furniture and items from the store. But what her and her friends would really love to do is actually play games together. So she buys a couple of different types of slot machines and a scratch card machine, games that they can play while they're all hanging out and chatting and catching up. So now she's about to place them in her own little living room, her own virtual living room, and she's about to turn it into a real-life casino. She's going to activate the games by clicking on them in just a second. And she's

going to play them. And her and her friends can enjoy these games while chatting and catching up.

So ladies and gentlemen, what you're looking at aren't just virtual games. They're not just toys. These are licensed, cash out enabled, audited, real-money casino games available for players outside the United States. Virtual currency only, obviously, for players inside the United States. Now she's playing some slot machines. She was just playing some scratch cards earlier. But the game that Sarah and her friends really love to play is bingo. They used to love to hit the bingo halls together. So, that's the game that Sarah would really love to be able to put into her room. So as you can see there, she's got her sights set on that bingo machine there.

But she's got to be level five to buy it. She's only level three. So Sarah's got some leveling up to do. So she goes into our world, Chumba World, the world's first virtual casino world that's filled with hundreds or thousands of people from all across the globe. Chatting, meeting each other, socializing, and playing games. Dozens of games, in fact. Games like horse racing. You know, Sarah and her friends used to love to get dressed up and hit the horse races together. So now she's having a virtual punt. But with real money, as she's in the UK, on virtual horse racing.

Now, perhaps Sarah has met someone at the races. A nice guy. They get chatting, and they agree to go on a lovely romantic date on top of Mount Chumba. With a beautiful view overlooking the city, and they're about to share a little romantic kiss. Awww. But Sarah's a busy woman. She's got some gaming to do if she's going to get that bingo machine.

So she heads back into the city. Now she's playing some video poker. Ladies and gentlemen, again, this is not a toy. This is a real-life, cash out enabled, licensed, and audited video poker machine. So she's about to hit a bonus game and double her money and get enough experience points and the chance to win some bonus virtual items. And she's hit level four, so she's almost there. Perhaps Sarah likes skill games like chess, games where even in the States, you can actually play the house to win and lose real money.

Perhaps she likes casual games, games inspired by some of the most popular casual games on the planet, like Bejeweled or Puzzle Bubble, like you're seeing here. Again, being games of skill, she can play the house and win or lose real currency. So now Sarah's almost level five, so she returns back to her home, to her little mini casino, and starts playing some three reel slots. And she wins, and now she's hit level five. And at last she can now look at purchasing that bingo machine for her and her friends to enjoy in the privacy of their own little virtual room environment. So she goes to the store, checks out the game machines available to her.

But, Sarah needs to be a VIP. She needs to be a subscriber to the platform to actually purchase and build out her own casino even further. So she subscribes, and now she can purchase it and place a couple of machines in her little virtual casino.

Now this is just the beginning for Sarah. Sarah would love to take this even further and expand this beyond her little social group of girlfriends that love to hang out. Sarah's dream is to create a massive bingo hall to populate it with even more furniture, and items, and spread it to her Twitter followers and embed it on her blog; and create different themes, purchase multiple rooms, and turn this into a real and thriving growing casino business. Now, remember, Sarah's getting between 10% and 20% of all the turnover generated by her casino."

*(Ends demonstration of product)*

"This is not a toy; it's a real casino. So, ladies and gentlemen, that's just a taste of some of the potential available to us when we combine the world of gaming with gambling."

Jason Calacanis: "Let's hear it for Virtual Gaming Worlds. And I guess the obvious question: is this real money or fake money? Is this real money or fake money?"

*(laughter)*

"No; you answered it seven times. You answered that seven times. Okay, I'm just fucking with you. Sky, you're a degenerate gambler like myself. We've spent many hours playing poker together until all hours of the morning. What do you think of this degeneracy?"

Sky Dayton: "Well, Brad and I were just talking about our greatest dream was to have our own private bingo hall, so thank you for making that possible. I mean, I think we are probably a fairly U.S.-centric panel, so I think you're going to find not a lot of real money online gaming experience here. I mean, is this— I mean, I think with what's happening legislatively, that's going to change in the U.S. But what is the stage? I mean, where is this at right now? Is this live?"

Laurence Escalante: "No, it's live for beta testers now."

Sky Dayton: "And what do you think, who's your competition for this? Who else is doing something like this?"

Laurence Escalante: "Something exactly identical to this there's practically no one yet, but certainly the guys looking to get in the space, everyone from Zynga in the

social gaming space. They've been making noise about the online gambling space for quite some time now. Everyone from the offline guys to the online gambling guys, they're all wading thick and fast into the space. So you talked about virtual currency gambling and how relatively small that might be, but it's not actually the case. Casino games on Facebook are actually some of the highest monetizing games on the Facebook platform. To give you an example, about eight weeks ago, IGT, the largest slots machine maker on the planet, 5 million MAUs, and purchased them for half a billion dollars. That's entirely a virtual casino that cannot enable real money play. They're not licensed. They're based out of Seattle. They have no international licenses; games not tested; games not architected to be applicable for the real-money gambling world that exists outside of the United States."

Jason Calacanis: "Shervin, you've got probably more experience than anybody in the virtual gaming space on the panel. What are the chances? I mean, Zynga's been pretty clear that they're going to go into this space. The stock had a massive run-up when they gave every indication, but we can all be sure they're going to go into this space. Facebook is clearly going to allow some level of this, correct? What do you think? What does your gut tell you, your instinct, Shervin?"

Shervin Pishevar: "So the last company I started was SGN, Social Gaming Network, and we got to about 50 million users on the iPhone. And my last game that I did before I sold it was called Mini Tycoon Casino."

Laurence Escalante: "Yes, I saw it, played it, loved it."

Shervin Pishevar: "You're a fan? Good. There was a lot of love in that game, and we worked really hard on it. And the concept was to kind of set it up so that if in

the future that becomes legal, that you could turn that on. So Zynga is definitely waiting for that to happen in the U.S. But at the same time, there's this massive opportunity in the rest of the world to do this. And I've been looking for someone to build this platform. And if you're saying it's already ready, I mean, you've built it specifically for this, I mean, that's a really tremendous and big idea for the rest of the world. And, you know, what you'd have to do, obviously, you'd have to set up your company, I'm sure you've done this, outside of the U.S. and then build it, launch it, have it be successful, and when it actually is legal in the U.S., then you would launch here. But at the same time, it's just a — it's a massive opportunity."

Jason Calacanis: "Shervin, let me ask you this: I mean, you've joined Menlo, correct? And so you've done tons of angel investing on your own now you're at a big VC firm. Would Menlo or a VC firm be able to invest in this? Or do they have you know, sort of conditions with their limited partners that they cannot invest in this?"

Shervin Pishevar: "Yeah, most I mean, most U.S. venture firms are not going to invest in this."

Jason Calacanis: "Would you personally invest in this?"

Shervin Pishevar: "So, I mean, I'm investing through Menlo, so no."

Jason Calacanis: "But you can invest personally if Menlo passes."

Shervin Pishevar: "Yeah, so I'd have to check with my lawyers."

Jason Calacanis: "But would you? Would you be interested?"

Shervin Pishevar: “It's a massive idea, and I think the potential is there, so I would definitely consider it, yeah.”

Jason Calacanis: “What about you, Sky, and Matt? I mean, there’s been a little bit of a sort of perception here in the United States that gambling is something horrible, even though we have lotteries and all kinds of stuff going on there, and the tax revenue is certainly needed. Would you, as angel investors, and I know, Matt, you're primarily an angel investor, and Sky, you do it rarely, would you consider getting involved in this kind of space, or do you have a morality kind of issue with it?”

Matt (Last Name Unknown): “Yeah, I mean, I haven't made that decision before and invested in something. I mean, there's definitely uh… I guess my answer is I don't know. I haven't really thought about it.”

Sky Dayton: “I mean, for me personally, probably not. And that's not to say it's not a multi-billion dollar idea. I think it probably is.”

Shervin Pishevar: “I would urge you to do something from the beginning in terms of donating. a percentage of any profits to causes and education, all of that.”

Matt (Last Name Unknown): “I just had two product questions, though.”

Laurence Escalante: “Sure.”

Matt (Last Name Unknown): “Does the person who has the casino, are they taking a rake? I didn't quite get, is that right?”

Laurence Escalante: “Yeah, it depends on the type of game. So if they've got a poker table, yeah. A poker table is this rake, and obviously with the other games

like scratch cards and slot machines, you know, there's a house edge, you know, the house hold, the typical percentage that the house takes. So they'll get a percentage of that between 10 and 20."

Matt (Last Name Unknown): "And what's your background?

Laurence Escalante: "In game development for about seven years, globally distributed game developments across the Philippines. That's where a bulk of our team is. All our real money engineers are in India. So we're a very globalized team."

Unknown (Off Screen): "Is it run as a standalone downloadable app, or is it run on a browser, or is it run on a Facebook page?"

Laurence Escalante: "Yeah, not currently a standalone downloadable on its own web page. It's Facebook Connect enabled, and we'll be porting it to mobile next."

Brad Gerstner: "Is the IP around the actual licenses and the games, is all of that yours, or do you have partnerships with people who've built some of that?"

Laurence Escalante: "All proprietary."

Sky Dayton: "And how do you establish trust? You talk about these. Slot machines, for example, being audited and everything like that. There's an established feel of a casino when you go in that the slot machine is somehow legitimate or something. How do you do that? With a third party or what brand?"

Laurence Escalante: "As a precondition to pretty much any reputable gambling regulatory body, they require your games to go through certification, which is basically an independent order that reviews everything about the game from the

source code to the graphics and the random number generator. They look at 4 billion results and run it through 50 statistical tests to make sure that they rubber stamp it and make sure that you're a compliant. It's a real money gambling game."

Unknown (Off Screen): "Where is it licensed? What country?"

Laurence Escalante: "We're starting in Asia. So the first one is out of the Philippines. That's Asia's first online gambling jurisdiction. But most of the big ones are in Europe, actually. So that's our next step."

Jason Calacanis: "Great. Let's hear it for Virtual Gaming Worlds"

# EXHIBIT "I"

— Opinion

# Why cashing out won't be easy for Australia's gambling billionaires

Adrian Portelli, Laurence Escalante and Ed Craven have more than just their gaming fortunes in common. They could all face big problems if they try to sell their companies or go public.

**Primrose Riordan**
*Associate editor*



Apr 22, 2025 – 5.00am

Listen to this article
5 min

LMCT+'s Adrian Portelli, Virtual Gaming World's Laurence Escalante and Stake.com's Ed Craven are relatively young and have become extraordinarily rich from their expanding businesses in the grey area of gambling and gaming.

According to last year's Financial Review Rich List, Portelli is worth $1.29 billion, Escalante's wealth sits at $3.75 billion and Craven's fortune is estimated at $4.51 billion.



Adrian Portelli, pictured in 2023, is diversifying into the childcare sector. **Kristoffer Paulsen**

But the three Australians have something else in common. They all have regulators sniffing around their companies, which could result in unknown financial consequences if they try to sell or take them public.

The question is front of mind after Portelli, as reported by *The Australian Financial Review*'s Street Talk column, sought advice from bankers at Macquarie Capital on selling parts of LMCT+ [https://www.afr.com/street-talk/portelli-hits-fast-lane-on-mooted-lmct-sale-maccap-takes-the-wheel-20250413-p5lrco].

He previously toyed with a sale in 2023. A spokesman for Portelli declined to comment.
Critics say the billionaires operate the most profitable parts of their businesses by exploiting legal loopholes, such as "trade promotions" and "sweepstakes", where the product is a game of chance or involves gambling. Or in Stake's case, by operating in markets where gambling with cryptocurrencies is still allowed.

Portelli's LMCT+ is a membership-based business that offers shopping discounts and access to regular prize draws of cars and houses (including those from Nine's *The Block*) to paying subscribers.

However, lotteries in Australia are restricted to not-for-profit organisations. Companies can offer "trade promotions" but players can't pay to enter, or entry

must be in exchange for goods or services. LMCT+ argues its membership qualifies as that product.

In the latest attack from regulators, last year South Australia's Consumer and Business Services investigated LMCT+ and charged Portelli and his company Xclusive Tech Pty Ltd with multiple counts of conducting an unlawful lottery.

LMCT+ denied the charges and is fighting them in court.

Escalante's online gaming company, VGW, pioneered the use of a US legislative loophole that allowed it to offer casino-like experiences online with cash prizes in states where online gambling has long been banned [https://www.afr.com/companies/games-and-wagering/laurence-escalante-is-living-large-off-controversial-gambling-billions-20240304-p5f9kc]. The company managed to get around the ban partly by providing an option to play the games for free.

VGW's Chumba Casino has been the most popular sweepstakes casino in the US, and Craven's Stake.us has also jumped on board and runs a similar online gaming portal.

But an increasing number of US states are in hot pursuit, introducing legislation to ban sweepstakes operators. The *Financial Review* spoke to New York Senator Joseph P. Addabbo jnr, who is spearheading an effort to regulate sweepstakes casinos.

"It's a big money business – there is a lot of money at stake – and [sweepstakes casinos are] everywhere," he says. "Now, more and more states are becoming aware – they see it as lost revenue."


Laurence Escalante built Virtual Gaming Worlds into a multibillion-dollar business.

Addabbo does not want to ban them completely and argues sweepstakes operators should be regulated so they are on a level playing field with casino and gambling companies. But his comments demonstrate the hardening of attitudes towards sweepstakes platforms.

"It might be free to play, but it's a child in a candy store. You show access, and it's enticing, so they are going to want to play more and more. An adult might not

realise they will have an addiction."

Escalante in 2016 attempted a backdoor listing, but the Australian Securities and Investments Commission put a stop order on the prospectus over regulatory concerns. Now, to the disappointment of some investors, he's not focused on an IPO and there are no signs he is looking to sell out.

Meanwhile, the gambling billionaires are engaged in a diversification frenzy. Portelli has told the *Financial Review* he is investing in childcare centres and developments to benefit from the National Disability Insurance Scheme [https://www.afr.com/young-rich/lambo-loving-young-rich-lister-is-a-shy-person-20230829-p5e0at].

Escalante has told investors to look at his expansion into new businesses. "We invented an industry, bro. Everyone else just copied us. Watch chapter 2," he posted on social media recently, along with a photo of downtime with his legal team.

In March, one of his companies released puzzle game *Monopoly Match* to try to emulate Hasbro's runaway success with *Monopoly Go!*, which has delivered the toy and board game company billions in revenue.

VGW has also expanded into lotteries [https://www.afr.com/companies/games-and-wagering/laurence-escalante-s-vgw-bulks-up-exec-ranks-as-casinos-bristle-20241117-p5kr9f] and hired a former live casino executive. Stake, which has had its own run-ins with regulators [https://www.afr.com/companies/games-and-wagering/stake-com-to-quit-britain-after-bonnie-blue-video-controversy-20250217-p5lcoq], is trying to apply for government gaming licences.

The issue with diversification for the value of these companies is that the chances of repeating the exponential growth in the industry that made them rich are likely lower as they move into sectors saturated with strong competitors.

At the same time, as they attempt to legitimise their companies by getting licenses, they run into well-established gambling giants.

The variety of luxury supercars in their garages and the size of their super yachts suggest they won round one. But whether, when the chips are down, they can go home with the jackpot is another story.

**RELATED**



Young Rich [/young-rich]

**The 10 richest young Australians revealed**
https://www.afr.com/young-rich/the-10-richest-young-australians-revealed-20241016-p5kirr



**Exclusive** IPO [/topic/initial-public-offering-1mx1]

**Escalante-backed WeMoney valued at $100m as it eyes ASX listing**
https://www.afr.com/technology/escalante-backed-wemoney-valued-at-100m-as-it-eyes-asx-listing-20250404-p5lp7i

**Primrose Riordan** covers private companies and family offices from the AFR's Sydney newsroom. Primrose was previously a correspondent for the Financial Times and covered foreign affairs and politics in Canberra. Primrose has won multiple awards for her journalism including from The National Press Club, SABEW in the US and Press Gazette in the UK. Message Primrose on Signal: https://tinyurl.com/PrimroseSignal *Connect with Primrose on Facebook and Twitter. Email Primrose at primrose.riordan@afr.com*

# EXHIBIT “J”



virtualgamingworlds VGW

# PROSPECTUS

## SYNERGY PLUS LIMITED

TO BE RENAMED VGW GAMING LIMITED

ACN 091 126 082

For personal use only

Corporate Advisors:

indianocean


For personal use only

For personal use only

# Prospectus

For a public offer of up to 70,000,000 Shares (post-Consolidation) at an issue price of $0.05 per New Share to raise up to $3,500,000 (**Public Offer**).

**The Public Offer is scheduled to close at 5:00pm (WST) on 9 February 2016 unless extended or withdrawn. Applications must be received before that time to be valid.**

This Prospectus also contains:

- an offer of up to 932,183,398 Shares and 95,662,112 Options (post-Consolidation) to the VGW Holdings Vendors in consideration for the acquisition of all of the issued capital in VGW Holdings (**VGW Holdings Offer**). Refer to Section 2.1.2 of this Prospectus for further details of the VGW Holdings Offer;
- an offer of up to 19,000,000 Shares (post-Consolidation) to the Synergy Lenders in consideration for conversion and repayment of the SNR Lenders (**SNR Lender Offer**). Refer to Section 2.1.3 of this Prospectus for further details of the SNR Lender Offer;
- an offer of up to 20,000,000 Shares and 6,000,000 Options (post-Consolidation) to Minimum Risk in consideration for conversion and repayment of the Minimum Risk Loan (**Minimum Risk Offer**). Refer to Section 2.1.4 of this Prospectus for further details of the Minimum Risk Offer;
- an offer of up to 47,350,067 Employee Loan Shares and 96,926,780 Employee Incentive Options (post-Consolidation) to the VGW Holdings employee (**Employee Offer**). Refer to Section 2.1.5 of this Prospectus for further details of the Employee Offer;
- an offer of up to 9,000,000 Options (post-Consolidation) to the Company's incoming Executive Chairman, Mr Nigel Blythe-Tinker (**Chairman Offer**). Refer to Section 2.1.6 of this Prospectus for further details of the Chairman Offer;
- an offer of up to 650,000,000 Performance Shares (post-Consolidation) to Lance East Corporation (**Lance East Offer**). Refer to Section 2.1.7 of this Prospectus for further details of the Lance East Offer; and
- an offer of up to 72,500,000 New Options (post-Consolidation) to Minimum Risk (or its nominee) as part consideration for underwriting the Public Offer (**Underwriter Offer**). Refer to Section 2.1.8 of this Prospectus for further details of the Underwriter Offer.

  (collectively, the **Transaction Offers**)

**The Transaction Offers are scheduled to close at 5:00pm (WST) on 9 February 2016 unless extended or withdrawn. Application must be received before that time to be valid.**

Completion of each of the Offers is conditional upon Shareholders approving, at the General Meeting to be held on 29 January 2016, various resolutions, including the change in nature and scale of activities, consolidation of capital and the issue of the Shares and Options offered by this Prospectus. Please refer to Section 2.2 of this Prospectus for further details.

## IMPORTANT INFORMATION

This Prospectus is a re-compliance prospectus for the purposes of satisfying Chapters 1 and 2 of the ASX Listing Rules and to satisfy the ASX requirements for re-listing following a change to the nature and scale of the Company's activities.

All references to Securities in this Prospectus are made on the basis that the 50:1 Consolidation, unless otherwise stated, for which Shareholder approval is being sought at the General Meeting to be held on 29 January 2016, has taken effect.

This is an important document that should be read in its entirety.

If you do not understand it you should consult your professional advisers without delay. The Securities offered by this Prospectus should be considered highly speculative.

For personal use only

# Contents

Corporate Directory ..... 5
Important Notice ..... 6
Key Offer Information ..... 8
Chairman's Letter ..... 9
1 Investment Overview ..... 11
2 Details of the Offers ..... 47
3 Company Overview Upon Completion of Acquisition ..... 57
4 Independent Industry Report ..... 67
5 Risk Factors ..... 103
6 Financial Information ..... 115
7 Investigating Accountant's Report ..... 135
8 Board, Management and Corporate Governance ..... 139
9 Material Contracts ..... 151
10 Additional Information ..... 161
11 Directors' Authorisation ..... 179
12 Glossary ..... 181

# Corporate Directory

## DIRECTORS

Domenic Martino
*Non-Executive Chairman*

Christopher Martino
*Non-Executive Director*

Philip Silva
*Executive Director*

## PROPOSED DIRECTORS

Nigel Blythe-Tinker
*Proposed Executive Chairman*

Laurence Escalante
*Proposed Managing Director and Chief Executive Officer*

Mats Johnson
*Proposed Executive Director*

Lorenzo Escalante
*Proposed Non-Executive Director*

## COMPANY SECRETARIES

Leanne Ralph
*Non-Executive Director*

Jackob Tsaban
*Non-Executive Director*

## PROPOSED COMPANY SECRETARY

Rointon Nugara
*Company Secretary*

## ASX CODE

Current: SRN
Proposed: VGW

## REGISTERED OFFICE

C/- Ground Floor,
8 St Georges Terrace,
Perth WA 6000

Telephone: +61 2 8263 0515
Facsimile: +61 2 8263 0500

## SOLICITORS

Hunt & Humphry
15 Colin Street,
West Perth WA 6005

HopgoodGanim Lawyers
Level 27, 77 St Georges Terrace,
Perth WA 6000

## INVESTIGATING ACCOUNTANT

Sothertons L.L.P.
Level 6
468 St. Kilda Road
Melbourne VIC 3004

## AUDITOR*

RSM Australia Partners
Ground Floor,
8 St Georges Terrace,
Perth WA 6000

## SHARE REGISTRY*

Security Transfer Registrars Pty Limited
770 Canning Highway
Applecross WA 6153

Telephone: +61 8 9315 2333
Facsimile: +61 8 9315 2233

* This entity is included for information purposes only. It has not been involved in the preparation of this Prospectus.

For personal use only

For personal use only

# Important Notice

This Prospectus is dated 4 January 2016 and was lodged with the ASIC on that date. The ASIC and its officers take no responsibility for the contents of this Prospectus or the merits of the investment to which this Prospectus relates.

No Securities may be issued on the basis of this Prospectus later than 13 months after the date of this Prospectus.

Application will be made to the ASX within seven days after the date of this Prospectus for Official Quotation of the Shares the subject of this Prospectus.

No person named in this Prospectus, nor any other person, guarantees the performance of the Company. No person is authorised to give information or to make any representation in connection with this Prospectus, which is not contained in the Prospectus. Any information or representation not so contained may not be relied on as having been authorised by the Company in connection with this Prospectus.

The distribution of this Prospectus in jurisdictions outside Australia and New Zealand may be restricted by law and persons who come into possession of this Prospectus should seek advice on, and observe any of these restrictions. Failure to comply with these restrictions may violate securities laws. Applicants who are resident in countries other than Australia and New Zealand should consult their professional advisers as to whether any governmental or other consents are required or whether any other formalities need to be considered and followed.

This Prospectus does not constitute an offer in any place in which, or to any person to whom, it would not be lawful to make such an offer. No action has been taken to register or qualify the Securities or the Offers or to otherwise permit a public offering of the Securities in any jurisdiction outside Australia.

It is important that you read this Prospectus in its entirety and seek professional advice where necessary. The Securities the subject of this Prospectus should be considered highly speculative.

## RISK FACTORS

Potential investors should consider that an investment in the Company is highly speculative and should consult their professional advisers before deciding whether to apply for Securities pursuant to this Prospectus. For further information in relation to the risk factors of the Company please refer to the summary in the Investment Overview Section in Section 1 and Section 5 of this Prospectus.

## PRECONDITIONS TO ISSUE

The Offers made under this Prospectus and the issue of Shares, Options and Performance Shares pursuant to this Prospectus is subject to and conditional upon the Preconditions to Issue. If the Preconditions to Issue are not satisfied, no Shares will be allotted pursuant to this Prospectus and the Company will repay all money received from Applicants without interest. Accordingly, where relevant, this Prospectus assumes that the Preconditions to Issue have been satisfied.

## EXPOSURE PERIOD

Applications for Securities under this Prospectus will not be processed until after expiry of the Exposure Period pursuant to Chapter 6D of the Corporations Act. No preference will be conferred on Applications received during the Exposure Period. All Applications received during the Exposure Period will be treated as if they were simultaneously received on the Opening Date. If the Exposure Period is extended by ASIC, Applications will not be processed until the expiry of the extended Exposure Period.

The purpose of the Exposure Period is to enable examination of this Prospectus by market participants prior to the acceptance of Applications and the raising of funds. That examination may result in the identification of deficiencies in this Prospectus and, in those circumstances, any Application that has been received may need to be dealt with in accordance with section 724 of the Corporations Act.

## PHOTOGRAPHS AND DIAGRAMS

Photographs used in this Prospectus which do not have descriptions are for illustration only and should not be interpreted to mean that any person shown endorses the Prospectus or its contents or that the assets shown in them are owned by the Company. Diagrams used in this prospectus are illustrative only and may not be drawn to scale.

## WEB SITE – ELECTRONIC PROSPECTUS

A copy of this Prospectus can be downloaded from the website of the Company at **www.vgw.co**. If you are accessing the electronic version of this Prospectus for the purpose of making an investment in the Company, you must be an Australian or New Zealand resident and must only access this Prospectus from within Australia or New Zealand.

The Corporations Act prohibits any person passing onto another person an Application Form unless it is attached to a hard copy of this Prospectus or it accompanies the complete and unaltered version of this Prospectus. You may obtain a hard copy of this Prospectus free of charge by contacting the Company.

The Company reserves the right not to accept an Application Form from a person if it has reason to believe that when that person was given access to the electronic Application Form, it was not provided together with the electronic Prospectus and any relevant supplementary or replacement prospectus or any of those documents were incomplete or altered.

## FORWARD-LOOKING STATEMENTS

This Prospectus contains forward-looking statements which are identified by words such as 'may', 'could', 'believes', 'estimates', 'targets', 'expects', or 'intends' and other similar words that involve risks and uncertainties.

These statements are based on an assessment of present economic and operating conditions, and on a number of

For personal use only

assumptions regarding future events and actions that, as at the date of this Prospectus, are expected to take place.

Such forward-looking statements are not guarantees of future performance and involve known and unknown risks, uncertainties, assumptions and other important factors, many of which are beyond the control of our Company, the Directors and our management.

We cannot and do not give any assurance that the results, performance or achievements expressed or implied by the forward-looking statements contained in this prospectus will actually occur and investors are cautioned not to place undue reliance on these forward-looking statements.

We have no intention to update or revise forward-looking statements, or to publish prospective financial information in the future, regardless of whether new information, future events or any other factors affect the information contained in this prospectus, except where required by law.

These forward looking statements are subject to various risk factors that could cause our actual results to differ materially from the results expressed or anticipated in these statements. These risk factors are set out in Section 5 of this Prospectus.

## NOTE TO APPLICANTS

This Prospectus does not provide investment advice. You should seek your own investment and/or financial advice in relation to the Offer. The Offer contained in this Prospectus does not take into account your investment objectives, financial situation and particular needs. It is important that you read this Prospectus carefully and in full before deciding to invest in the Company. In particular, in considering the prospects of the Company, you should consider the risk factors that could affect the financial performance of the Company in light of your personal circumstances (including financial and taxation issues) and seek professional advice from your stockbroker, accountant or other professional financial adviser before deciding to invest.

## SPECULATIVE INVESTMENT

The Securities offered pursuant to this Prospectus should be considered highly speculative. There is no guarantee that the Securities offered pursuant to this Prospectus will make a return on the capital invested, that dividends will be paid on the Shares or that there will be an increase in the value of the Securities in the future.

Prospective investors should carefully consider whether the Securities offered pursuant to this Prospectus are an appropriate investment for them in light of their personal circumstances, including their financial and taxation position. Refer to Section 5 for details relating to the key risks applicable to an investment in the Securities.

## DISCLAIMER

No person named in this Prospectus, nor any other person, guarantees the performance of the Company, the repayment of capital or the payment of a return on the Shares. No person is authorised to give any information or make any representation in connection with the Offer which is not contained in this Prospectus. Any information or representation not contained in the Prospectus may not be relied on as having been authorised by the Company or the Directors.

## PRIVACY

By filling out an Application Form to apply for Shares and Options, you are providing personal information to the Company through the Company's service provider, the Share Registry, which is contracted by the Company to manage Applications. The Company, and the Share Registry on its behalf, collect, hold and use that personal information in order to process your Application, service your needs as a Shareholder, provide facilities and services that you request and carry out appropriate administration.

If you do not provide the information requested in the Application Form, the Company and the Share Registry may not be able to process or accept your Application.

Your personal information may also be used from time to time to inform you about other products and services offered by the Company which it considers may be of interest to you. Please refer to Section 10.17 of this Prospectus for further information regarding Privacy.

## CONSOLIDATION

The Offers are subject to and conditional upon the Shareholders approving the Consolidation at the General Meeting. Please refer to the details of the Shareholder Approvals to be obtained at the General Meeting as set out in Section 2.2 of this Prospectus.

Unless stated otherwise, all references to Securities of the Company as set out in this Prospectus are on the basis that the Consolidation (for which approval is being sought at the General Meeting to be held on 29 January 2016) **has** occurred.

## NO COOLING OFF PERIOD

Applicants have no cooling off rights in relation to Securities for which they apply. This means that an Applicant is not permitted or entitled to withdraw its Application once submitted, other than in certain specified circumstances as detailed in the Corporations Act.

## GLOSSARY

Defined terms and abbreviations used in this Prospectus are detailed in the glossary of terms in Section 12.

## CONTACTS

If you require assistance to complete the Application Form, require additional copies of this Prospectus, or have any questions in relation to the Offers you should contact the Share Registry on +61 (0)8 9315 2333 (from within Australia) or +61 (0) 8 9315 2333 (from outside Australia for Australian residents temporarily overseas), or go to the Company's website at https://www.securitytransfer.com.au/.

If you are uncertain as to whether the Company is a suitable investment for you, you should seek professional advice from your accountant, stockbroker or other professional financial adviser

For personal use only

The following conclusions are drawn:

1 Global real money gaming growth is on a **steady upwards trajectory**.

2 **The US**, despite significant prohibition, remains **by far the largest gaming market in the world**.

3 Global gaming gross win reached **€364.0bn** in 2014 and will continue to grow at a **2.0% CAGR** from **2015 to 2020** to reach **€409.3bn** by the end of the decade.

4 The real money online gaming sector reached **€32.0bn** global gross win in 2014, growing at **8x the rate of its land-based equivalent** over the last 10 years, with no signs of this trend slowing down.

5 **750 million** people play social games worldwide, the majority (**24.5%**) aged over **46+ years**.

6 In the US, there are over **200 million players**, with 50% of social networking users and 34% of internet users playing social games.

7 '**Social casino**' is by far **the most popular form** of social gaming in the world.

8 Global social casino revenues were **€2.64bn** in 2014, and by 2019, will reach **€4.14bn GGR**, at a **CAGR of 7.8%**.

9 The US represents **the largest social casino market in the world**, with **€0.85bn** or **32%** of the global market in 2014.

10 Growth is expected to rise at a **CAGR of 16.0%**, so that by 2019, the US will have **over 50%** of the world's social casino market **(€2.07bn)**.

11 '**Sweepstakes**' are a unique concept and not classed as gaming within the sector because they are **free to enter**.

12 If analysed against the potential value of the US real money online gaming if regulated, the actual market value for the sweepstakes gaming model could be as much as **$12.2bn** today, or **$82bn** over a 5-year period.

13 **Internet Sweepstakes Cafes** have evolved and proliferated across the US over the last 10 years, but are **equally as applicable** across many of the world's Top 30 gaming nations.

14 **Internet Sweepstakes Cafes** are reported to have turned over **$10bn (€9.4bn)** in 2015, with **over 5,000** now operating in **12 states**.

*H2 Copyright*

*No part of this report may be reproduced for any purpose whatsoever without prior permission from H2 Gambling Capital. H2 Gambling Capital owns the interactive gambling industry model that generates the industry values and forecasts referenced herein.*

For personal use only

## SECTION 3: US INTERNET SWEEPSTAKES GAMING

*'Sweepstakes' are a unique concept and not classed as gambling within the sector because they are free to enter.*

*If assessed against the potential value of the US real money online gaming if regulated, the actual market value for the sweepstakes model could be as much as $12.2bn today, or $82bn over a 5-year period.*

*Internet Sweepstakes Cafes provide a land-based example that has evolved and proliferated across the US over the last 10 years, but are equally as applicable across many of the world's Top 30 gaming nations.*

*Internet Sweepstakes Cafes are reported as turning over $10bn (€9.4bn) annually in 2015, with over 5,000 now operating in 12 states.*

### DEFINITION

65 'Sweepstakes' are a particular form of gaming in which all stakes in the game are offered at no charge to the participants, and its associated prizes are divided up amongst its winners. They are a unique concept within the sector as they are not classed legally as gambling or lotteries. They are instead considered a free to enter promotion in which a cash prize is awarded to its participants, even though this is won on the basis of chance, not skill.[6]

66 Sweepstakes are globally used as a form of trade promotion, but they have gained particular traction in the US recently, and are now considered a real market opportunity, as well as an innovative way of combining land-based and online gaming. Under US gambling law, if the sweepstakes participant can play a game for free (i.e. with no paid-in consideration), then it does not matter if the outcome is determined more by chance than skill, prizes can still be won. No-purchase-necessary sweepstakes have been common in the US since at least 1954, when the US Supreme Court ruled that the television game show *Name That Tune* was not a lottery, given contestants at home could enter by sending in a postcard. Sweepstakes do not involve 'consideration' because the player does not pay to enter, rather their entry is supplementary to a related purchase.

67 Over the last 10 years, 'Internet Sweepstakes Cafes' have evolved and proliferated across the US. They operate as internet cafes that offer their customers entrance into a sweepstakes draw upon the purchase of a product, often internet time or telephone call minutes. The participant can find out whether they have won the pre-determined draw by a simple reveal but many choose to do so through a programme that simulates a slot machine or poker game. This may even include an online element, but neither the presentation nor their interaction affects the outcome of the draw.

68 Increasingly sweepstakes gaming has emerged out of these cafes, with consumer products allowing 'free' entrance into games in which cash prizes can be won in return.

### MARKET SIZE – GLOBAL V US

69 There is far less reported data on Internet Sweepstakes Gaming (Internet Sweepstakes Gaming or ISG) than any other form of gaming.

70 Sweepstakes are an established form of trade promotion in many of the more developed international economies, and while the US market has demonstrated the highest rate of adoption of the internet sweepstakes cafe business model, it is equally applicable across the majority of the world's top 30 gaming nations (see Fig 6 earlier).

---

6 *http://www.sweepstakeslaw.com/internet-sweepstakes.html*

For personal use only

## US Potential Activity

71 There is a significant opportunity for Internet Sweepstakes Gaming in the United States market. The size of the market opportunity could be estimated based on the total size of the US online real money gaming market (particularly casino, poker and lottery) if it was fully regulated and licensed across the US, as this, in comparative terms, ultimately represents the market (estimated below in US$) within which the internet sweepstakes cafe model presently operates.

72 Only $2.82bn (or 2.4%) of all US real money gaming was online in 2014. Although this number positions the United States as the 4th largest online gaming market in the world, H2 is confident that it does not represent anywhere near the present potential for onshore regulated online gaming in the US at this time. This is because the 3 states currently legalised (Delaware, Nevada and New Jersey) have all operated under significant open market constraints – including a lack of a critical mass of other states in the market (liquidity); limited acceptance of payment credit cards, and key restrictions on advertising (the lifeline of the online operator).

73 In considering both this and the 'potential' US activity nationwide, H2 believes it is conservative to focus on the 24 states in which land-based gaming is legal and regulated, namely: Nevada, South Dakota, Colorado, New Mexico, Kansas, Oklahoma, Iowa, Missouri, Illinois, Michigan, Indiana, Ohio, West Virginia, Louisiana, Mississippi, Florida, Pennsylvania, New York, Maryland, Delaware, New Jersey, Rhode Island, Massachusetts and Maine.

74 H2's has estimated the size of the market opportunity for Internet Sweepstakes Gaming in the US based on its estimate of the size of the online real money casino and poker gaming market, increasing to $9.3bn gross win within 1 year and reaching $14.4bn within 5 years, with a total of c$60bn over the first 5 years. For lottery, it would result in an additional $2.9bn within year 1, rising to $4.6bn by year 5, with a first 5 year total of c$22bn. H2 estimates a total US online real money gaming market size of $12.2bn today, $19.0bn in 2020 and a total amount of $82bn over the full five year period.

75 As it is difficult, to predict legislative movement at a US Federal level over the next 5 years, it is reasonable to develop a more realistic 'base case' estimate of the market size, somewhere in the realm of about half of the above estimates. H2 estimates this 'base case' could be achieved if just 8-10 key states, including the addition of the four states actively considering online regulation currently (i.e. California, Illinois, New York and Pennsylvania), which would get the estimation to c50% of the potential value. However this would be predicated on all 3 of the above issues being addressed, including the ability to pool liquidity and operate across states but be locally licensed (as is the case currently with US horse race betting).

## US Current Activity

76 In terms of current US market size, the American Gaming Association has estimated that there are presently 5,000 internet sweepstakes cafes operating in 12 states across the US.[7] Internet sweepstakes cafes are estimated to turnover $10bn (€9.4bn) annually in 2015[8].

---

7 *ASA 'Internet sweepstakes cafes: unregulated storefront gambling in the neighborhood' - https://www.americangaming.org/research/white-papers/internet-sweepstakes-cafes and http://www.latimes.com/local/lanow/la-me-ln-sweepstakes-games-20150625-story.html*

8 *ASA 'Internet sweepstakes cafes: unregulated storefront gambling in the neighborhood' - https://www.americangaming.org/rese-arch/white-papers/internet-sweepstakes-cafes and http://www.latimes.com/local/lanow/la-me-ln-sweepstakes-games-20150625-story.html*

For personal use only

## US MARKET OVERVIEW

77 In terms of regulation, US sweepstakes is governed at the federal level by:

- The Deceptive Mail Prevention and Enforcement Act (commonly known as the 'sweepstakes law') which applies to sweepstakes made available and promoted through direct mail. The Act is not relevant to online sweepstakes; and
- The Federal Trade Commission regulates sweepstakes by imposing certain conditions on sweepstakes rules, generally governing the information that must be disclosed to participants. The Commission also protects consumers from prize and sweepstakes scams.

78 Sweepstakes are also subject to regulation at the state level, including those that restrict them in regulated industries, those that require registration with the regulator and those that require certain information to be disclosed to participants. Appendix 2 provides a comprehensive but not exhaustive list of state by state laws currently relating to the offering of sweepstakes for reference purposes.

79 Internet sweepstakes generally specify the jurisdictions in which the draw is valid and a blank statement 'void where prohibited by law' to ensure compliance with the relevant jurisdiction.

80 The developing regulatory approach to Internet Sweepstakes Gaming and Internet Sweepstakes Cafes within the US, and the estimated market size and current level of activity, reflect the considerable commercial need for Sweepstakes Gaming at this time. The Sweepstakes Gaming segment is a source of significant gaming revenue in the US market and it is expected grow strongly with the emergence of Internet Sweepstakes Gaming.

## INTERNATIONAL MARKET OPPORTUNITY

81 Internet Sweepstakes Cafes have evolved and proliferated across the US over the last 10 years.

82 Sweepstakes are widespread trade promotion marketing techniques used across many of the world's Top 30 gaming nations.

83 Internet Sweepstakes Gaming may be equally applicable as a business model, subject to local legal compliance, across major international gaming markets.

For personal use only

## SUMMARY AND CONCLUSIONS

84 We conclude that in all 3 segments: real money gaming; social casino and internet sweepstakes – the US market remains strongly positioned, with considerable further growth over the next 5 years to the end of the decade.

85 We draw the following conclusions:

1 *Global real money gaming growth is on a steady upwards trajectory.*

2 *The US, despite significant prohibition, remains by far the largest gaming market in the world.*

3 *Global gaming gross win reached €364.0bn in 2014 and will continue to grow at a 2.0% CAGR from 2015 to 2020 to reach €409.3bn by the end of the decade.*

4 *The real money online gaming sector reached €32.0bn global gross win in 2014, growing at 8x the rate of its land-based equivalent over the last 10 years, with no signs of this trend slowing down.*

5 *750 million people play social games worldwide, the majority (24.5%) aged over 46+ years.*

6 *In the US, there are over 200 million players, with 50% of social networking users and 34% of internet users playing social games.*

7 *'Social casino' is by far the most popular form of social gaming in the world.*

8 *Global social casino revenues were €2.64bn in 2014, and by 2019, will reach €4.14bn GGR, at a CAGR of 7.8%.*

9 *The US represents the largest social casino market in the world, with €0.85bn or 32% of the global market in 2014.*

10 *Growth is expected to rise at a CAGR of 16.0%, so that by 2019, the US will have over 50% of the world's social casino market (€2.07bn).*

11 *'Sweepstakes' are a unique concept and not classed as gaming within the sector because they are free to enter.*

12 *If analysed against the potential value of the US real money online gaming if regulated, the actual market value for the sweepstakes gaming model could be as much as $12.2bn today, or $82bn over a 5-year period.*

13 *Internet Sweepstakes Cafes have evolved and proliferated across the US over the last 10 years, but are equally as applicable across many of the world's Top 30 gaming nations.*

14 *Internet Sweepstakes Cafes are reported to have turned over $10bn (€9.4bn) in 2015, with over 5,000 now operating in 12 states.*

# EXHIBIT "K"

Synergy Plus Limited
ACN 091 126 082
c/- RSM Bird Cameron
8 St. George Terrace
WA 6000 Australia

27 October 2015 **ASX ANNOUNCEMENT**

# SYNERGY PLUS LIMITED ENTERS AGREEMENT TO ACQUIRE VGW HOLDINGS LIMITED

## HIGHLIGHTS

- Synergy Plus Limited (**Synergy** or the **Company**) has entered into a conditional acquisition agreement with VGW Holdings Limited (**VGW**).
- VGW is an Australian technology and online gaming company that develops and operates international cash-prize contests through its innovative social casino products. It currently operates on the largest social network and leverages the world's leading payment provider platforms.
- VGW operates a sweepstakes social casino, targeting the global casino market, particularly the unrealised United States real-money gaming market.
- VGW had annualised revenue of over $13 million in September 2015, which was derived from paying players in the United States.
- VGW has been in operation for over 4 years and developed and commercialised through total private equity capital raisings of $14.6 million.
- VGW is positioned to take advantage of its large target markets, which are currently subject to low-levels of competition and have significant potential for growth.
- Synergy Plus Limited to raise $5 million, where existing shareholders will have a preference in taking-up the offer under the prospectus.
- VGW will use the proceeds of the capital raising to continue to grow in the United States international expansion, and the development of new products.

## SUMMARY

Synergy is pleased to announce that it has signed a conditional term sheet to acquire 100% of VGW, a technology and online gaming business (the **Transaction**).

VGW develops and operates proprietary technology in real-money gaming, enabling cash-prizes to be paid to international players, particularly those located in the United States, via its social casino games. It operates the sweepstakes social casino: Chumba Casino.

Synergy's acquisition of VGW will include the appointment of VGW founders and executive management to the Synergy board. Synergy proposes to undergo a capital consolidation as a part of the acquisition of VGW and a capital raising of $5 million under a prospectus. Preference of allocation under the prospectus will be given to Synergy shareholders.

VGW will use the proceeds of the capital raising to continue its United States growth, global expansion, and the development of new products.

## ABOUT VGW HOLDINGS LIMITED

VGW is a developer and operator of social casino games with sweepstakes cash prize gameplay, which provides for the payout of cash prize winnings from casino games. Sweepstakes gameplay entails a real-money, online prize gaming alternative for all 50 states of the United States, where online gambling is largely prohibited.

VGW derives a majority of revenues via its wholly owned platform: http://www.chumbacasino.com

VGW's primary marketing channel is via the Facebook social media platform, a globally dominant social and casual gaming platform, and its primary payment platform is Paypal, the world's largest payment provider platform.

VGW's strategy is to:

- continue to deploy sweepstakes gameplay technology in the United States and to expand the offering across other key gaming product lines, including: casino, lottery, poker and sports;
- expand into major Asian, European and Latin American gaming markets;
- pursue strategic acquisitions in the social games and gaming sectors, to accelerate growth by integrating VGW's Sweepstakes Gameplay technology with existing gaming businesses and audiences; and
- leverage the skills and expertise of an experienced and proven executive and leadership team.

The company has been in operation for over 4 years, developed and commercialised through total private equity capital raisings of $14.6 million, has over 8,000 paying customers and is currently operating at an annualised revenue run-rate of over $13 million.

VGW will undertake a scheme of arrangement to implement the Transaction with Synergy.

## THE TRANSACTION

The key terms of the Transaction are as follows:

1. Initial capital raising by Synergy of $300,000 through the placement of Shares with a free attaching option for each new share (**Placement Shares**);
2. Synergy will conduct a 50:1 consolidation of its existing issued capital. This will reduce the issued capital of Synergy to approximately 14,808,157 fully paid ordinary shares (**Shares**);
3. Subject to receiving the consent of third party lenders and creditors, Synergy will issue up to 17,000,000 Shares (post consolidation) at a deemed issue price of $0.05 per Share to payout, or in consideration for the conversion of previously advanced loans and creditors totaling approximately $850,000 (**Conversion Shares**);
4. The issue of 14,000,000 Shares (post consolidation) to Minimum Risk Pty Ltd in consideration for the off-set of outstanding loans made by Minimum Risk Pty Ltd to various subsidiaries of Synergy (**Minimum Risk Shares**). In addition, Minimum Risk will take control of Synergy's 60% owned subsidiary, Airdata Pty Ltd. Minimum Risk Pty Ltd is a company associated with and controlled by Mr Christopher Martino, a director of Synergy;

5. Synergy will acquire VGW via the issue of up to 933,346,204[1] Shares (post-consolidation) at a deemed issue price of $0.05 per Share, 650,000,000 Performance Shares (refer to paragraph 6 below) and 65,662,112 options (exercisable at $0.05 and with an expiry date of 14 August 2017) (**Acquisition Securities**) and agreeing to issuing 9,000,000 options (exercisable at $0.05 and with an expiry date of 15 May 2017) to VGW's Executive Chairman, Mr Nigel Blythe-Tinker. Subject to any necessary approvals that may be required, it is anticipated that the Acquisition Securities will be distributed under schemes of arrangement with existing VGW securityholders. Pursuant to ASX Listing Rules, the Acquisition Securities may attract escrow provisions;

6. Synergy will issue Performance Shares as follows to Lance East Corporation, the founding shareholder of VGW controlled by Mr Laurence Escalante:

| Milestone | No. of Performance Shares (Post Consolidation) | Performance Period |
|---|---|---|
| A$10 million annual audited revenues in VGW | 120,000,000 | 5 years |
| A$20 million annual audited revenues in VGW | 120,000,000 | 5 years |
| A$30 million annual audited revenues in VGW | 120,000,000 | 5 years |
| A$40 million annual audited revenues in VGW | 120,000,000 | 5 years |
| A$50 million annual audited revenues in VGW | 120,000,000 | 5 years |
| A$100 million annual audited revenues in VGW | 50,000,000 | 5 years |

Each Performance Share will convert into one ordinary Share if the relevant Milestone is met within the Performance Period

7. Synergy will assume VGW's Convertible Note liabilities totaling $400,000, and comprising: (a) three convertible notes with a total face value of $250,000 convertible (at the noteholder's discretion) to 12,500,000 shares (post-consolidation) at 2 cents per share; and (b) one convertible note with a face value of $150,000 convertible (at the noteholder's discretion) to up to 2,000,000 shares (post-consolidation), with the final number of shares being dependent upon the value of VGW at time of conversion, unless otherwise converted to equity prior to completion of the Transaction.

8. Synergy will seek to issue 100,000,000 Shares (post-consolidation) at an issue price of $0.05 per Share to raise not less than $5,000,000 under a prospectus (**Capital Raising Shares**). The capital raising has been underwritten by Minimum Risk Pty Ltd, a related party and is subject to shareholder approval.

[1] This number includes 10,833,333 VGW shares still to be issued (unless it is agreed that these shares are otherwise issued on completion of the Transaction). 2,333,333 shares are to be issued to three overseas based VGW contractors in quarterly installments to June 2016 as payment for services; and 8,500,000 shares to be issued to three VGW employees in quarterly installments to June 2016 through non-recourse loan arrangements. The loan is repayable when the shares are sold or if triggered by a liquidity event.

On completion of the Transaction, Synergy proposed to change its name to “VGW Gaming Limited”. Additionally, the current Board of Synergy will be replaced with Messrs Nigel Blythe-Tinker (Executive Chairman), Laurence Escalante (Chief Executive Officer) and a third director at VGW’s discretion (Non-executive Director). Messrs Domenic Martino, Philip Silva and Christopher Martino will resign from the board.

**CONDITIONS PRECEDENT**

Completion of the acquisition of VGW is subject to and conditional upon satisfaction of the following conditions by the dates indicated below (or such other dates as agreed between the parties):

1. Completion of due diligence investigations by Synergy by 15 November 2015;
2. Receipt of consents from lenders and creditors of Synergy to effect the proposed loan restructurings by 30 November 2015;
3. Receipt from ASX of conditional re-listing approval on ASX by 30 November 2015;
4. Receipt of shareholder approval in relation to the underwriting agreement with Minimum Risk Pty Ltd with respect to the Capital Raising Shares before 31 January 2016; and
5. The parties obtaining all relevant approvals, including shareholder approval, court approval, board approval and any third party consents necessary to implement the Transaction by 31 January 2016.

**PUBLIC OFFERING AND RE-ADMISSION**

Synergy will prepare a prospectus to issue the Capital Raising Shares which will give preference to existing shareholders as well as enable third party investors to participate in the public offering. Synergy will then seek to apply for re-admission to the official list of ASX (**Official List**). Whilst the Board is confident that Synergy will satisfy the ASX Listing Rule requirements for re-admission by completing the Transaction, there is no guarantee that ASX will permit Synergy to be re-admitted to the Official List.

**SHAREHOLDER BENEFITS**

Completion of the Transaction will restructure the Company’s issued capital and net asset base, providing working capital, a new board and business direction.

Whilst the current board of Synergy is aware that the Transaction will result in a significant dilution of existing shareholders, the board is of the view that this proposal is the best outcome for shareholders in the current circumstances.

**SHAREHOLDER MEETING**

To implement the Transaction, Synergy will prepare a notice of meeting seeking shareholder approval for, among other things, the acquisition of VGW.

Shareholders will receive a notice of meeting setting out various resolutions and further information relating to the proposed Transaction (**Notice of Meeting**). A detailed explanatory statement will accompany the Notice of Meeting and will be distributed to all shareholders prior to the Meeting.

virtualgamingworlds VGW synergy

## INDICATIVE CAPITAL STRUCTURE

The table below details the Company's current capital structure and its proposed indicative capital structure after the completion of the Transaction:

| Securities | Current | Post-Acquisition |
|---|---|---|
| Shares | 740,407,849 | 1,085,154,361 |
| Options | - | 175,662,112 |
| Performance Shares | - | 650,000,000 |

## UNDERWRITING

Subject to shareholder and regulatory approvals, Minimum Risk Pty Ltd (an entity associated with Mr Christopher Martino) has agreed to underwrite the Company's proposed $5 million capital raising.

A summary of the terms of the Underwriting Agreement is as follows:

- Minimum Risk Pty Ltd fully underwrites the Capital Raising Shares;
- Minimum Risk Pty Ltd may procure sub-underwriters;
- The underwriting fee comprises:
  - an underwriting fee equal to 6% of $5,000,000 (being the amount sought to be raised under the Capital Raising); and
  - the issue of 47,500,000 options (post-consolidation) (exercisable at $0.05 and with an expiry date of 3 years from the date of issue) and 47,500,000 options (post-consolidation) (exercisable at $0.06 and with an expiry date of 3 years from the date of issue). No payment is to be made by Minimum Risk Pty Ltd for the issue of those options.
- Minimum Risk Pty Ltd is to subscribe for any shortfall within 5 business days after it receives the shortfall notice from the Company;
- Various events (such as breach of any representations given by the Company under the Underwriting Agreement, the commencement of litigation against the Company after the date of the Underwriting Agreement, the level of the ASX 300 Index declining by an aggregate amount of 20% in the 20 business days preceding the offer or there is an outbreak of hostilities involving any of Australia, Japan, the United Kingdom, the USA, the People's Republic of China), enable Minimum Risk Pty Ltd to terminate the Underwriting Agreement where the event is likely to have a material adverse effect on the financial position of the Company;
- The obligations of the underwriting only arise if the Company's shareholders approve the terms of the agreement, the prospectus is lodged with ASIC in accordance with an agreed timetable and the underwriter has approved the prospectus (which approval must not be unreasonably withheld).

## INDICATIVE TIMETABLE

The timetable for the acquisition of VGW and the re-listing of the Company on ASX will be advised to shareholders as soon as it is available. Consideration is being given to the requirements of VGW's scheme of arrangement and the December 2015 holiday period.

The board of Synergy will continue to provide shareholders with updates regarding the Transaction.

For and on behalf of the Board

**Leanne Ralph**
Company Secretary

For more information, please contact:

**Synergy Plus Limited**

Leanne Ralph
Company Secretary
+61 2 8263 0515

**VGW Holdings Limited**

Laurence Escalante
Founder & CEO
E: laurence@vgw.co

Nigel Blythe-Tinker
Non-executive Chairman
E: nigel@vgw.co

Rointon Nugara
CFO & Company Secretary
E: rointon.nugara@vgw.co

Tel: +2 8599 2507

# EXHIBIT "L"

THE HONORABLE ROBERT S. LASNIK

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

ADRIENNE BENSON AND MARY SIMONSON, individually and on behalf of all others similarly situated,

*Plaintiffs*,

*v.*

DOUBLE DOWN INTERACTIVE, LLC, a Washington limited liability company, and INTERNATIONAL GAME TECHNOLOGY, a Nevada corporation, and IGT, a Nevada corporation.

*Defendants*.

Case No. 2:18-cv-00525-RSL

**SECOND AMENDED CLASS ACTION COMPLAINT**

**JURY DEMAND**

Plaintiffs Adrienne Benson and Mary Simonson ("Plaintiffs") bring this case, individually and on behalf of all others similarly situated, against Double Down Interactive, LLC ("Double Down") as well as International Game Technology and its subsidiary IGT (together "IGT") (altogether, collectively, "Defendants") to enjoin Defendants' operation of illegal online casino games. Plaintiffs allege as follows upon personal knowledge as to themselves and their own acts and experiences, and upon information and belief, including investigation conducted by their attorneys, as to all other matters.



EDELSON PC
350 N LaSalle Street, 14th Floor, Chicago, IL 60654
Tel: 312 589 6370 • Fax: 312 589 6378

## NATURE OF THE ACTION

1. Defendants own and operate video game development companies in the so-called "casual games" industry—that is, computer games designed to appeal to a mass audience of casual gamers. Defendants (at all relevant times) owned and operated a popular online casino under the name Double Down Casino.

2. Double Down Casino is available to play on Android, and Apple iOS devices, and on Facebook.

3. Defendants provide a bundle of free "chips" to first-time visitors of Double Down Casino that can be used to wager on games within Double Down Casino. After consumers inevitably lose their initial allotment of chips, Defendants attempt to sell them additional chips for real money. Without chips, consumers cannot play the gambling game.

4. Freshly topped off with additional chips, consumers wager to win more chips. The chips won by consumers playing Defendants' games of chance are identical to the chips that Defendants sell. Thus, by wagering chips that have been purchased for real money, consumers have the chance to win additional chips that they would otherwise have to purchase.

5. By operating the Double Down Casino, Defendants have violated Washington law and illegally profited from tens of thousands of consumers. Accordingly, Plaintiffs, on behalf of themselves and a Class of similarly situated individuals, bring this lawsuit to recover their losses, as well as costs and attorneys' fees.

## PARTIES

6. Plaintiff Adrienne Benson is a natural person and a citizen of the state of Washington.

7. Plaintiff Mary Simonson is a natural person and a citizen of the state of Washington.

8. Defendant Double Down Interactive, LLC is a limited liability company organized and existing under the laws of the State of Washington with its principal place of business at 605 Fifth Avenue South, Suite 300, Seattle, Washington 98104. Double Down


EDELSON PC
350 N LaSalle Street, 14th Floor, Chicago, IL 60654
Tel: 312 589 6370 • Fax: 312 589 6378

conducts business throughout this District, Washington State, and the United States.

9. Defendant International Game Technology is a corporation existing and organized under the laws of the State of Nevada with its principal place of business at 6355 South Buffalo Drive, Las Vegas, Nevada 89113. International Game Technology conducts business throughout this District, Washington State, and the United States.

10. Defendant IGT, a subsidiary of International Game Technology, is a corporation existing and organized under the laws of the State of Nevada with its principal place of business at 6355 South Buffalo Drive, Las Vegas, Nevada 89113. IGT conducts business throughout this District, Washington State, and the United States. IGT conducts business throughout this District, Washington State, and the United States.

## JURISDICTION AND VENUE

11. Federal subject-matter jurisdiction exists under 28 U.S.C. § 1332(d)(2) because (a) at least one member of the class is a citizen of a state different from any Defendants, (b) the amount in controversy exceeds $5,000,000, exclusive of interests and costs, and (c) none of the exceptions under that subsection apply to this action.

12. The Court has personal jurisdiction over Defendants because Defendants conduct significant business transactions in this District, and because the wrongful conduct occurred in and emanated from this District.

13. Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the evens giving rise to Plaintiffs' claims occurred in and emanated from this District.

## FACTUAL ALLEGATIONS

### I. Free-to-Play and the New Era of Online Gambling

14. The proliferation of internet-connected mobile devices has led to the growth of what are known in the industry as "free-to-play" videogames. The term is a misnomer. It refers to a model by which the initial download of the game is free, but companies reap huge profits by selling thousands of "in-game" items that start at $0.99 (purchases known as "micro-transactions" or "in-app purchases").


EDELSON PC
350 N LaSalle Street, 14th Floor, Chicago, IL 60654
Tel: 312 589 6370 • Fax: 312 589 6378

15. The in-app purchase model has become particularly attractive to developers of games of chance (*e.g.*, poker, blackjack, and slot machine mobile videogames, amongst others), because it allows them to generate huge profits. In 2017, free-to-play games of chance generated over $3.8 billion in worldwide revenue, and they are expected to grow by ten percent annually.[1] Even "large land-based casino operators are looking at this new space" for "a healthy growth potential."[2]

16. With games of chance that employ the in-game purchase strategy, developers have begun exploiting the same psychological triggers as casino operators. As one respected videogame publication put it:

> "If you hand someone a closed box full of promised goodies, many will happily pay you for the crowbar to crack it open. The tremendous power of small random packs of goodies has long been known to the creators of physical collectible card games and companies that made football stickers a decade ago. For some … the allure of a closed box full of goodies is too powerful to resist. Whatever the worth of the randomised [sic] prizes inside, the offer of a free chest and the option to buy a key will make a small fortune out of these personalities. For those that like to gamble, these crates often offer a small chance of an ultra-rare item."[3]

17. Another stated:

> "Games may influence 'feelings of pleasure and reward,' but this is an addiction to the games themselves; micro-transactions play to a different kind of addiction that has existed long before video games existed, more specifically, an addiction similar to that which you could develop in casinos and betting shops."[4]

18. The comparison to casinos doesn't end there. Just as with casino operators, mobile game developers rely on a small portion of their players to provide the majority of their profits. These "whales," as they're known in casino parlance, account for just "0.15% of players" but provide "over 50% of mobile game revenue."[5]

---

[1] GGRAsia – Social casino games 2017 revenue to rise 7pct plus says report, http://www.ggrasia.com/social-casino-games-2017-revenue-to-rise-7pct-plus-says-report/ (last visited Jul 23, 18)

[2] *Report confirms that social casino games have hit the jackpot with $1.6B in revenue | GamesBeat,* https://venturebeat.com/2012/09/11/report-confirms-that-social-casino-games-have-hit-the-jackpot-with-1-6b-in-revenue/ (last visited Jul. 23, 18)

[3] PC Gamer, *Microtransactions: the good, the bad and the ugly*, http://www.pcgamer.com/microtransactions-the-good-the-bad-and-the-ugly/ (last visited Apr. 5, 2018).

[4] The Badger, *Are micro-transactions ruining video games? | The Badger*, http://thebadgeronline.com/2014/11/micro-transactions-ruining-video-games/ (last visited Apr. 5, 2018).

[5] *Id.* (emphasis added).


EDELSON PC
350 N LaSalle Street, 14th Floor, Chicago, IL 60654
Tel: 312 589 6370 • Fax: 312 589 6378

19. Game Informer, another respected videogame magazine, reported on the rise (and danger) of micro-transactions in mobile games and concluded:

> "[M]any new mobile and social titles target small, susceptible populations for large percentages of their revenue. If ninety-five people all play a [free-to-play] game without spending money, but five people each pour $100 or more in to obtain virtual currency, the designer can break even. These five individuals are what the industry calls whales, and we tend not to be too concerned with how they're being used in the equation. While the scale and potential financial ruin is of a different magnitude, a similar profitability model governs casino gambling."[6]

20. Academics have also studied the socioeconomic effect games that rely on in-app purchases have on consumers. In one study, the authors compiled several sources analyzing so-called free-to-play games of chance (called "casino" games below) and stated that:

> "[Researchers] found that [free-to-play] casino gamers share many similar sociodemographic characteristics (*e.g.*, employment, education, income) with online gamblers. Given these similarities, it is perhaps not surprising that a strong predictor of online gambling is engagement in [free-to-play] casino games. Putting a dark line under these findings, over half (58.3%) of disordered gamblers who were seeking treatment stated that social casino games were their first experiences with gambling."
>
> …
>
> "According to [another study], the purchase of virtual credits or virtual items makes the activity of [free-to-play] casino gaming more similar to gambling. Thus, micro-transactions may be a crucial predictor in the migration to online gambling, as these players have now crossed a line by paying to engage in these activities. Although, [sic] only 1–5% of [free-to-play] casino gamers make micro-transactions, those who purchase virtual credits spend an average of $78. Despite the limited numbers of social casino gamers purchasing virtual credits, revenues from micro-transactions account for 60 % of all [free-to-play] casino gaming revenue. Thus, a significant amount of revenue is based on players' desire to purchase virtual credits above and beyond what is provided to the player in seed credits."[7]

21. The same authors looked at the link between playing free-to-play games of chance and gambling in casinos. They stated that "prior research indicated that winning large sums of virtual credits on social casino gaming sites was a key reason for [consumers'] migration to

---

[6] Game Informer, *How Microtransactions Are Bad For Gaming - Features - www.GameInformer.com*, http://www.gameinformer.com/b/features/archive/2012/09/12/how-microtransactions-are-bad-for-gaming.aspx?CommentPosted=true&PageIndex=3 (last visited Apr. 5, 2018)

[7] Hyoun S. Kim, Michael J. A. Wohl, *et al.*, *Do Social Casino Gamers Migrate to Online Gambling? An Assessment of Migration Rate and Potential Predictors*, Journal of gambling studies / co-sponsored by the National Council on Problem Gambling and Institute for the Study of Gambling and Commercial Gaming (Nov. 14, 2014), *available at* http://link.springer.com/content/pdf/10.1007%2Fs10899-014-9511-0.pdf (citations omitted).


EDELSON PC
350 N LaSalle Street, 14th Floor, Chicago, IL 60654
Tel: 312 589 6370 • Fax: 312 589 6378

online gambling," yet the largest predictor that a consumer will transition to online gambling was "micro-transaction engagement." In fact, "the odds of migration to online gambling were approximately *eight times greater* among people who made micro-transactions on [free-to-play] casino games compared to [free-to-play] casino gamers who did not make micro-transactions."[8]

22. The similarity between micro-transaction games of chance and games of chance found in casinos has caused governments across the world to intervene to limit their availability.[9] Unfortunately, such games have eluded regulation in the United States. As a result, and as described below, Defendants' online casino games have thrived and thousands of consumers have spent millions of dollars unwittingly playing Defendants' unlawful games of chance.

## II. A Brief Introduction to Double Down and IGT

23. Double Down is a leading game developer with an extensive library of free-to-play online casino games. Double Down sells in-app chips to consumers in the Double Down Casino so that consumers can play various online casino games in Double Down Casino.

24. IGT is a global leader in the gaming industry with long ties to the traditional casino market. It has developed a multitude of casino and lottery games, including traditional slot machines and video lottery terminals. In 2012, IGT acquired Double Down and its library of online casino games, and has since "grown into one of the largest and most successful brands in the North American social casino market."[10]

25. In 2017, IGT sold Double Down for $825 million to DoubleU Games.[11] In addition to the sale, IGT has also entered into a long-term game development and distribution

---

[8] *Id.* (emphasis added).

[9] In late August 2014, South Korea began regulating "social gambling" games, including games similar to Defendants', by "ban[ning] all financial transactions directed" to the games. PokerNews.com, *Korea Shuts Down All Facebook Games In Attempt To Regulate Social Gambling | PokerNews*, https://www.pokernews.com/news/2014/09/korea-shuts-down-facebook-games-19204 htm (last visited Apr. 5, 2018). Similarly, "the Maltese Lotteries and Gambling Authority (LGA) invited the national Parliament to regulate all digital games with prizes by the end of 2014." *Id.*

[10] *IGT To Sell Online Casino Unit DoubleDown To South Korean Firm For $825 Million - Poker News,* https://www.cardplayer.com/poker-news/21554-igt-to-sell-online-casino-unit-doubledown-to-south-korean-firm-for-825-million (last visited Ap. 6, 2018).

[11] *Id.*


EDELSON PC
350 N LaSalle Street, 14th Floor, Chicago, IL 60654
Tel: 312 589 6370 • Fax: 312 589 6378

# EXHIBIT "M"

The Honorable Tiffany M. Cartwright

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| RICK LARSEN, individually and on behalf of all others similarly situated,<br><br>*Plaintiff*,<br><br>*v.*<br><br>PTT, LLC (d/b/a HIGH 5 GAMES, LLC), a Delaware limited liability company, and HIGH 5 ENTERTAINMENT, LLC, a New Jersey limited liability company,<br><br>*Defendants*. | Case No. 18-cv-05275-TMC<br><br>**THIRD AMENDED COMPLAINT—CLASS ACTION**<br><br>**JURY DEMAND** |

Plaintiff Rick Larsen brings this case, individually and on behalf of all others similarly situated, against Defendants PTT, LLC, d/b/a High 5 Games, LLC ("High 5 Games") and High 5 Entertainment, LLC ("High 5 Entertainment") (collectively "High 5" or "Defendants") to enjoin their operation of illegal online casino games. Plaintiff alleges as follows upon personal knowledge as to himself and his own acts and experiences, and upon information and belief, including investigation conducted by his attorneys, as to all other matters.

## NATURE OF THE ACTION



EDELSON PC
150 California Street, 18th Floor, San Francisco, CA 94111
Tel: 415.212.9300 • Fax: 415.373.9435

> games and companies that made football stickers a decade ago. For some … the allure of a closed box full of goodies is too powerful to resist. Whatever the worth of the randomised [sic] prizes inside, the offer of a free chest and the option to buy a key will make a small fortune out of these personalities. For those that like to gamble, these crates often offer a small chance of an ultra-rare item."[3]

15. Another stated:

> "Games may influence 'feelings of pleasure and reward,' but this is an addiction to the games themselves; micro-transactions play to a different kind of addiction that has existed long before video games existed, more specifically, an addiction similar to that which you could develop in casinos and betting shops."[4]

16. The comparison to casinos doesn't end there. Just as with casino operators, mobile game developers rely on a small portion of their players to provide the majority of their profits. These "whales," as they're known in casino parlance, account for just "0.15% of players" but provide "over 50% of mobile game revenue."[5]

17. Game Informer, another respected videogame magazine, reported on the rise (and danger) of micro-transactions in mobile games and concluded:

> "[M]any new mobile and social titles target small, susceptible populations for large percentages of their revenue. If ninety-five people all play a [free-to-play] game without spending money, but five people each pour $100 or more in to obtain virtual currency, the designer can break even. These five individuals are what the industry calls whales, and we tend not to be too concerned with how they're being used in the equation. While the scale and potential financial ruin is of a different magnitude, a similar profitability model governs casino gambling."[6]

18. Academics have also studied the socioeconomic effect games that rely on in-app purchases have on consumers. In one study, the authors compiled several sources analyzing so-called free-to-play games of chance (called "casino" games below), and stated that:

> "[Researchers] found that [free-to-play] casino gamers share many similar sociodemographic characteristics (*e.g.*, employment, education, income) with online gamblers. Given these similarities, it is perhaps not surprising that a strong predictor of online gambling is engagement in [free-to-play] casino games. Putting a dark line under these findings, over half (58.3%) of disordered gamblers who

---

[3] PC Gamer, *Microtransactions: the good, the bad and the ugly*, http://www.pcgamer.com/microtransactions-the-good-the-bad-and-the-ugly/ (last visited Apr. 5, 2018).

[4] The Badger, *Are micro-transactions ruining video games? | The Badger*, http://thebadgeronline.com/2014/11/micro-transactions-ruining-video-games/ (last visited Apr. 5, 2018)..

[5] *Id.* (emphasis added).

[6] Game Informer, *How Microtransactions Are Bad For Gaming - Features - www.GameInformer.com*, http://www.gameinformer.com/b/features/archive/2012/09/12/how-microtransactions-are-bad-for-gaming.aspx?CommentPosted=true&PageIndex=3 (last visited April 5, 2018)


EDELSON PC
150 California Street, 18th Floor, San Francisco, CA 94111
Tel: 415.212.9300 • Fax: 415.373.9435

were seeking treatment stated that social casino games were their first experiences with gambling."

…

"According to [another study], the purchase of virtual credits or virtual items makes the activity of [free-to-play] casino gaming more similar to gambling. Thus, micro-transactions may be a crucial predictor in the migration to online gambling, as these players have now crossed a line by paying to engage in these activities. Although, [sic] only 1–5% of [free-to-play] casino gamers make micro-transactions, those who purchase virtual credits spend an average of $78. Despite the limited numbers of social casino gamers purchasing virtual credits, revenues from micro-transactions account for 60 % of all [free-to-play] casino gaming revenue. Thus, a significant amount of revenue is based on players' desire to purchase virtual credits above and beyond what is provided to the player in seed credits."[7]

19. The same authors looked at the link between playing free-to-play games of chance and gambling in casinos. They stated that "prior research indicated that winning large sums of virtual credits on social casino gaming sites was a key reason for [consumers'] migration to online gambling," yet the largest predictor that a consumer will transition to online gambling was "micro-transaction engagement." In fact, "the odds of migration to online gambling were approximately *eight times greater* among people who made micro-transactions on [free-to-play] casino games compared to [free-to-play] casino gamers who did not make micro-transactions."[8]

20. The similarity between micro-transaction games of chance and games of chance found in casinos has caused governments across the world to intervene to limit their availability.[9] Unfortunately, such games have eluded regulation in the United States. As a result, and as described below, Defendants have thrived, and thousands of consumers have spent millions of dollars unwittingly playing Defendants' unlawful games of chance.

---

[7] Hyoun S. Kim, Michael J. A. Wohl, *et al.*, *Do Social Casino Gamers Migrate to Online Gambling? An Assessment of Migration Rate and Potential Predictors*, Journal of gambling studies / co-sponsored by the National Council on Problem Gambling and Institute for the Study of Gambling and Commercial Gaming (Nov. 14, 2014), *available at* http://link.springer.com/content/pdf/10.1007%2Fs10899-014-9511-0.pdf (citations omitted).

[8] *Id.* (emphasis added).

[9] In late August 2014, South Korea began regulating "social gambling" games, including games similar to Defendants', by "ban[ning] all financial transactions directed" to the games. PokerNews.com, *Korea Shuts Down All Facebook Games In Attempt To Regulate Social Gambling | PokerNews*, https://www.pokernews.com/news/2014/09/korea-shuts-down-facebook-games-19204.htm (last visited Apr. 5, 2018). Similarly, "the Maltese Lotteries and Gambling Authority (LGA) invited the national Parliament to regulate all digital games with prizes by the end of 2014." *Id.*

## II. A Brief Introduction to High 5

21. Founded in 1985, High 5 Games has been a leading developer of land-based casino games, including video slot machines. High 5 Games gained popularity in 2008 with the release of its best performing slot machine in the company's history: Da Vinci Diamonds. High 5 Games continued to rise in prominence in the casino game industry with the release of the "mega hit" Golden Goddess and Black Widow video slot machine games.

22. Indeed, High 5 Games expanded its casino game operation into the "casual game" industry by launching a multitude of online slot machine games on Apple's iOS, Android, and Facebook.

23. High 5 Games transferred ownership and operation of its online slot machine games to its subsidiary, High 5 Entertainment, in October 2022. High 5 Games executed the transfer after a damages class was certified in this lawsuit comprised of all individuals in Washington who purchased virtual casino chips in either High 5 Casino or High 5 Vegas after April 9, 2014. High 5 Games retained the liability for this lawsuit.

24. Acies Investments, LLC invested $3 million of capital into the new entity, High 5 Entertainment, for the purpose of creating an online sweepstakes business. The $3 million investment was not related to the value of the social casino business.

25. High 5 Entertainment receives all revenues from the social casino business. High 5 Entertainment has significantly more revenue than High 5 Games and significantly more cash on hand.

26. High 5 Games retained the technical platform on which the social casinos run. High 5 Entertainment does not help maintain the technical platform.

27. The High 5 Entertainment board consists of Anthony Singer and Lisa Husniye Singer. Lisa Husniye Singer is Anthony Singer's wife and an employee of High 5 Games. She is not an employee of High 5 Entertainment. She is involved in the day-to-day operations of High 5 Entertainment, making decisions on matters such as promotions to customers and approving contracts with third-party advertisers.


EDELSON PC
150 California Street, 18th Floor, San Francisco, CA 94111
Tel: 415.212.9300 • Fax: 415.373.9435

**Doc. 629**

**Judgment In a Civil Case**

**Larsen v. PTT, LLC**

**(Case No. 3:18-cv-05275-TMC)**

# UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON
AT TACOMA

RICK LARSEN, individually and on behalf of all others similarly situated

Plaintiff,

v.

PTT, LLC, doing business as High 5 Games, LLC

Defendant

**JUDGMENT IN A CIVIL CASE**

Case Number 3:18-cv-05275-TMC

☒ **Jury Verdict**. This action came before the Court for a trial by jury. The issues have been tried and the jury has rendered its verdict.

☐ **Decision by Court**. This action came to consideration before the Court. The issues have been considered and a decision has been rendered.

THE COURT HAS ORDERED THAT

Pursuant to Federal Rule of Civil Procedure 54(b), the Court enters final judgment on the following claims only:

For Plaintiff's claims against Defendant PTT, LLC (d/b/a High 5 Games, LLC) under the Recovery of Money Lost at Gambling Act, RCW 4.24.070, and the Washington Consumer Protection Act, RCW 19.86.090, the Court enters judgment in favor of Plaintiff Rick Larsen and against Defendant PTT, LLC in the amount of $11,653.98; and in favor of the Damages Class and against Defendant PTT, LLC in the amount of $24,928,712.17.

Dated June 11, 2025.

Ravi Subramanian
Clerk of Court

*/s/Courtroom Deputy*
Deputy Clerk

# EXHIBIT "N"

**TABLE – DESCRIPTION OF CLAUSES IN TERMS OF SERVICE [and CONDITIONS] WHERE VGW LUCKYLAND (LUCKYLAND SLOTS), VGW MALTA (CHUMBA CASINO) AND VGW GP (GLOBAL POKER) RESERVE RIGHTS – CAN EXERCISE SOLE DISCRETION**

| Description of Clause in Terms of Service or Terms and Conditions<br><br>And<br><br>Statement of Clause | Location in Luckyland Terms of Service (April 3, 2024) (Doc. 9-1, Exh. A, pp. 11-33)<br><br>Chumba Casino Terms and Conditions (March 11, 2024) (Doc. 9-1, Exh. C, pp. 38-56)<br><br>Chumba Casino Terms and Conditions (June 14, 2024) (Doc. 9-1, Exh. D, pp. 57-75)<br><br>Global Poker Terms and Conditions (March 11, 2024) (Doc. 9-1, Exh. F, pp. 77-92)<br><br>Global Poker Terms and Conditions (June 14, 2024) (Doc. 9-1, Exh. H, pp. 94-110)<br><br>CLAUSE |
|---|---|
| Add or remove games and amend terms and conditions<br><br>**Game** means any one or more Game(s) available on the Platform in either Standard Play or Promotional Play. We reserve the right to add and/or remove Games from the Platform (including limiting their availability in certain jurisdictions) at our sole discretion for any reason. | 1 |
| No liability for unauthorized use of customer's account<br><br>You are solely responsible for maintaining the confidentiality of your password and you will be held responsible for all uses of your Customer Account, including any purchases made under the Customer Account, whether those purchases were authorised by you or not. | 5.8 |
| No liability for unauthorized access to customer's account<br><br>You are solely responsible for anything that happens through your Customer Account, whether or not you undertook those actions. You acknowledge that your Customer Account may be terminated if someone else uses it and engages in any activity that breaches these Terms of Service [and Conditions] or is otherwise illegal. | 5.9 |
| Upon closing account – operator keeps funds in account | 5.13 |

| | |
|---|---|
| If you wish to close your Customer Account you may do so at any time by selecting the “Contact Us” link on the Platform and filling in the form ‘’Close Customer Account’ or by emailing support@luckylandslots.com. Closing your Customer Account will forfeit all continued access to and right to use, enjoy or benefit from any Gold Coins, Sweeps Coins and unredeemed Prizes associated with your Customer Account. | |
| Limit or close accounts – sole discretion<br><br>We reserve the right to place limits on, suspend, close, or refuse to open a Customer Account in our sole discretion. If we close your Customer Account pursuant to clause 21.1 of these Terms of Service [and Conditions], the consequences set out in clause 21 shall apply. If we close your Customer Account for other reasons, we will make reasonable efforts to enable you to redeem any Prizes in your Customer Account, but any licence to continued use, enjoyment or benefit of or from the Gold Coins and Sweeps Coins will be terminated. | 5.16 |
| No refunds of purchases – 30 day statute of limitations for billing problems or discrepancies<br><br>**No Refunds**. Purchases of Gold Coins are final and are not refundable, transferable or exchangeable. You agree to notify us about any billing problems or discrepancies within 30 days from the date of your purchase. If you do not bring them to our attention within 30 days, you agree that you waive your right to dispute such problems or discrepancies. You are responsible for and agree to reimburse us for all reversals, charge-backs, claims, fees, fines, penalties and any other liability incurred by us (including costs and related expenses) that were caused by or arising out of payments that you authorized or accepted or that were authorized or accepted using your Customer Account (even if not authorized by you). | 6.6 |
| Power to offset account and suspend account if purchases are returned or charged back<br><br>If you are found to have one or more of your purchases returned or reversed or charged back, your Customer Account will be suspended. If this occurs, the amount of such purchases will constitute a debt owed by you to us and you must immediately remit payment for such purchases through an alternative payment method. Until payment is received by us or our Payment Administration Agent, any purchases and winnings will be deemed void and requests to redeem Sweeps Coins for Prizes will not be allowed. | 6.12 |
| Reset the minimum wager requirements<br><br>we may, in our sole discretion, require that any Sweeps Coins allocated to you be played a greater number of times (not exceeding 20) in any combination of Promotional Play Games before it is able to be redeemed as a Prize. | 6.13(b) |
| Declare a game void – sole discretion<br><br>We reserve the right to declare Participation in a Game void, partially or in full, if, in our sole discretion, we deem it obvious that there was an error, mistake, misprint or technical error on the pay-table, win-table, minimum or maximum stakes, odds or software. | 6.14 |
| Additional Terms and Conditions – amendments<br><br>All promotions, including Games played in Promotional Play, contests, special offers and bonuses are subject to these Terms of Service [and Conditions], the Sweeps Rules and to additional terms that may be published at the time of the promotion. | 7.1 |

| | |
|---|---|
| **Reserve right to withdraw or modify promotions without notice**<br><br>VGW Group reserves the right, at its sole discretion, to withdraw or modify such promotions (including their availability) without prior notice to you. | 7.3 |
| **Deny or cancel award of prizes / money – sole discretion**<br><br>If, in the reasonable opinion of VGW Group, we form the view that a Registered Customer is abusing any promotion to derive any advantage or gain for themselves or other Registered Customers, including by way of Fraudulent Conduct, we may, at our sole discretion, withhold, deny or cancel any advantage, bonus or Prize as we see fit. | 7.4 |
| **Royalty-free license to use content published by customer**<br><br>Without limiting clause 12.4, you confirm that you grant VGW Group an irrevocable, perpetual, worldwide, non- exclusive, royalty-free licence to use in whatever way we see fit, and without further acknowledgement of you as the author, any Content you post or publish as part of a promotion, contest or competition. | 7.5 |
| **Can require same payment method for redemption of Prizes, or specific payment method – own discretion**<br><br>When you choose to redeem Prizes for cash, the cash payment will be made to the Payment Medium from which you purchased Gold Coins, or if this is not technically possible, then to an alternative financial account you nominate, provided that account is legally and beneficially owned by you. We reserve the right to require the use of the same payment method for redemption of Prizes as was used to purchase Gold Coins, or a specific payment method at our own discretion. | 8.1(b) |
| **Right to charge fees for processing redemptions – payment of prizes / money and to charge minimum of SC50 (SC100 for Chumba Casino)**<br><br>We reserve the right to charge fees for processing the redemption of Prizes to you and to set a minimum redemption threshold of SC50 [SC 100] [for Prize redemptions]. | 8.2 |
| **Reserve right to limit prize redemption to $10,000 per day**<br><br>We reserve the right, in our sole discretion, to limit the value of your Prize redemptions to<br><br>(a) US$10,000 per day;<br><br>(b) any other amount over any time that we consider necessary to satisfy our regulatory obligations or the requirements of our partners and suppliers. | 8.4 |
| **Withhold payment – set verification requirements – sole discretion** | 8.9 (a) |

| | |
|---|---|
| Prizes redeemed for cash:<br><br>(a) will be paid into a joint account or joint wallet provided that one of the names on the joint account or joint wallet matches the name you provided when registering your Customer Account or your verified name and all verification checks we require in relation to you and the other account holder are completed to our satisfaction. For the avoidance of doubt, if either joint account holder does not satisfy our verification requirements, as determined solely at our discretion, we will not make payments into the nominated joint account; [nominated bank account] | |
| Not required to reissue payments made where mistake in description of account<br><br>Where you are required to provide the details of your financial institution, bank account or online wallet, you agree that you are solely responsible for the accuracy of those details. You further agree that, where you have chosen to redeem a Prize for cash and the details you have provided are not accurate, and we have processed the payment using the details you have provided, the redemption of that Prize is complete and we cannot and are not required to reverse or reissue the payment | 8.10 |
| Can void or refuse to make payments to alternative bank accounts if not confirmed in 60 days – discretion<br><br>if you are unable to nominate an alternative bank account which meets the requirements set out in these Terms of Service [and Conditions] within 60 days of a request from us to do so, VGW Group is not obliged to make the relevant payments to you and may in its discretion deem the Prizes to be void. | 8.11(c) |
| Appoint Payment Administrator / Agent – sole discretion<br><br>You acknowledge and agree that we may in our sole discretion, from time to time, appoint one or more Payment Administration Agents to accept or make payments (including merchant facilities) from or to Players on our behalf. | 8.20 |
| Limit Liability – Payment Administrator<br><br>A Payment Administration Agent will have the same rights, powers and privileges that we have under these Terms of Service [and Conditions] and will be entitled to exercise or enforce their rights, powers and privileges as our agent or in their own name. In no event will we be liable to any Player for any loss, damage or liability resulting from the Payment Administration Agent's negligence or acts beyond the authority given by VGW Group. | 8.21 |
| Sweeps Coins in account valid for 60 days or expire<br><br>Sweeps Coins are only valid for 60 days from the date you last logged on to your Customer Account and will thereafter automatically expire. | 8.22 |
| Sweeps Coins forfeited if Customer Account closed for any reason – our discretion<br><br>Sweeps Coins may be forfeited if a Customer Account is closed for any reason, or at our discretion. | 8.23 |
| Suspend account pending investigation | 8.25 |

| | |
|---|---|
| If you choose to redeem Prizes for cash but refuse to accept payments made to your nominated bank account by VGW Group, you must refuse the amount in its entirety. Where you refuse to accept payment to your nominated bank account more than twice in any 3 month period, VGW Group reserves the right to suspend your Customer Account to undertake investigations to ensure that the Platform is not being used as a vehicle for fraudulent activity | |
| Offset for mistake in making payments<br><br>If at any time we mistakenly add Gold Coins or Sweeps Coins to your Customer Account that do not belong to you, whether due to a technical error, human error or otherwise, the Gold Coins or Sweeps Coins added by mistake will remain VGW Group property and will be deducted from your Customer Account. If you become aware that you have mistakenly received a prize redemption that does not belong to you prior to us becoming aware of the error, the mistakenly paid amount will (without prejudice to other remedies and actions that may be available at law) constitute a debt owed by you to us. In the event you discover an incorrect addition of Gold Coins or Sweeps Coins, you are obliged to notify Customer Support by using the “Contact” link on the Platform without delay. | 8.26 |
| May restrict, suspend, or close Customer Account in any matter – we deem reasonably appropriate – pending verification<br><br>Until all required verification checks are completed to our satisfaction:<br><br>(a) any request you have made for redemption of Prizes will remain pending;<br><br>and<br><br>(b) we are entitled to restrict your Customer Account in any manner that we may reasonably deem appropriate, including by suspending or closing your Customer Account. | 9.2 |
| If customer doesn’t provide document in form that Operator requires – after 30 days – may restrict or close account – sole discretion<br><br>Where any identification, credit or other verification check we require cannot be completed to our satisfaction because you have not provided any document we request from you in the form that we require within 30 days of the date the document was first requested, then we are under no obligation to continue with the verification check and may in our sole discretion, close or otherwise restrict your Customer Account in any manner that we may reasonably deem appropriate | 9.4 |
| If Operator or VGW suspect improper activity or conduct violating Terms of Service – Customer Account suspended or closed – no obligation to return purchases or pay winnings.<br><br>If VGW Group suspects that you may be engaging in, or have engaged in fraudulent, unlawful or improper activity, including money laundering activities or any conduct which violates these Terms of Service [and Conditions], your access to the Platform will be suspended immediately and your Customer Account may be closed. If your Customer Account is suspended or closed under such circumstances, VGW Group is under no obligation to reverse any Gold Coin purchases you have made or to redeem any Sweeps Coins or Prizes that may be in your Customer Account. In addition, VGW Group may pass any necessary information on to the relevant authorities, other online service providers, banks, credit card companies, electronic payment providers or other | 11.3 |

| | |
|---|---|
| financial institutions. You will cooperate fully with any VGW Group investigation into such activity. | |
| License to use customer information, images, comments uploaded to Operator website<br><br>You grant us, and represent and warrant that you have the right to grant us, an irrevocable, perpetual, worldwide, non- exclusive, royalty-free licence to use in whatever way we see fit, any information, images, videos, comments, messages, music or profiles you publish or upload to any website or social media page controlled and operated by VGW Group. | 12.4 |
| Limitation of liability without limitation delays or data corruption on Platform<br><br>VGW Group accepts no liability for any damages or losses which are deemed or alleged to have arisen out of or in connection with any Platform or its Content including, without limitation, delays or interruptions in operation or transmission, loss or corruption of data, communication or lines failure, any person's misuse of a Platform or its Content for any errors or omissions in Content. | 14.3 |
| Suspend or modify content to the platform – sole discretions – without notice – no liability for losses<br><br>VGW Group reserves the right to suspend, modify, remove or add Content (including its availability) to the Platform at its sole discretion with immediate effect and without notice to you. We will not be liable to you for any loss suffered as a result of any changes made or for any modification to, or suspension, unavailability, or discontinuance of the Platform (including any Game, promotion, challenge or Content thereon) and you will have no claims against VGW Group in such regard. | 14.7 |
| May temporarily suspend whole or part of any Platform for any reason at sole discretion<br><br>We may temporarily suspend the whole or any part of the Platform for any reason at our sole discretion. We may, but will not be obliged to, give you as much notice as is reasonably practicable of such suspension. We will restore the Platform, as soon as is reasonably practicable, after such temporary suspension. | 14.8 |
| No liability if damage arises out of Live Chat service<br><br>We will not be liable if damage arises out of the Live Chat service. | 19.12 |
| Close customer accounts- sole discretion – if reason to believe conditions (a) through (q)<br><br>Without limiting clause 5.16, we reserve the right, at our sole discretion, to suspend or close your Customer Account (notwithstanding any other provision contained in these Terms of Service) [and Conditions] where we have reason to believe that you have engaged or are likely to engage in any of the following activities:<br><br>(a) you breached, or assisted another party to breach, any provision of these Terms of Service [and Conditions] or the Sweeps Rules, or we have a reasonable ground to suspect such breach;<br><br>(b) you have more than one Customer Account, including any Inactive Account, on any Platform;<br><br>(c) the name registered on your Customer Account does not match the name on (i) your Payment Medium used to make purchases of Gold Coins or (ii) the account into which | 21.1 |

| | |
|---|---|
| you elect to redeem Prizes or you do not legally and beneficially own such Payment Medium or redemption account;<br><br>(d) your communication with us consists of harassment or offensive behaviour, including (but not limited to) threatening, derogatory, abusive or defamatory statements, or racist, sexually explicit, pornographic, obscene or offensive language;<br><br>(e) your Customer Account is deemed to be an Inactive Account;<br><br>(f) you become bankrupt;<br><br>(g) you provide incorrect or misleading information;<br><br>(h) your identity or source of wealth or source of funds (if requested) cannot be verified;<br><br>(i) you attempt to use your Customer Account through a VPN, proxy or similar service that masks or manipulates the identification of your real location, or by otherwise providing false or misleading information regarding your citizenship, location or place of residence, or by playing Games using the Platform through a third party or on behalf of a third party;<br><br>(j) you are not over 18 years of age or such higher minimum legal age of majority as stipulated in the jurisdiction of your residence;<br><br>(k) you are located in a jurisdiction:<br><br>i. where Participation is illegal; or<br><br>ii. where you are ineligible to Participate in Promotional Play in accordance with the Sweeps Rules.<br><br>(l) you have allowed or permitted (whether intentionally or unintentionally) someone else to Participate using your Customer Account;<br><br>(m) you have played in tandem with other Player(s) as part of a club, group, etc., or played the Games in a coordinated manner with other Player(s) involving the same (or materially the same) selections;<br><br>(n) without limiting clause 6.12, where VGW Group has received a charge back, claim or dispute and/or a return notification via your Payment Medium;<br><br>(o) you have failed our due diligence procedures, or are found to be colluding, cheating, money laundering or undertaking any kind of fraudulent activity;<br><br>(p) it is determined by VGW Group that you have employed or made use of a system (including machines, computers, software or other automated systems such as bots) which give you an unfair advantage; or<br><br>(q) you do not meet the criteria set out in our Customer Acceptance Policy. | |
| **Liability and Indemnification by customer if account closed under 20.1 – No remedies to customer**<br><br>If VGW Group suspends or closes your Customer Account for any of the reasons referred to in clause 21.1 above, you will be liable for any and all claims, losses, liabilities, damages, costs and expenses incurred or suffered by VGW Group (together "Claims") arising therefrom and you will indemnify and hold VGW Group harmless on demand for such Claims. | 21.2 |
| **Withhold funds in customer accounts**<br><br>If we have reasonable grounds to believe that you have participated in any of the activities set out in clause 21.1 above then we reserve the right to withhold all or part of the balance or recover from your Customer Account any Prizes, Gold Coins or Sweeps Coins that are attributable to any of the activities contemplated in clause 21.1. In such circumstances, your details may be passed on to any applicable regulatory authority, regulatory body or any other relevant external third parties. | 21.3 |

| | |
|---|---|
| Hold Harmless / Indemnification required of customer (a) through (e)<br><br>YOU AGREE TO INDEMNIFY AND HOLD HARMLESS US AND OUR AFFILIATES, AND OUR RESPECTIVE PARTNERS, DIRECTORS, OFFICERS, EMPLOYEES, SHAREHOLDERS, SUBCONTRACTORS, LICENSORS, SUPPLIERS AND AGENTS AGAINST ANY AND ALL COSTS, EXPENSES, LIABILITIES AND DAMAGES (WHETHER DIRECT, INDIRECT, SPECIAL, CONSEQUENTIAL, EXEMPLARY OR PUNITIVE OR OTHER) ARISING FROM ANY PARTICIPATION BY YOU, INCLUDING WITHOUT LIMITATION:<br><br>(a) ACCESSING OR USING THE PLATFORM;<br><br>(b) RE-USE OF ANY CONTENT AT, OR OBTAINED FROM, THE PLATFORM OR ANY OTHER SOURCE WHATSOEVER;<br><br>(c) FACILITATING OR MAKING A PAYMENT INTO YOUR CUSTOMER ACCOUNT;<br><br>(d) PLAYING THE GAMES THROUGH ANY DELIVERY MECHANISM OFFERED; AND<br><br>(e) ACCEPTANCE AND USE OF ANY PRIZE. | 22.1 |
| Limit liability of damages to 30 day's worth of wagers – private statute of limitations - (includes officers, directors, employees, shareholders, agents, licensors, subcontractors, or suppliers)<br><br>TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, UNDER NO CIRCUMSTANCES WILL WE, OUR AFFILIATES, AND OUR RESPECTIVE PARTNERS, OFFICERS, DIRECTORS, EMPLOYEES, SHAREHOLDERS, AGENTS, LICENSORS, SUBCONTRACTORS OR SUPPLIERS, BE LIABLE TO YOU FOR MORE THAN THEAMOUNT YOU HAVE PAID US IN THE THIRTY (30) DAYS IMMEDIATELY PRECEDING THE DATE ON WHICH YOU FIRST ASSERT ANY SUCH CLAIM. YOU ACKNOWLEDGE AND AGREE THAT IF YOU HAVE NOT PAID US ANY AMOUNTS IN THE THIRTY (30) DAYS IMMEDIATELY PRECEDING THE DATE ON WHICH YOU FIRST ASSERT ANY SUCH CLAIM, YOUR SOLE AND EXCLUSIVE REMEDY FOR ANY DISPUTE WITH US IS TO STOP USING THE PLATFORM AND TO CLOSE YOUR CUSTOMER ACCOUNT. | 22.3 |
| No obligations to pay interest on outstanding prizes – no corresponding right for customer<br><br>You will not receive any interest on outstanding Prizes and you will not treat VGW Group as a financial institution. | 23.1 |
| Power to unilaterally assign rights under agreement granted to Operator<br><br>These Terms of Service [and Conditions] are personal to you, and are not assignable, transferable or sub-licensable by you except with our prior written consent. We reserve the right to assign, transfer or delegate any of our rights and obligations hereunder to any third party without notice to you. | 25.11 |
| | |

| | |
|---|---|
| Total No. of Clauses 40<br>Subparts to clause 20.1 (16-17)<br>Subparts to clause 21 (4-5) | Total: cc. 60 |